158

SOUTHERN BURLINGTON COUNTY N.A.A.C.P., CAMDEN COUNTY C.O.R.E., CAMDEN COUNTY N.A.A.C.P., ETHEL LAWRENCE, THOMASINE LAWRENCE, CATHERINE STILL, MARY E. SMITH, SHIRLEY MORRIS, JACQUELINE CURTIS, GLADYS CLARK, BETTY WEAL AND ANGEL PEREZ, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS, AND DAVIS ENTERPRISES, PLAINTIFF-INTERVENOR AND CROSS-RESPONDENT, v. TOWNSHIP OF MOUNT LAUREL, DEFENDANT-RESPONDENT AND CROSS-APPELLANT (A–35/36).

SOUTHERN BURLINGTON COUNTY N.A.A.C.P., CAMDEN COUNTY C.O.R.E., CAMDEN COUNTY N.A.A.C.P., ETHEL LAWRENCE, THOMASINE LAWRENCE, CATHERINE STILL, MARY E. SMITH, SHIRLEY MORRIS, JACQUELINE CURTIS, GLADYS CLARK, BETTY WEAL AND ANGEL PEREZ, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS-RESPONDENTS, AND DAVIS ENTERPRISES, PLAINTIFF-INTERVENOR-RESPONDENT, v. TOWNSHIP OF MOUNT LAUREL, DEFENDANT-APPELLANT (A–172).

URBAN LEAGUE OF GREATER NEW BRUNSWICK, A NONPROFIT CORPORATION OF THE STATE OF NEW JERSEY, CLEVELAND BENSON, JUDITH CHAMPION, BARBARA TIPPETT AND KENNETH TUSKEY, ON THEIR OWN BEHALF AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS-APPELLANTS, AND FANNIE BOTTS, LYDIA CRUZ AND JEAN WHITE, PLAINTIFFS, v. THE MAYOR AND COUNCIL OF THE BOROUGH OF CARTERET, MAYOR AND COUNCIL OF THE BOROUGH OF DUNELLEN, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF EDISON, MAYOR AND COUNCIL OF THE BOROUGH OF HELMETTA, MAYOR AND COUNCIL OF THE BOROUGH OF HIGHLAND PARK, MAYOR AND COUNCIL OF THE BOROUGH OF JAMESBURG, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MADISON, MAYOR AND COUNCIL OF THE BOROUGH OF METUCHEN, MAYOR AND COUNCIL OF THE BOROUGH OF MIDDLESEX, MAYOR AND COUNCIL OF THE BOROUGH OF MILLTOWN, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF NORTH BRUNSWICK, MAYOR AND COUNCIL OF THE BOROUGH OF SAYREVILLE, MAYOR AND COUNCIL OF THE CITY OF SOUTH AMBOY,

MAYOR AND COUNCIL OF THE BOROUGH OF SOUTH RIVER, MAYOR AND COUNCIL OF THE BOROUGH OF SPOTSWOOD AND TOWNSHIP COMMITTEE OF THE TOWNSHIP OF WOODBRIDGE, DEFENDANTS, AND TOWNSHIP COMMITTEE OF THE TOWNSHIP OF CRANBURY, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF EAST BRUNSWICK, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MONROE, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF PISCATAWAY, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF PLAINSBORO, TOWNSHIP COMMITTEE OF THE TOWNSHIP OF SOUTH BRUNSWICK AND MAYOR AND COUNCIL OF THE BOROUGH OF SOUTH PLAINFIELD, DEFENDANTS-RESPONDENTS (A–4).

JOSEPH CAPUTO AND ALDO CAPUTO, PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS, v. TOWNSHIP OF CHESTER AND PLANNING BOARD OF TOWNSHIP OF CHESTER, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS (A–7/21).

GLENVIEW DEVELOPMENT CO., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT, v. FRANKLIN TOWNSHIP, PLANNING BOARD AND ENVIRONMENTAL COMMISSION OF FRANKLIN TOWNSHIP, DEFENDANTS-RESPONDENTS (A–8).

URBAN LEAGUE OF ESSEX COUNTY, NORTH JERSEY COMMUNITY UNION, AMY INGRAM, JOHN LIGON AND JOSE MUNIZ, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS-APPELLANTS, v. TOWNSHIP OF MAHWAH, DEFENDANT-RESPONDENT, AND BOROUGH OF RAMSEY, NEW JERSEY, BOROUGH OF SADDLE RIVER, NEW JERSEY AND BOROUGH OF UPPER SADDLE RIVER, NEW JERSEY, DEFENDANTS (A–18).

ROUND VALLEY, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. TOWNSHIP OF CLINTON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, TOWNSHIP COUNCIL OF THE TOWNSHIP OF CLINTON AND PLANNING BOARD OF THE TOWNSHIP OF CLINTON, DEFENDANTS-RESPONDENTS (A–37).

Argued October 20, 21, 22 and December 15, 1980—
Decided January 20, 1983.

171

172

176

184

188

*Carl S. Bisgaier,* Director, Division of Public Interest Advocacy, and *Kenneth E. Meiser,* Deputy Director, Division of Public Interest Advocacy, argued the cause for appellants (A–35/36) and *amicus curiae* Department of the Public Advocate (A–4, A–7/21, A–8 and A–18), and *Kenneth E. Meiser* submitted a brief on behalf of respondents (A–172) (*Stanley C. Van Ness,* Public Advocate, attorney; *Peter J. O'Connor,* of counsel; *Carl S. Bisgaier, Kenneth E. Meiser, Linds R. Hurd* and *Linda R. Pancotto* and *Stephen Eisdorfer,* Assistant Deputy Public Advocates, on the briefs).

*Marilyn J. Morheuser,* and *Martin E. Sloane,* a member of the District of Columbia bar, argued the cause for appellants (A–4) (*Marilyn J. Morheuser,* attorney; *Martin E. Sloane* and *Roger C. Rosenthal,* a member of the District of Columbia bar, of counsel).

*Philip Lindeman, II,* argued the cause for appellants and cross-respondents (A–7/21) (*Hellring, Lindeman, Goldstein & Siegal,* attorneys).

*Robert Benbrook,* argued the cause for appellant (A–8) (*Morrow & Benbrook,* attorneys; *Robert Benbrook* and *James W. Tubbs,* on the briefs).

*Richard F. Bellman,* a member of the New York bar, argued the cause for appellants (A–18) (*Courter, Kobert & Pease,* attorneys; *Joel Kobert,* on the briefs).

*Michael J. Herbert,* argued the cause for appellant (A–37) (*Sterns, Herbert & Weinroth,* attorneys; *Michael J. Herbert* and *Joel H. Sterns,* of counsel and on the briefs).

*John E. Harrington,* submitted briefs on behalf of appellant (A–172) (*Hartman, Schlesinger, Schlosser & Faxon,* attorneys).

*S. David Brandt,* argued the cause for intervenor and cross-respondent (A–35/36) and submitted a brief on behalf of intervenor-respondent (A–172) (*Brandt, Haughey, Penberthy, Lewis & Hyland,* attorneys; *S. David Brandt* and *Gerald E. Haughey,* on the briefs).

*John E. Patton* and *John W. Trimble* argued the cause for respondent and cross-appellant (A–35/36) (*Trimble & Master,* attorneys).

*William C. Moran, Jr.,* argued the cause for respondent Township Committee of the Township of Cranbury (A–4) (*Huff & Moran,* attorneys).

*Bertram E. Busch* argued the cause for respondent Township Committee of the Township of East Brunswick (A–4) (*Busch & Busch,* attorneys).

*Daniel S. Bernstein* argued the cause for respondent Township Committee of the Township of Piscataway (A–4) (*Sachar, Bernstein, Rothberg, Sikora & Mongello,* attorneys; *Daniel S. Bernstein* and *Marilyn R. Frankenthaler,* on the briefs).

*Joseph L. Stonaker* argued the cause for respondent Township Committee of the Township of Plainsboro (A–4) (*Stonaker & Stonaker,* attorneys; *Joseph L. Stonaker* and *Janice B. Stonaker,* on the briefs).

*Barry C. Brechman* argued the cause for respondent Township Committee of the Township of South Brunswick (A–4).

*Sanford E. Chernin* argued the cause for respondent Mayor and Council of the Borough of South Plainfield (A–4) (*Chernin & Freeman,* attorneys).

*Alfred L. Ferguson* argued the cause for respondents and cross-appellants (A–7/21) (*McCarter & English,* attorneys).

*Richard G. O'Brien* argued the cause for respondents (A–8) (*Bowers, Rinehart, Murphy & O'Brien,* attorneys; *Richard G. O'Brien* and *Steven B. Lieberman,* on the briefs).

*Brian T. Campion* argued the cause for respondent (A–18) (*Breslin & Breslin,* attorneys).

*Roger M. Cain* argued the cause for respondents Township of Clinton, etc. and Township Council of the Township of Clinton (A–37) (*Felter, Cain & Shurts,* attorneys; *Roger M. Cain* and *William A. Shurts,* on the briefs).

*Francis P. Sutton,* argued the cause for respondent Planning Board of the Township of Clinton (A–37).

*Thomas R. Farino, Jr.,* submitted briefs on behalf of respondent Township Committee of the Township of Monroe (A–4).

*J. William Barba* and *Glenn S. Pantel,* argued the cause for *amici curiae* Assemblyman James J. Barry, Jr., Senator James S. Cafiero, Senator Lee B. Laskin, Senator S. Thomas Gagliano, Senator Walter E. Foran, Senator Wayne Dumont, Jr., Senator Donald T. DiFrancesco, Senator John H. Dorsey, Senator James P. Vreeland, Jr., Senator Garrett W. Hagedorn, Senator John H. Ewing, Assemblyman James R. Hurley, Assemblyman John A. Rocco, Assemblyman Thomas J. Shusted, Assemblyman H. James Saxton, Assemblyman Clifford W. Snedeker, Assemblyman William F. Dowd, Assemblyman Anthony M. Villane, Jr., Assemblyman John O. Bennett, Assemblywoman Marie S. Muhler, Assemblyman Robert E. Littell, Assemblyman Walter J. Kavanaugh, Assemblyman Elliott F. Smith, Assemblyman Robert D. Franks, Assemblyman William J. Maguire, Assemblyman Arthur R. Albohn, Assemblywoman Barbara A. Curran, Assemblyman Dean A. Gallo, Assemblywoman Jane Burgio, Assemblyman Frederic Remington, Assemblyman Carl A. Orechio, Assemblyman Anthony Imperiale, Assemblyman Emil Olszowy, Assemblyman Louis F. Kosco, Assemblyman John B. Paolella, Assemblyman Gerald Cardinale, Assemblyman John W. Markert, Assemblyman Walter M.D. Kern, Jr., Assemblyman Karl Weidel and Assemblyman Charles L. Hardwick (A–35/36, A–4, A–7/21, A–8, A–18 and A–37) (*Shanley & Fisher,* attorneys; *J. William Barba, Glenn S. Pantel* and *Richard A. Levao,* on the briefs).

*Arnold K. Mytelka,* argued the cause for *amicus curiae* City of Newark (A–7/21) (*Clapp & Eisenberg,* attorneys; *Philip S. Elberg,* of counsel).

*Henry D. Blinder,* Deputy Attorney General, submitted briefs on behalf of *amicus curiae* Department of Community Affairs (A–35/36, A–4, A–7/21, A–8, A–18 and A–37) (*John J. Degnan,* Attorney General of New Jersey, attorney; *Stephen Skillman,* Assistant Attorney General, of counsel; *Henry D. Blinder, Dennis R. Casale* and *Daniel P. Reynolds,* Deputy Attorneys General, on the briefs).

*Alphonse A. Stanzione, Jr.,* submitted a brief on behalf of *amici curiae* The Manufactured Housing Association in New Jersey and Manufactured Housing Institute, Inc. (A–35/36) (*Stanzione & Stanzione,* attorneys; *Edward F. Canfield* and *Robert E. Heggestad,* members of the District of Columbia bar, of counsel).

*Thomas Norman* submitted a brief on behalf of *amicus curiae* American Planning Association, New Jersey Chapter (A–4).

*Martin F. Murphy* submitted a brief on behalf of *amicus curiae* Township of West Milford (A–7/21) (*Johnson, Johnson & Murphy,* attorneys).

*Samuel W. Lambert, III* submitted a brief on behalf of *amicus curiae* Environmental Defense Fund, Inc. (A–8) (*Smith, Cook, Lambert & Miller,* attorneys; *James T.B. Tripp,* a member of the New York bar, of counsel).

Outline of Opinion

Introduction 198

I. Background 204
 A. History of the *Mount Laurel* Doctrine 204
 B. Constitutional Basis for *Mount Laurel* and the Judicial Role 208
 C. Summary of Rulings 214

II. Resolution of the Issues 220
 A. Defining the *Mount Laurel* Obligation 220

B. Determining the *Mount Laurel* Obligation: Use of the State Development Guide Plan ........ 223

C. Calculating Fair Share ........ 248

D. Meeting the *Mount Laurel* Obligation ........ 258

 1. Removing Excessive Restrictions and Exactions ........ 258

 2. Using Affirmative Measures ........ 260

 a. Subsidies ........ 262

 b. Inclusionary Zoning Devices ........ 265

 i. Incentive Zoning ........ 266

 ii. Mandatory Set-Asides ........ 267

 3. Zoning for Mobile Homes ........ 274

 4. Providing "Least Cost" Housing ........ 277

E. Judicial Remedies ........ 278

 1. Builder's Remedy ........ 279

 2. Revision of the Zoning Ordinance: the Master ........ 281

 3. Remedies for Non-Compliance ........ 285

 4. Summary of the Remedial Stage ........ 290

F. Judicial Management ........ 292

III. Resolution of the Cases ........ 293

A. *Mount Laurel II* ........ 293

 1. The 1976 Revised Zoning Ordinance ........ 293

 2. The Builder's Remedy ........ 307

B. *Caputo v. Chester* ........ 309

C. *Glenview Development Co. v. Franklin Township* ........ 316

D. *Round Valley v. Township of Clinton* ........ 321

 1. Procedural and Factual Setting ........ 321

 2. The Appellate Division Opinion ........ 324

 3. Analysis of Clinton's Fair Share Responsibility ........ 328

 a. The Fair Share Determination ........ 328

 b. The Builder's Remedy ........ 330

 c. The Master ........ 332

198

E. *Urban League of Essex County v. Mahwah Twp.* ... 332

 1. Procedural and Factual Setting ... 332

 2. Standing to Challenge Mahwah's Ordinance ... 336

 3. Determination of Mahwah's Fair Share ... 338

F. *Urban League of Greater New Brunswick v. Borough of Carteret* ... 339

 1. Procedural and Factual Setting ... 341

 2. The Appellate Division Opinion ... 348

 3. Procedure on Remand ... 350

Conclusion ... 351

Appendix ... 354

The opinion of the Court was delivered by

WILENTZ, C.J.

This is the return, eight years later, of *Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel,* 67 *N.J.* 151 (1975) (*Mount Laurel I*). We set forth in that case, for the first time, the doctrine requiring that municipalities' land use regulations provide a realistic opportunity for low and moderate income housing. The doctrine has become famous. The *Mount Laurel* case itself threatens to become infamous. After all this time, ten years after the trial court's initial order invalidating its zoning ordinance, Mount Laurel remains afflicted with a blatantly exclusionary ordinance. Papered over with studies, rationalized by hired experts, the ordinance at its core is true to nothing but Mount Laurel's determination to exclude the poor.

Mount Laurel is not alone; we believe that there is widespread non-compliance with the constitutional mandate of our original opinion in this case.

To the best of our ability, we shall not allow it to continue. This Court is more firmly committed to the original *Mount Laurel* doctrine than ever, and we are determined, within appropriate judicial bounds, to make it work. The obligation is to provide a realistic opportunity for housing, not litigation. We have learned from experience, however, that unless a strong judicial hand is used, *Mount Laurel* will not result in housing, but in paper, process, witnesses, trials and appeals. We intend by this decision to strengthen it, clarify it, and make it easier for public officials, including judges, to apply it.

This case is accompanied by five others, heard together and decided in this opinion.[1] All involve questions arising from the

---

[1]The six cases are *Southern Burlington County N.A.A.C.P. v. Township of Mount Laurel,* decided below at 161 *N.J.Super.* 317 (Law Div.1978) (*Mount Laurel II*), and directly certified by this Court; three other trial court judgments directly certified: *Urban League of Essex Co. v. Township of Mahwah,* Docket No. L–17112–71 (Law Div. Mar. 8, 1979) (unreported); *Glenview Development Co. v. Franklin Township,* 164 *N.J.Super.* 563 (Law Div.1978); and *Caputo v. Township of Chester,* Docket No. L–42857–74 (Law Div. Oct. 4, 1978) (unreported); and two trial court judgments that were reversed by the Appellate Division: *Urban League of Greater New Brunswick v. Borough of Carteret,* 142 *N.J.Super.* 11 (Ch.Div.1976), rev'd, 170 *N.J.Super.* 461 (App.Div. 1979); and *Round Valley, Inc. v. Township of Clinton,* Docket No. L–29710–74 (Feb. 24, 1978) (unreported), rev'd, 173 *N.J.Super.* 45 (App.Div.1980).

Because these cases raised many similar issues concerning the *Mount Laurel* doctrine, they were argued together and have been disposed of in this single opinion.

We would prefer that our opinion took less time and less space. The subject is complex, highly controversial, and obviously of great importance. We have not one, but six cases before us that raise practically all of the major questions involved in the *Mount Laurel* doctrine; furthermore we have dealt with other questions that, strictly speaking, might not be necessary for resolving these cases, since we thought it important to settle them as well. Unfortunately, as the history of the *Mount Laurel* doctrine proves,

*Mount Laurel* doctrine. They demonstrate the need to put some steel into that doctrine. The deficiencies in its application range from uncertainty and inconsistency at the trial level to inflexible review criteria at the appellate level. The waste of judicial energy involved at every level is substantial and is matched only by the often needless expenditure of talent on the part of lawyers and experts. The length and complexity of trials is often outrageous, and the expense of litigation is so high that a real question develops whether the municipality can afford to defend or the plaintiffs can afford to sue.

There is another side to the story. We believe, both through the representations of counsel and from our own research and experience, that the doctrine has done some good, indeed, perhaps substantial good. We have tried to make the doctrine clearer for we believe that most municipal officials will in good faith strive to fulfill their constitutional duty. There are a number of municipalities around the State that have responded to our decisions by amending their zoning ordinances to provide realistic opportunities for the construction of low and moderate

---

the clear resolution of issues of this kind requires extensive time and extensive discussion.

In the event changes have occurred since trial of these cases (including amendments to the relevant municipal ordinances) that render any part of our remand inappropriate, applications for revision may be made to the trial court, but only in conformance with today's rulings. Where such applications are based on ordinance amendments, the trial court should make certain that relitigation of the case based on those amendments does not result in unwarranted delay. While we recognize the legitimacy of the municipal interest in having these amendments considered on remand, the circumstances may indicate, on balance, that vindication of the constitutional obligation requires that compliance with *Mount Laurel* be determined on the basis of the prior ordinances, and that ordinance revisions be made pursuant to a remedial order of the trial court in accordance with this opinion. *See Kruvant v. Mayor & Council Twp. of Cedar Grove,* 82 *N.J.* 435 (1980), discussed *infra* at 306–307.

income housing.[2] Further, many other municipalities have at least recognized their obligation to provide such opportunities in their ordinances and master plans. Finally, state and county government agencies have responded by preparing regional housing plans that help both the courts and municipalities themselves carry out the *Mount Laurel* mandate. Still, we are far from where we had hoped to be and nowhere near where we should be with regard to the administration of the doctrine in our courts.

These six cases not only afford the opportunity for, but demonstrate the necessity of reexamining the *Mount Laurel* doctrine. We do so here. The doctrine is right but its administration has been ineffective.

A brief statement of the cases may be helpful at this point. *Mount Laurel II* results from the remand by this Court of the original *Mount Laurel* case. The municipality rezoned, purportedly pursuant to our instructions, a plenary trial was held, and the trial court found that the rezoning constituted a bona fide attempt by Mount Laurel to provide a realistic opportunity for the construction of its fair share of the regional lower income housing need. Reading our cases at that time (1978) as requiring no more, the trial court dismissed the complaint of the N.A.A.C.P. and other plaintiffs but granted relief in the form of a builder's remedy, to a developer-intervenor who had attacked the total prohibition against mobile homes. Plaintiffs' appeal of the trial court's ruling sustaining the ordinance in all other respects was directly certified by this Court, as ultimately was defendant's appeal from the grant of a builder's remedy allowing construction of mobile homes. We reverse and remand to determine Mount Laurel's fair share of the regional need and for further proceedings to revise its ordinance; we affirm the grant of the builder's remedy.

---

[2]For a listing of these municipalities and a discussion of their inclusionary zoning ordinances, *see* Department of Community Affairs, *Housing Handbook for New Jersey Municipalities* 12–16 (1976) (Housing Handbook).

In *Caputo v. Township of Chester,* two resident landowners of that Morris County township had long sought rezoning of their property to allow residential construction with densities greater than those previously permitted. After much negotiation the municipality rezoned but not to plaintiffs' satisfaction. Plaintiffs therefore commenced an action challenging the validity of the ordinance, an action that ultimately was based upon our decision in *Mount Laurel.* The trial court held that the ordinance was invalid but refused to grant a builder's remedy to the would-be-developer, who appealed. Chester apparently acceded to the court's ruling, no appeal having been taken. We granted direct certification of the developer's appeal. The only issues before us in that matter are the propriety of the denial of a builder's remedy and of the invalidation of a five acre minimum lot requirement in a single family zone. We affirm that denial, reverse the ruling as to the minimum lot requirement, and reverse and remand the cause for further proceedings limited to the issue of the satisfaction of Chester's present indigenous need for lower income housing.

In *Glenview Development Co. v. Franklin,* again a developer sought both to invalidate the zoning ordinance and to obtain a builder's remedy. The trial court held that this rural Hunterdon County township was not subject to the *Mount Laurel* obligation because it was deemed not to be a "developing" community, from which ruling the developer appealed. We certified the matter directly. We affirm the trial court's ruling but reverse and remand the cause for further proceedings limited to the issue of the satisfaction of Franklin's present indigenous need for lower income housing.

In *Round Valley, Inc. v. Clinton,* the usual two-pronged attack by the developer (declaration of invalidity and builder's remedy) was successful at the trial level, where the court entered a judgment invalidating the ordinance and appointing a master to assure its appropriate revision and to assist in effectuating a builder's remedy. On appeal, the Appellate Division held that the judgment below did not pass upon the validity of the

ordinance but simply granted a builder's remedy; that such action by a trial court was not authorized by the *Mount Laurel* doctrine, since it consisted of little more than the grant of a variance without complying with the statutory requirements. The Appellate Division also indicated that the sale of a portion of the developer's tract between the trial and the appeal rendered most of the matters moot, since the portion sold was that designed by the developer for all of its multi-family units. The matter is before us on the developer's appeal. We reverse the Appellate Division and remand for further proceedings to determine fair share and thereafter to revise the ordinance; in effect we sustain the trial court's finding that the ordinance is invalid and its appointment of a master to aid in its revision, as well as its award of the builder's remedy subject to the conditions set forth herein.

*Urban League of Essex Co. v. Mahwah* was the latest of numerous attempts to force the construction of housing for those who work in Mahwah in Bergen County. The trial court held that the Mahwah zoning ordinance complied with the *Mount Laurel* doctrine in that it allowed for the construction of "least cost" housing although admittedly no lower income housing could possibly be built there. Plaintiffs, being both those who live in and out of Mahwah and who work there, believing that the ordinance could more realistically provide an opportunity for the construction of lower income housing, appealed to the Appellate Division and we certified the matter directly. We reverse and remand for further proceedings concerning Mahwah's fair share and thereafter to revise the ordinance.

In *Urban League of Greater New Brunswick v. Carteret,* the zoning ordinances of all the municipalities in Middlesex County were initially challenged. The majority of the cases were settled during trial (through the revision of ordinances to comply with the trial court's directives, or, in the cases of Perth Amboy, Carteret and Dunellen, through judgments of the trial court holding that no *Mount Laurel* obligation existed). Only seven municipalities appealed from the judgment of the trial court.

As to those seven, the trial court held that their zoning ordinances violated the *Mount Laurel* doctrine. The court determined the regional need and then allocated to each municipality a sufficient part of the regional need so that, were it built, that municipality's lower income housing would constitute the same percentage of its total housing as the lower income housing of the county constituted of its total housing. The balance of the regional need allocable to those seven municipalities was divided among them equally. On appeal the Appellate Division reversed, holding, among other things, that the trial court's determination was improperly "formulaic" and that the formula was incorrect. There was no remand for proceedings in accordance with the Appellate Division's opinion. The appeal to us is from that Appellate Division decision. We reverse the judgment of the Appellate Division but remand to the trial court for further proceedings concerning region, regional need, and fair share and thereafter for revision of the various ordinances.

This opinion is divided into three sections. Section I contains a brief history of the *Mount Laurel* doctrine with a discussion of the major implementation problems addressed in this opinion; a statement of the constitutional basis for the doctrine and the appropriate scope of the judicial power to enforce it; and a summary of the more significant rulings in today's opinion. In Section II, we resolve the substantive issues raised by the six cases before us and set forth the obligations imposed upon municipalities and trial courts by the *Mount Laurel* doctrine. Finally, in Section III we apply these rulings to dispose of the six cases themselves.

I.

### Background

A. *History of the Mount Laurel Doctrine*

In *Mount Laurel I,* this Court held that a zoning ordinance that contravened the general welfare was unconstitutional. We pointed out that a developing municipality violated that consti-

tutional mandate by excluding housing for lower income people; that it would satisfy that constitutional obligation by affirmatively affording a realistic opportunity for the construction of its fair share of the present and prospective regional need for low and moderate income housing. 67 *N.J.* at 174.[3] This is the core of the *Mount Laurel* doctrine. Although the Court set forth important guidelines for implementing the doctrine, their application to particular cases was complex, and the resolution of many questions left uncertain. Was it a "developing" municipality? What was the "region," and how was it to be determined? How was the "fair share" to be calculated within that region? Precisely what must that municipality do to "affirmatively afford" an opportunity for the construction of lower income housing? Other questions were similarly troublesome. When should a court order the granting of a building permit (*i.e.*, a builder's remedy) to a plaintiff-developer who has successfully challenged a zoning ordinance on *Mount Laurel* grounds? How should courts deal with the complicated procedural aspects of *Mount Laurel* litigation, such as the appointment of experts and masters, the joinder of defendant municipalities, and the problem of interlocutory appeals? These have been the principal questions that New Jersey courts have faced

---

[3]Several other state courts have held that municipalities have an obligation to consider regional needs in their zoning decisions. *See, e.g., Surrick v. Zoning Bd. of Providence Twp.,* 476 Pa. 182, 382 A.2d 105, 108–10 (Pa.1977); *Associated Home Builders v. Livermore,* 18 Cal.3d 582, 599–601, 557 P.2d 473, 483, 135 Cal.Rptr. 41, 51 (Cal.1976); *Berenson v. Town of New Castle,* 38 N.Y.2d 102, 378 N.Y.S.2d 672, 341 N.E.2d 236, 242 (N.Y.1975), aff'd as modified, 67 A.D.2d 506, 415 N.Y.S.2d 669 (App.Div.1979), enforced *sub nom. Blitz and Locker v. Town of New Castle,* —— N.Y.2d ——, —— N.Y.S.2d ——, —— N.E.2d —— (N.Y.1982) appeal filed __ 82; *see also Manatee County v. Estech Gen. Chem. Corp.,* 402 So.2d 1251 (Fla.Dist.Ct.App.1981). None of these decisions, however, requires municipalities to provide their fair share of low and moderate income housing needs. For a general discussion of the case law in this area, see Blumstein, "A Prolegomenon to Growth Management and Exclusionary Zoning Issues," 43 *Law & Contemp. Prob.* 5 (Spring 1979); Note, "Developments in the Law-Zoning," 91 *Harv.L.Rev.* 1427, 1635–59 (1978).

in attempting to implement the *Mount Laurel* mandate, and the principal questions dealt with in this opinion. We begin by examining how some of these questions have been dealt with up to now.

Two years after *Mount Laurel I*, in *Oakwood at Madison, Inc. v. Township of Madison*, 72 *N.J.* 481 (1977), this Court once again faced the exclusionary zoning issue. We ruled that "fair share" allocations need not be "precise" or based on "specific formulae" to win judicial approval. *Id.* at 498–99. Instead, the Court explained, a court should look to the "substance" of a challenged zoning ordinance and the "*bona fide* efforts" of a municipality to remove exclusionary barriers in order to determine whether that municipality had met its *Mount Laurel* burden.

With regard to the definition of the "region" from which fair share allocations were to be made, the majority cited with approval the trial court's formulation of a region as the " 'area from which, in view of available employment and transportation, the population of the township would be drawn, absent invalidly exclusionary zoning.' " *Id.* at 537; quoting *Oakwood at Madison, Inc. v. Township of Madison*, 128 *N.J.Super.* 438, 441 (Law Div.1974). We distinguished this very general standard for determining region from the situation with which we would be confronted if a state planning body promulgated a plan that divided the whole state into regions.

*Madison* also addressed the nature of a municipality's "affirmative" duty to encourage the construction of lower income housing. The Court reaffirmed that affected municipalities must provide realistic opportunities for their fair share of lower income housing, and required the municipality to provide density bonuses for the construction of multi-bedroom units, while reserving judgment, however, on other affirmative measures. 72 *N.J.* at 517–18 (a density bonus allows the developer to build more units per acre if certain kinds of units are included in the project).

An important aspect of the Court's decision was the award of a builder's remedy to the plaintiff-developer. The Court emphasized that the plaintiff, for "six years" and through "two trials and on this extended appeal," had "borne the stress and expense of this public interest litigation." *Id.* at 549–50. The Court admonished, however, that this kind of remedy should "ordinarily be rare." *Id.* at 551–52 n. 50.

Finally, the Court introduced the important concept of "least cost" housing, *i.e.,* housing built at the least cost possible, even though not inexpensive enough for lower income occupancy. Recognizing that even with subsidies and affirmative devices some municipalities simply might not be able to provide a realistic opportunity for the construction of lower income housing, the Court held that under those and *only* those circumstances such municipalities could meet their obligation with "least cost" housing. *Id.* at 512–13.

Later in the same year that *Madison* was decided, the Court determined which municipalities were subject to the *Mount Laurel* fair share obligation. *Pascack Ass'n, Ltd. v. Washington Twp.,* 74 *N.J.* 470 (1977); *Fobe Associates v. Demarest,* 74 *N.J.* 519 (1977). In *Pascack,* the Court held that "fully developed, single-family residential" communities such as Washington Township did not have any *Mount Laurel* obligation. This holding was reaffirmed in *Fobe* where the Court upheld the decision of the Demarest Board of Adjustment denying a variance sought for multi-family housing given the fact that a "developed" municipality like Demarest did not have a *Mount Laurel* obligation.[4]

---

[4] *Home Builders League v. Township of Berlin,* 81 *N.J.* 127 (1979), rounds out this Court's involvement with the *Mount Laurel* doctrine since 1975. In *Berlin,* the Court invalidated minimum floor area requirements (or "any other factor, such as frontage or lot size") for residential dwellings that were unrelated to the number of occupants living in a dwelling. *Id.* at 130. The Court upheld the trial court's determination that such requirements were *per se* exclusionary under *Mount Laurel.*

### B. Constitutional Basis for Mount Laurel and the Judicial Role

The constitutional basis for the *Mount Laurel* doctrine remains the same. The constitutional power to zone, delegated to the municipalities subject to legislation, is but one portion of the police power and, as such, must be exercised for the general welfare. When the exercise of that power by a municipality affects something as fundamental as housing, the general welfare includes more than the welfare of that municipality and its citizens: it also includes the general welfare—in this case the housing needs—of those residing outside of the municipality but within the region that contributes to the housing demand within the municipality. Municipal land use regulations that conflict with the general welfare thus defined abuse the police power and are unconstitutional. In particular, those regulations that do not provide the requisite opportunity for a fair share of the region's need for low and moderate income housing conflict with

Six of the most important lower court decisions in this area are now before us. Other important lower court rulings reported in this area include: *In re Egg Harbor Associates,* 185 *N.J.Super.* 507 (App.Div.), certif. granted, 91 *N.J.* 552 (1982) (sustaining, partly on *Mount Laurel* grounds, Department of Environmental Protection regulation imposing fair share housing obligation on developer in coastal area). *Rowe v. Township of Pittsgrove,* 172 *N.J.Super.* 209 (App.Div.1980) (holding that *Mount Laurel* did not require a municipality to relocate within the same municipality persons displaced through building code enforcement); *Swiss Village Assocs. v. Township of Wayne,* 162 *N.J.Super.* 138 (App.Div.1978) (upholding a municipality's refusal to provide for high-rise developments in its zoning ordinance); *Castroll v. Township of Franklin,* 161 *N.J.Super.* 190 (App.Div. 1978) (upholding the denial of a variance for a multi-family dwelling project where the developer claimed that multi-family housing, even for "median income" households, inherently serves the public interest); *Nigito v. Borough of Closter,* 142 *N.J.Super.* 1 (App.Div.1976) (upholding a municipality's denial of a use variance for a garden apartment complex, in part on the ground that the municipality was "developed" and therefore outside the ambit of *Mount Laurel*); *Segal v. Borough of Wenonah,* 134 *N.J.Super.* 421 (App.Div.1975) (finding the defendant municipality to have no *Mount Laurel* obligation); *Montgomery Assocs. v. Township of Montgomery,* 149 *N.J.Super.* 536 (Law Div.1977) (holding that the *Mount Laurel* doctrine does not bar a municipality that has met its fair municipality for lower income housing).

the general welfare and violate the state constitutional requirements of substantive due process and equal protection. *Mount Laurel I,* 67 *N.J.* at 174 and 181.

■ That is the constitutional rationale for the *Mount Laurel* doctrine. The doctrine is a corollary of the constitutional obligation to zone only in furtherance of the general welfare. The doctrine provides a method of satisfying that obligation when the zoning in question affects housing.

■ It would be useful to remind ourselves that the doctrine does not arise from some theoretical analysis of our Constitution, but rather from underlying concepts of fundamental fairness in the exercise of governmental power. The basis for the constitutional obligation is simple: the State controls the use of land, *all* of the land. In exercising that control it cannot favor rich over poor. It cannot legislatively set aside dilapidated housing in urban ghettos for the poor and decent housing elsewhere for everyone else. The government that controls this land represents everyone. While the State may not have the ability to eliminate poverty, it cannot use that condition as the basis for imposing further disadvantages. And the same applies to the municipality, to which this control over land has been constitutionally delegated.

The clarity of the constitutional obligation is seen most simply by imagining what this state could be like were this claim never to be recognized and enforced: poor people forever zoned out of substantial areas of the state, not because housing could not be built for them but because they are not wanted; poor people forced to live in urban slums forever not because suburbia, developing rural areas, fully developed residential sections, seashore resorts, and other attractive locations could not accommodate them, but simply because they are not wanted. It is a vision not only at variance with the requirement that the zoning power be used for the general welfare but with all concepts of

fundamental fairness and decency that underpin many constitutional obligations.[5]

---

[5]Unfortunately, this unpleasant "vision" is to a large extent already with us, as can be seen by comparing the poverty and decay of Newark and Camden with the prosperity of many of their suburban neighbors. For a discussion of these urban-suburban disparities in New Jersey, *see* "Recession in Jersey: 'Dire' or 'Mild,'" *The New York Times,* June 28, 1982, at B1, col. 3. As many commentators ranging from law review writers to national commissions have maintained, a major cause of this urban-suburban inequality has been suburban exclusionary zoning (by which we mean zoning whose purpose or effect is to keep poor people out of a community). *See, e.g.,* Note, "Developments in the Law—Zoning," 91 *Harv.L.Rev.* 1427, 1624–35 (1978); A. Downs, *Opening up the Suburbs* (1973); Rubinowitz, *Exclusionary Zoning: A Wrong in Search of a Remedy,* 6 *U.Mich.J.L.Ref.* 625 (1973); *Report of the National Advisory Commission on Civil Disorders* 1 (U.S.Gov't Printing Office, 1968) (citing suburban exclusion as one of the principal causes making America "two societies, one black, one white—separate and unequal"). For a discussion of the impact of exclusionary zoning in New Jersey in particular, see M. Danielson, *The Politics of Exclusion* 40–43, 190 (1976). *See also* N.J. Department of Community Affairs, State Development Guide Plan 84–85 (1980) (noting the "ultimately self-destructive division between affluent suburban areas and depressed inner cities").

As these commentators document, since World War II there has been a great movement of commerce, industry, and people out of the inner cities and into the suburbs. At the same time, however, exclusionary zoning made these suburbs largely inaccessible to lower income households. Beside depriving the urban poor of an opportunity to share in the suburban development, this exclusion also increased the relative concentration of poor in the cities and thereby hastened the flight of business and the middle class to the suburbs. A vicious cycle set in as increased business and middle class flight led to more urban decay, and more urban decay led to more flight, etc.

The provision of lower income housing in the suburbs may help to relieve cities of what has become an overwhelming fiscal and social burden. It may also make jobs more accessible for the unemployed poor. Deconcentration of the urban poor will presumably make cities more attractive for businesses and upper income residents to return to. For an in-depth discussion of the relationship between ending exclusionary zoning and the revitalization of our inner cities, *see* Downs, "Why Improving the Inner City Requires Opening up the Suburbs," in A. Downs, *Opening up the Suburbs* 115–30 (1973). See also the Community Development Act of 1974, in which Congress found that a "significant" cause of our nation's urban crisis is "the concentration of persons of lower income in central cities," 42 *U.S.C.* 5301(a)(1) (1977), and called for the "reduction of the isolation of

Subject to the clear obligation to preserve open space and prime agricultural land, a builder in New Jersey who finds it economically feasible to provide decent housing for lower income groups will no longer find it governmentally impossible. Builders may not be able to build just where they want—our parks, farms, and conservation areas are not a land bank for housing speculators. But if sound planning of an area allows the rich and middle class to live there, it must also realistically and practically allow the poor. And if the area will accommodate factories, it must also find space for workers. The specific location of such housing will of course continue to depend on sound municipal land use planning.

While *Mount Laurel I* discussed the need for "an appropriate variety and choice of housing," 67 *N.J.* 179, the specific constitutional obligation addressed there, as well as in our opinion here, is that relating to low and moderate income housing. *Id.* All that we say here concerns that category alone; the doctrine as we interpret it has no present applicability to other kinds of housing. *See Pascack,* 74 *N.J.* at 480. It is obvious that eight years after *Mount Laurel I* the need for satisfaction of this

---

income groups within communities" and the "spatial deconcentration of housing opportunities for persons of lower income," 42 *U.S.C.* 5301(c)(6) (1977); and the 1968 *Report for Action* of the Governor's Select Commission on Civil Disorder at 64–65.

Cities, while most directly affected, are not the sole victims of exclusionary zoning. The damage done by urban blight and decay is in no way confined to those who must remain in our cities. It affects all of us. Violent crime and drug abuse spawned in urban slums do not remain within city limits, they spread out to the suburbs and infect those living there. Efforts to combat these diseases require expenditures of public dollars that drain all taxpayers, urban and suburban alike. The continuing disintegration of our cities encourages business and industry to leave New Jersey altogether, resulting in a drain of jobs and dollars from our economy. In sum, the decline of our cities and the increasing economic segregation of our population are not just isolated problems for those left behind in the cities, but a disease threatening us all. Zoning ordinances that either encourage this process or ratify its results are not promoting our general welfare, they are destroying it.

doctrine is greater than ever. Upper and middle income groups may search with increasing difficulty for housing within their means; for low and moderate income people, there is nothing to search for.[6]

No one has challenged the *Mount Laurel* doctrine on these appeals. Nevertheless, a brief reminder of the judicial role in this sensitive area is appropriate, since powerful reasons suggest, and we agree, that the matter is better left to the Legislature. We act first and foremost because the Constitution of our State requires protection of the interests involved and because the Legislature has not protected them. We recognize the social and economic controversy (and its political consequences) that has resulted in relatively little legislative action in this field. We understand the enormous difficulty of achieving a political consensus that might lead to significant legislation enforcing the constitutional mandate better than we can, legislation that might completely remove this Court from those controversies. But enforcement of constitutional rights cannot await a supporting political consensus. So while we have always preferred legislative to judicial action in this field, we shall continue—until the Legislature acts—to do our best to uphold the constitutional obligation that underlies the *Mount Laurel*

---

[6] *See, e.g.,* S. Seidel, *Housing Costs and Government Regulations* 9–14 (1978) (Housing Costs) (documenting that over the last decade housing costs have far outpaced average income increases, particularly for lower income households); "Finding the House You Can Afford," *The New York Times,* Apr. 4, 1982, § 8, at 1, col. 2 ("affordable houses" in this region are "usually available only to families with incomes well in excess of $20,000 a year"); "Housing Is Called Big Issue," *The New York Times,* Apr. 12, 1981, EII, at 38, col. 1 (reporting a statement by a New Jersey Department of Community Affairs spokesman that the average new home price in New Jersey is now $75,000, a price that only one in twenty families can afford); "Home of Future: Size Will Shrink But Not the Price," *The New York Times,* Jan. 25, 1981, § 1, at 20. col. 1. The importance of affordable, decent housing for individuals and families is, of course, undeniable. *See, e.g.,* C. Hartman, Housing and Social Policy 1–5 (1975).

doctrine. That is our duty. We may not build houses, but we do enforce the Constitution.[7]

We note that there has been some legislative initiative in this field. We look forward to more. The new Municipal Land Use Law explicitly recognizes the obligation of municipalities to zone with regional consequences in mind, *N.J.S.A.* 40:55D–28(d); it also recognizes the work of the Division of State and Regional Planning in the Department of Community Affairs (DCA), in creating the State Development Guide Plan (1980) (SDGP), which plays an important part in our decisions today. Our deference to these legislative and executive initiatives can be regarded as a clear signal of our readiness to defer further to more substantial actions.

The judicial role, however, which could decrease as a result of legislative and executive action, necessarily will expand to the extent that we remain virtually alone in this field. In the absence of adequate legislative and executive help, we must give meaning to the constitutional doctrine in the cases before us

---

[7]In New Jersey, it has traditionally been the judiciary, and not the Legislature, that has remedied substantive abuses of the zoning power by municipalities. A review of zoning litigation and legislation since the enactment of the zoning enabling statute in the 1920's shows that the Legislature has confined itself largely to regulating the procedural aspects of zoning. The judiciary has at the same time invalidated or modified zoning ordinances that violated constitutional rights or failed to serve the general welfare. *See, e.g., Lusardi v. Curtis Point Property Ass'n,* 86 *N.J.* 217 (1981) (invalidating a municipal ordinance to the extent it conflicted with the State's policy for recreational use of beachfront property); *State v. Baker,* 81 *N.J.* 99 (1979) (overturning zoning prohibiting more than four unrelated individuals from sharing a single housing unit); *Katobimar Realty Co. v. Webster,* 20 *N.J.* 114 (1955) (holding that a municipality could not bar all retail commercial uses in an industrial zone); *DeMott Homes v. Margate City,* 136 *N.J.L.* 330 (Sup.Ct.1947), aff'd o.b., 136 *N.J.L.* 639 (E. & A.1948) (holding that a municipality could not bar two family homes in a seashore area). Although the complexity and political sensitivity of the issue now before us make it especially appropriate for legislative resolution, we have no choice, absent that resolution, but to exercise our traditional constitutional duty to end an abuse of the zoning power.

through our own devices, even if they are relatively less suitable. That is the basic explanation of our decisions today.

## C. Summary of Rulings

Our rulings today have several purposes. First, we intend to encourage voluntary compliance with the constitutional obligation by defining it more clearly. We believe that the use of the State Development Guide Plan and the confinement of all *Mount Laurel* litigation to a small group of judges, selected by the Chief Justice with the approval of the Court, will tend to serve that purpose. Second, we hope to simplify litigation in this area. While we are not overly optimistic, we think that the remedial use of the SDGP may achieve that purpose, given the significance accorded it in this opinion. Third, the decisions are intended to increase substantially the effectiveness of the judicial remedy. In most cases, upon determination that the municipality has not fulfilled its constitutional obligation, the trial court will retain jurisdiction, order an immediate revision of the ordinance (including, if necessary, supervision of the revision through a court appointed master), and require the use of effective affirmative planning and zoning devices. The long delays of interminable appellate review will be discouraged, if not completely ended, and the opportunity for low and moderate income housing found in the new ordinance will be as realistic as judicial remedies can make it. We hope to achieve all of these purposes while preserving the fundamental legitimate control of municipalities over their own zoning and, indeed, their destiny.

The following is a summary of the more significant rulings of these cases:

(1) *Every* municipality's land use regulations should provide a realistic opportunity for decent housing for at least some part of its resident poor who now occupy dilapidated housing. The zoning power is no more abused by keeping out the region's poor than by forcing out the resident poor. In other words, each municipality must provide a realistic opportunity for decent

housing for its indigenous poor except where they represent a disproportionately large segment of the population as compared with the rest of the region. This is the case in many of our urban areas.

(2) The existence of a municipal obligation to provide a realistic opportunity for a fair share of the region's present and prospective low and moderate income housing need will no longer be determined by whether or not a municipality is "developing." The obligation extends, instead, to every municipality, any portion of which is designated by the State, through the SDGP as a "growth area." This obligation, imposed as a remedial measure, does not extend to those areas where the SDGP discourages growth—namely, open spaces, rural areas, prime farmland, conservation areas, limited growth areas, parts of the Pinelands and certain Coastal Zone areas. The SDGP represents the conscious determination of the State, through the executive and legislative branches, on how best to plan its future. It appropriately serves as a judicial remedial tool. The obligation to encourage lower income housing, therefore, will hereafter depend on rational long-range land use planning (incorporated into the SDGP) rather than upon the sheer economic forces that have dictated whether a municipality is "developing." Moreover, the fact that a municipality is fully developed does not eliminate this obligation although, obviously, it may affect the extent of the obligation and the timing of its satisfaction. The remedial obligation of municipalities that consist of both "growth areas" and other areas may be reduced, based on many factors, as compared to a municipality completely within a "growth area."

There shall be a heavy burden on any party seeking to vary the foregoing remedial consequences of the SDGP designations.

(3) *Mount Laurel* litigation will ordinarily include proof of the municipality's fair share of low and moderate income housing in terms of the number of units needed immediately, as well as the number needed for a reasonable period of time in the future.

"Numberless" resolution of the issue based upon a conclusion that the ordinance provides a realistic opportunity for *some* low and moderate income housing will be insufficient. Plaintiffs, however, will still be able to prove a *prima facie* case, without proving the precise fair share of the municipality, by proving that the zoning ordinance is substantially affected by restrictive devices, that proof creating a presumption that the ordinance is invalid.

The municipal obligation to provide a realistic opportunity for low and moderate income housing is not satisfied by a good faith attempt. The housing opportunity provided must, in fact, be the substantial equivalent of the fair share.

(4) Any future *Mount Laurel* litigation shall be assigned only to those judges selected by the Chief Justice with the approval of the Supreme Court. The initial group shall consist of three judges, the number to be increased or decreased hereafter by the Chief Justice with the Court's approval. The Chief Justice shall define the area of the State for which each of the three judges is responsible: any *Mount Laurel* case challenging the land use ordinance of a municipality included in that area shall be assigned to that judge.

Since the same judge will hear and decide all *Mount Laurel* cases within a particular area and only three judges will do so in the entire state, we believe that over a period of time a consistent pattern of regions will emerge. Consistency is more likely as well in determinations of regional housing needs and allocations of fair share to municipalities within the region. Along with this consistency will come the predictability needed to give full effect to the *Mount Laurel* doctrine. While determinations of region and regional housing need will not be conclusive as to any municipality not a party to the litigation, they shall be given presumptive validity in subsequent litigation involving any municipality included in a previously determined region.

The Chief Justice will analyze all pending *Mount Laurel* litigation to determine which, if any, should be transferred to one of the three *Mount Laurel* judges. As for the cases pending before us, given the knowledge acquired by the judges of the particular facts of the case, each will be remanded to the judge who heard the matter below with the exception of *Round Valley, Inc. v. Clinton* and *Urban League of Greater New Brunswick v. Carteret,* since neither of the judges who determined those matters remains on the trial bench.

(5) The municipal obligation to provide a realistic opportunity for the construction of its fair share of low and moderate income housing may require more than the elimination of unnecessary cost-producing requirements and restrictions. Affirmative governmental devices should be used to make that opportunity realistic, including lower-income density bonuses and mandatory set-asides. Furthermore the municipality should cooperate with the developer's attempts to obtain federal subsidies. For instance, where federal subsidies depend on the municipality providing certain municipal tax treatment allowed by state statutes for lower income housing, the municipality should make a good faith effort to provide it. Mobile homes may not be prohibited, unless there is solid proof that sound planning in a particular municipality requires such prohibition.

(6) The lower income regional housing need is comprised of both low and moderate income housing. A municipality's fair share should include both in such proportion as reflects consideration of all relevant factors, including the proportion of low and moderate income housing that make up the regional need.

(7) Providing a realistic opportunity for the construction of least-cost housing will satisfy a municipality's *Mount Laurel* obligation if, and only if, it cannot otherwise be satisfied. In other words, it is only after *all* alternatives have been explored, *all* affirmative devices considered, including, where appropriate, a reasonable period of time to determine whether low and moderate income housing is produced, only when everything has

been considered and tried in order to produce a realistic opportunity for low and moderate income housing that least-cost housing will provide an adequate substitute. Least-cost housing means what it says, namely, housing that can be produced at the lowest possible price consistent with minimal standards of health and safety.

(8) Builder's remedies will be afforded to plaintiffs in *Mount Laurel* litigation where appropriate, on a case-by-case basis. Where the plaintiff has acted in good faith, attempted to obtain relief without litigation, and thereafter vindicates the constitutional obligation in *Mount Laurel*-type litigation, ordinarily a builder's remedy will be granted, provided that the proposed project includes an appropriate portion of low and moderate income housing, and provided further that it is located and designed in accordance with sound zoning and planning concepts, including its environmental impact.

(9) The judiciary should manage *Mount Laurel* litigation to dispose of a case in all of its aspects with one trial and one appeal, unless substantial considerations indicate some other course. This means that in most cases after a determination of invalidity, and prior to final judgment and possible appeal, the municipality will be required to rezone, preserving its contention that the trial court's adjudication was incorrect. If an appeal is taken, all facets of the litigation will be considered by the appellate court including both the correctness of the lower court's determination of invalidity, the scope of remedies imposed on the municipality, and the validity of the ordinance adopted after the judgment of invalidity. The grant or denial of a stay will depend upon the circumstances of each case. The trial court will appoint a master to assist in formulating and implementing a proper remedy whenever that course seems desirable.

(10) The *Mount Laurel* obligation to meet the prospective lower income housing need of the region is, by definition, one that is met year after year in the future, throughout the years

of the particular projection used in calculating prospective need. In this sense the affirmative obligation to provide a realistic opportunity to construct a fair share of lower income housing is met by a "phase-in" over those years; it need not be provided immediately. Nevertheless, there may be circumstances in which the obligation requires zoning that will provide an immediate opportunity—for instance, zoning to meet the region's present lower income housing need. In some cases, the provision of such a realistic opportunity might result in the immediate construction of lower income housing in such quantity as would radically transform the municipality overnight. Trial courts shall have the discretion, under those circumstances, to moderate the impact of such housing by allowing even the present need to be phased in over a period of years. Such power, however, should be exercised sparingly. The same power may be exercised in the satisfaction of prospective need, equally sparingly, and with special care to assure that such further postponement will not significantly dilute the *Mount Laurel* obligation.

We reassure all concerned that *Mount Laurel* is not designed to sweep away all land use restrictions or leave our open spaces and natural resources prey to speculators. Municipalities consisting largely of conservation, agricultural, or environmentally sensitive areas will not be required to grow because of *Mount Laurel*. No forests or small towns need be paved over and covered with high-rise apartments as a result of today's decision.

As for those municipalities that may have to make adjustments in their lifestyles to provide for their fair share of low and moderate income housing, they should remember that they are not being required to provide more than their *fair* share. No one community need be concerned that it will be radically transformed by a deluge of low and moderate income developments. Nor should any community conclude that its residents will move to other suburbs as a result of this decision, for those "other suburbs" may very well be required to do their part to provide the same housing. Finally, once a community has

satisfied its fair share obligation, the *Mount Laurel* doctrine will not restrict other measures, including large-lot and open area zoning, that would maintain its beauty and communal character.

Many of these points will be discussed later in this opinion. We mention them now only to reassure all concerned that any changes brought about by this opinion need not be drastic or destructive. Our scenic and rural areas will remain essentially scenic and rural, and our suburban communities will retain their basic suburban character. But there will be *some* change, as there must be if the constitutional rights of our lower income citizens are ever to be protected. That change will be much less painful for us than the status quo has been for them.

## II.

### Resolution of the Issues

A. *Defining the Mount Laurel Obligation*

In *Oakwood v. Madison,* this Court held that it was sufficient in *Mount Laurel* litigation for courts to look to the "*substance*" of challenged zoning ordinances and to the existence of "*bona fide* efforts" by municipalities to meet their obligations. 72 *N.J.* at 499. It was hoped that this test would adequately protect the constitutional rights of lower income persons while at the same time minimizing the role of the courts in this area. Unfortunately, experience has taught us that this formulation is too vague to provide adequate guidance for either trial courts or municipalities. As the *Mount Laurel II* and *Mahwah* cases demonstrate, the *Madison* test does not ensure sufficient judicial scrutiny of zoning ordinances. Even those that plainly fail to meet the requisites of the *Mount Laurel* doctrine may pass the test of *Madison.*

 Therefore, proof of a municipality's bona fide attempt to provide a realistic opportunity to construct its fair share of lower income housing shall no longer suffice. Satisfaction of the *Mount Laurel* obligation shall be determined solely on an

objective basis: if the municipality has *in fact* provided a realistic opportunity for the construction of its fair share of low and moderate income housing, it has met the *Mount Laurel* obligation to satisfy the constitutional requirement; if it has not, then it has failed to satisfy it.[8] Further, whether the

---

[8]"Moderate income families" are those whose incomes are no greater than 80 percent and no less than 50 percent of the median income of the area, with adjustments for smaller and larger families. "Low income families" are those whose incomes do not exceed 50 percent of the median income of the area, with adjustments for smaller and larger families. See 42 *U.S.C.* § 1437a(b)(2) (1982 Supp.), in which these definitions are used to define income standards for the Section 8 housing subsidy program. Our phraseology differs from that in the Section 8 program, which defines "lower income families" as analogous to our moderate income families, and "very low income families" as analogous to our "low income." 42 *U.S.C.* § 1437a(b)(2) (1982 Supp.).

Since the median family income rises steadily with inflation, the precise monetary definition of low and moderate income will be constantly changing. At any particular time, an interested municipality, developer, or judge can find out what low and moderate income levels are in the area ("area" being defined as a Standard Metropolitan Statistical Area (SMSA)) by asking the regional office of the Department of Housing and Urban Development in either Camden or Newark. Although we suggest use of this statutory definition in order to simplify matters for municipalities and for the courts, we are not foreclosing the argument that in particular cases another definition may be more reasonable.

When we refer in this opinion to housing being "affordable" by lower income families ("lower" meaning "low and moderate") we mean that the family pays no more than 25 percent of its income for such housing, the 25 percent figure being widely accepted in the relevant literature. *See, e.g., Housing Costs, supra* at 212 n. 6, at 12; C. Hartman, *supra* at 212 n. 6, at 4; A. Downs, *Opening up the Suburbs* 47 (1973). (Note, however, that the federal government in 1981 adjusted its calculations of the maximum amount of rent supplements payable to low-income tenants, estimating that no more than 30 percent of a tenant's income, rather than 25 percent, should be paid for housing. *See* 12 *U.S.C.* 1701s(d) (1982).) As noted *supra* at 212 n. 6, the median price of a home now is around $75,000, and the annual income needed to support monthly payments is in the $24,000–$37,000 range depending on interest rates. *The New York Times,* Oct. 17, 1982, Real Estate Section. The article assumes the home-buyer devotes 32 percent of gross income to housing expenses.

We note that in 1970, when low and moderate income for a family of four ranged up to $8,567 per year, the proportion of lower income families in New Jersey was 39.4 percent (a total of about 800,000 households). See

opportunity is "realistic" will depend on whether there is in fact a likelihood—to the extent economic conditions allow—that the lower income housing will actually be constructed. Plaintiff's case will ordinarily include proof of the municipality's fair share of the regional need and defendant's proof of its satisfaction. Good or bad faith, at least on this issue, will be irrelevant. The numberless approach encouraged in *Madison,* where neither plaintiffs nor defendants are required to prove a fair share number, is no longer acceptable.

 The numberless approach is to be distinguished, however, from presumptive facial invalidity. Plaintiff may continue to prove (in addition to or instead of proving the fair share obligation of the municipality) that the land use regulations fail to provide a realistic opportunity for low and moderate income housing or that they contain "expressly prescribed requirements or restrictions which preclude or substantially hinder it." *Mount Laurel I,* 67 *N.J.* at 180–81. As before, such a showing shall create a *prima facie* case of a failure to satisfy the *Mount Laurel* obligation. The municipality shall then have the heavy burden of demonstrating, by a preponderance of the evidence, its fair share and its satisfaction of that share, or any justifica-

---

Department of Community Affairs, Revised Statewide Housing Allocation Report 9 (1978) (HAR). The Department assumed that, at least until 1990, there would be a "continuation of current socio-economic trends," meaning that the proportion of lower income families would stay at 39.4 percent. *Id.* at 8. We see no reason to dispute this assumption. Based on this assumption, and on population forecasts through 1990, the HAR projected a 300,232 growth in the number of lower income households through 1990. *Id.* at 9. It is important to note here that this final number is based upon a DCA assumption that the average household size would be 2.71 persons per household in 1990. *Id.* If, as many planners now predict and as the 1980 census figures indicate, the average household size in 1990 is significantly smaller than 2.71, and if that average holds true for lower income families, the number of new lower income households in 1990 would be concomitantly larger. We also note that the number of lower income households projected for 1990, since it is based on overall population projections, presumably includes lower income households expected to be moving into New Jersey from other states.

tion of its failure. It shall not be sufficient in such cases to show merely that there are one, two or three zones that *purport* to contain provisions for multi-family dwellings: what is needed where facial invalidity is relied on by the plaintiff is a definite presentation of facts by the defendant-municipality that shows that it has satisfied its fair share obligation.

In the remainder of Section II, we will restate what "fair share" means and what municipalities and courts must do to ensure that *Mount Laurel* obligations are met. Section IIB, using the DCA's SDGP as the remedial standard, sets forth which municipalities have a prospective fair share obligation. Section IIC describes various ways by which the prospective fair share of municipalities may be calculated. Section IID describes the mechanisms municipalities must use to meet their *Mount Laurel* obligations. Section IIE outlines the remedies available to trial courts to ensure compliance with our mandate. Finally, Section IIF emphasizes the importance of judicial management in making *Mount Laurel* effective.

B. *Determining the Mount Laurel Obligation: Use of the State Development Guide Plan*

The initial question in every *Mount Laurel* case is whether the municipality is subject to the *Mount Laurel* obligation. In its initial formulation in *Mount Laurel I,* this Court described the characteristics of Mount Laurel, implying that any municipality with similar characteristics would have the obligation announced in that opinion. *Mount Laurel I, 67 N.J.* at 160. Those municipalities are referred to as "developing municipalities." *Id.* at 190. All subsequent litigation concerning the doctrine treated this preliminary determination as a condition precedent to its applicability (although there were pointed disagreements suggesting the developing-developed distinction inequitable, *e.g., Pascack,* 74 *N.J.* at 494–95 (Schreiber, J., concurring)), and the particular factors descriptive of Mount Laurel set forth in that opinion became fixed as the "six criteria of a developing municipality":

A developing municipality (1) has a sizeable land area, (2) lies outside the central cities and older built-up suburbs, (3) has substantially shed rural characteristics, (4) has undergone great population increase since World War II or is now in the process of doing so, (5) is not completely developed and (6) is in the path of inevitable future residential, commercial and industrial demand and growth. [*Glenview Development Co.*, 164 *N.J.Super.* at 567–68].

These criteria are discussed as if each must be satisfied in order for a municipality to be "developing."

There are various drawbacks to this approach to the critical question of determining the existence of the obligation. Uncertainty is one of them. Ideally a municipality, and its governing body, should know without question whether it is subject to the *Mount Laurel* remedy, for without that knowledge municipalities that are "borderline" (between developing and non-developing) cannot be expected to comply with an obligation that may very well not exist. Given the foreseeable political pressures, governing bodies in that situation are almost certain to take the position either that the constitutional remedy or obligation does not apply, or that if it does apply, it has not been violated, or that their responsibility to the municipality and its residents requires that the issues be determined in litigation.

Of at least equal importance, the criteria will not necessarily result in the imposition of the obligation in accordance with sound planning. There may be areas that fit the "developing" description that should *not* yield to "inevitable future residential, commercial and industrial demand and growth." Those areas may contain prime agricultural land, open spaces and areas of scenic beauty; apart from these their development might impose unacceptable demands on public investment to extend the infrastructure required to support such growth. Indeed, to some extent the very definition of "developing" suggests results that are quite the opposite of sound planning, for the whole purpose of planning is to prevent or deflect what would otherwise be "inevitable."

Lacking any official guidance, however, as to the state's plans for its own future, its own determination of where development should occur and where it should not, and what kind of develop-

ment, this Court fashioned its own remedial planning guide in the form of a definition of "developing." It was obvious to anyone who studied the matter that such definition of the *Mount Laurel* responsibility furnished no guarantee that if lower income housing resulted, it would be built where it should be built, *i.e.*, where a comprehensive plan for the State of New Jersey might indicate such development was desirable. We proceeded in spite of this drawback since, given the constitutional requirement and the lack of any assurance that such a statewide plan would be forthcoming, there appeared no justification for delay.

We now have a satisfactory alternative. The State Development Guide Plan (May 1980) promulgated pursuant to *N.J.S.A.* 13:1B–15.52, provides a statewide blueprint for future development. Its remedial use in *Mount Laurel* disputes will ensure that the imposition of fair share obligations will coincide with the State's regional planning goals and objectives.

The SDGP represents the only official determination of the state's plan for its own future development and growth. It is substantially similar, in concept and approach, to various regional planning documents by other entities, such as the Tri-State Regional Planning Association, Delaware Valley Regional Planning Association, the Regional Plan Association, and the Middlesex, Somerset, Mercer Regional Study Council, Inc., which have the goal of guiding all new development within their planning jurisdictions. The SDGP resulted from an intensive study of all aspects of New Jersey's current growth and development considered in conjunction with the "physical assets" of the state: its natural resources, open spaces, farmland, "infrastructure" (transportation, sewage facilities, water supplies and facilities), including the location of present intensive development, employment centers, community facilities, recreation areas, etc.[9] By

---

[9]The final draft of the Plan reflects a great deal of thought, preparation, and participation by a wide variety of interested parties:

using proven sound planning concepts the Division of State and Regional Planning, statutorily charged with the obligation (*N.J. S.A.* 13:1B–15.52), developed a master plan (the SDGP and the Concept Map) for the purpose of guiding the future growth and development of this state.

The SDGP divides the state into six basic areas: growth, limited growth, agriculture, conservation, pinelands and coastal zones (the pinelands and coastal zones actually being the product of other protective legislation).[10] While it does not purport to draw its lines so finely as to delineate actual municipal boundaries or specific parcels of land, the concept map, through the county maps, makes it quite clear how every municipality in the state should be classified (see Appendix). By clearly setting forth the state's policy as to where growth should be encouraged and discouraged, these maps effectively serve as a blueprint for the implementation of the *Mount Laurel* doctrine. Pursuant to the concept map, development (including residential development) is targeted for areas characterized as "growth." The *Mount Laurel* obligation should, as a matter of sound judicial discretion reflecting public policy, be consistent with the state's plan for its future development. Consequently,

---

Distribution of the preliminary draft of the Guide Plan was started in late 1977 with copies sent to all State agencies, regional and county planning agencies, all municipalities and public libraries. Additional copies were made available to the general public on request. Of the 3,000 copies printed, all have been distributed. A brochure outlining the major elements of the plan was also produced and widely distributed. In addition, staff of the Division of Planning have participated in over 80 presentations and discussions with a variety of civic and interest groups and public agencies in all parts of New Jersey. Moreover, state agencies with land use responsibilities were surveyed to obtain information for incorporation in future plan revisions.

This present document builds on the preliminary draft and the consultation, discussions, presentations and conferences held on the plan since it was published in 1977. [SDGP, Preface at 1].

[10] *See N.J.S.A.* 13:18A–1 to –29 (pinelands) and *N.J.S.A.* 13:19–1 to –21 (coastal areas).

the obligation should apply in these "growth" areas, and only in these areas, subject to the exceptions mentioned *infra* at 240–243.[11]

The use of the SDGP for this purpose is consistent with the statute authorizing its preparation and with its actual use by the Legislature, counties, municipalities, the Federal government and the Division of State and Regional Planning within the Department of Community Affairs. The administrators who carried out the legislative requirement to prepare such a plan "... for the future improvement and development of the State," *N.J.S.A.* 13:1B–15.52 a.(2), interpreted the statute to require a plan that would guide and influence the location of future development, including residential development. Channeling the development impetus of the *Mount Laurel* doctrine into "growth areas" is precisely the kind of use of the plan that was intended by those who prepared it.

The statute requires the Division of State and Regional Planning to "[p]romote programs to insure the orderly development of the State's physical assets by ... preparing and maintaining a comprehensive guide plan and long term development and capital improvement program for the future improvement and development of the State ...." *N.J.S.A.* 13:1B–15.52(a), (a)(2). The same section of the statute requires the Division to "as-

--------

[11]The Division of State and Regional Planning, in its designation of land use areas, has incorporated the development plans of two statutory agencies: the Division of Coastal Resources, Bureau of Coastal Planning & Development, Department of Environmental Protection, and the Pinelands Commission. Each agency has prepared a comprehensive plan for the management and control of these environmentally sensitive areas. To the extent that these plans permit or encourage growth, the fair share obligation discussed herein may attach. *See infra* at 241–243. The Division of Coastal Resources has already in effect implemented this Court's fair share mandate in its recently promulgated regulations, *N.J.A.C.* 7:7E–7.2(d)(3), which were recently upheld in *In re Egg Harbor Associates,* 185 *N.J.Super.* 507, 518 (App.Div.), certif. granted, 91 *N.J.* 552 (1982), as "appropriately responding both to the directives of CAFRA [Coastal Area Facility Review Act, *N.J.S.A.* 13:19–1 to –21] and to the constitutional mandate of *Mount Laurel* [*I*]."

sembl[e] and analyz[e] pertinent facts as to existing development conditions and trends." *N.J.S.A.* 13:1B–15.52(a)(1). The plan is "comprehensive," its intent is to "guide . . . the future . . . development of the State," and its purpose of assuring the orderly development of the State's "physical assets" (land, open spaces, infrastructure—all of the State's natural and man-made "physical resources" (SDGP at ii)) is to be achieved by, among other things, "stimulating, assisting and coordinating local, county and regional planning activities." *N.J.S.A.* 13:1B–15.-52(a)(4).[12]

The Division of State and Regional Planning completed its Horizon Plan and Ten Million Plan in the 1960's, *see* SDGP, Preface at 1, and by 1975 was well along in its studies and work aimed at the preparation of the State Development Guide Plan. That work was proceeding through the efforts of the State Planning Task Force started in the early 1970's.

In 1975, the Legislature recognized and supported this effort to guide the further development of the state in accordance with that comprehensive guide plan. Presumably with knowledge of the Division's ongoing work in preparing the SDGP, it required all municipalities to consider the relationship of *their* master plans to the SDGP, each master plan to "include a specific policy statement indicating the relationship of the proposed development of the municipality as developed in the master plan to . . . [the State Development Guide Plan]." *N.J.S.A.* 40:55D–28(d). While it did not mandate conformance of the municipal master plan or the development of the municipality to the SDGP, the legislative intent was clear: municipalities were encouraged to

---

[12]This statute authorizing the SDGP, taken together with the federal act that helped fund the SDGP, demonstrates an intention not simply to *plan* the development of the state, but also to *guide* that development. *See* § 701 of the Housing Act of 1954 as amended, 40 *U.S.C.* § 461. The goal was to be achieved through governmental action at all levels, including coordination of local, county and regional planning activities, and, at the State level, the appropriate location of capital investment programs, all in accordance with a comprehensive State plan.

guide their development in conformance with the state plan to make it more likely that through voluntary municipal action, the future development of the entire state would be in accordance with comprehensive sound planning.

This legislatively mandated use of the SDGP is found in the Municipal Land Use Law, *L.*1975, *c.* 291, *N.J.S.A.* 40:55D–1 to –92, in which the Legislature explicitly recognized the importance of regional planning and the need to integrate each municipality's development with the development of the state as a whole. Among the purposes of the Act are the following: "to encourage municipal action to guide the appropriate use or development of all lands in this State," "to ensure that the development of individual municipalities does not conflict with the development and general welfare of neighboring municipalities, the county and the State as a whole," "to promote the establishment of appropriate population densities and concentrations that will contribute to the well-being of persons, neighborhoods, communities and regions ...," "to provide sufficient space in appropriate locations for a variety of agricultural, residential, recreational, commercial and industrial uses and open space, both public and private, according to their respective environmental requirements in order to meet the needs of all New Jersey citizens," and "to promote the conservation of open space and valuable natural resources and to prevent urban sprawl and degradation of the environment through improper use of land." *N.J.S.A.* 40:55D–2.

Among the many devices found in the law to achieve these purposes is the municipal master plan. That plan, which must relate to the SDGP, is "to guide the use of lands within the municipality." Thus, it is essentially a plan to help determine, control, and provide locations for the municipality's future growth. *N.J.S.A.* 40:55D–28(a). Among other things, master plans require "[a] land use plan element ... showing the existing and proposed location, extent and intensity of development of land to be used in the future for varying types of residential, commercial, industrial, agricultural, recreational, ed-

ucational and other public and private purposes or combination of purposes, and . . . including a statement of the standards of population density and development intensity recommended for the municipality." *N.J.S.A.* 45:55D–28 b(2).

When the Division of State and Regional Planning circulated its first draft of the SDGP in 1977 and then (after broad consultation with citizens throughout the state involved in the planning process, including county and regional planning agencies) released the SDGP in May 1980, it knew that the areas it had carved out of the state and designated for "growth," "limited growth," "conservation," and "agricultural" would be used by municipalities in determining where development in fact should and should not occur. The SDGP was not only a document that could be used to decide where growth should be encouraged and discouraged, permitted, and prohibited, but a document that the Legislature said *must* be used for that purpose. And so it has been used by municipalities in accordance with the Municipal Land Use Law and in many other ways.

■ The primary function of the SDGP is to determine where growth, including residential growth, should be encouraged or discouraged.

> The State Development Guide Plan is a policy statement about the State's future growth and development. It contains a concept map which shows spacially where growth should be either discouraged, encouraged or delayed, and reflects the need to balance conservation areas, agricultural land and water resource imperatives with opportunities for further economic and residential expansion. [SDGP at ii].

Speaking of population and employment projections that indicate that the already-developed "pattern of more widespread suburbanization will continue into the 1980's," and noting that "this could result in the development of substantial amounts of open land for residential, commercial and industrial uses," the SDGP describes the challenge that it is designed to help meet:

> A major challenge faced by the people of New Jersey is how to guide this projected growth so that open space and environmental quality are retained while, at the same time, good residential areas are made available, needed employment opportunities are created, and public investments are efficiently utilized and developed. [SDGP at 2].

Housing is one of the major factors discussed in the Plan, along with population distribution and growth, the economy, energy, urban areas, infrastructure, environmental quality and natural resources. The Plan notes that "a major challenge in the coming years will be to provide a variety of housing opportunities in appropriate locations for New Jersey's expanding population." SDGP at 7. Referring to the "suburbanization process" that followed World War II as "expensive and wasteful," the Plan notes "a need now in New Jersey to alter this unplanned pattern of spread development. A compact development pattern for the future can serve to promote the utilization of the existing infrastructure and service system in an economical way .... It is now suggested that a major portion of the State's development efforts should be directed to areas within and contiguous to existing development." SDGP at 25. One of its growth management strategies advocates "a suitable balance between conservation and growth in New Jersey with space for both the conservation of agricultural and critical environmental areas and for residential and economic growth." SDGP at 26.

"The overall strategy of the Guide Plan is to attain a sharper focus in governmental efforts directed to urban, suburban and open space areas so that the proposed patterns of conservation and development can be realized." SDGP at 80. The strategy is one of "discouraging population expansion" in "Limited Growth Areas," SDGP at 91, "to refrain from public investment in growth inducing facilities" in "Agricultural Areas," SDGP at 90, to utilize "acquisitions and regulatory control, the withholding of major public investments for growth-inducing facilities to deter development" in conservation areas, SDGP at 87, and to target public investments for new growth-inducing facilities to "Growth Areas," and within those areas "encourage housing development in proximity to jobs, commercial areas and public transportation," and "provide a variety of housing types so that households of varying sizes and incomes can find suitable housing," SDGP at 86, "Growth Areas" being those parts of the

State previously defined as being "particularly suitable for development." SDGP at 47.[13]

---

[13]The SDGP compares itself with the Tri-State Regional Development Guide (RDG). "The broad policies of both plans are similar. However, the RDG is more detailed. It contains maps which show incremental density ranges for each square mile, it has an extensive classification and designation of economic centers, and employment and housing unit targets are provided in addition to population targets." SDGP at 113. After noting that the detail in the RDG brought out some differences with the SDGP that were not apparent "at a more general level of plan comparison," SDGP at 113, the Plan goes on to state that "each plan *promotes* concentration of growth, stressing that future development *should occur* adjacent to already developed areas and as infill in mostly settled areas. Accordingly, each plan recognizes the public and private costs of sprawl, and *promotes* a land use pattern that would encourage efficient use of capital investments for facilities such as sewers and highways. Discouraging present trends toward scattered development in suburban and ex-urban areas is also seen as a way to conserve energy usage." SDGP at 114 (emphasis supplied). As an example of the difference in the plans, the SDGP at page 116 has an overlay of the RDG map on the SDGP map for Somerset County. It notes that the apparent differences (the RDG indicates urban development occasionally in areas shown by the SDGP as open land) result primarily from the greater detail of the RDG map and that despite these minor differences there is a clear "correspondence of associated policies." SDGP at 115. What is most significant, however, is that practically all of the new residential development proposed by the RDG is located in the "growth area" of Somerset County as outlined in broader brush by the SDGP. When the SDGP notes that "each plan promotes concentration of growth," at 114, it is speaking of all growth, and in particular its own confinement of new residential development to growth areas.

In a brochure that accompanied the distribution of the preliminary State Development Guide Plan designed to acquaint a "wider audience" with its contents and to solicit their comments, the first of "the challenges facing New Jersey" listed is "to accommodate approximately one and a half million more persons by the year 2000 in sound housing which will offer reasonable choices in location, in type and in cost." It notes that the Plan "indicates where further expansion should be encouraged, where less intensive development is appropriate and where essential natural resources, recreational space and agricultural land should be preserved" and thereby provides "a framework for making these decisions . . .," referring to the "hard choices among competing and worthy needs—the need for jobs and clean air, the need for adequate housing and for profitable farmland, the need for improved transit systems and for recreational open space." It suggests that the "Plan could influence development decisions made by State, county and local governments." In answer to its own question, "how

██ The remedial use by this Court of the SDGP as the primary standard to determine the locus of the *Mount Laurel* obligation, and consequently to determine where development (in this case housing) should be encouraged and, as importantly, its use to assure that the *Mount Laurel* doctrine does not encourage development in *conflict* with the State's comprehensive plan, is thus the kind of use of the SDGP contemplated by the Legislature in various statutes, and by the Plan itself.

For instance, it is clear that municipal master plans, pursuant to the statutory mandate, have considered the SDGP; that many seem to view it as a helpful guide; that some conscientiously attempt to conform their proposed development to that suggested in the Plan; that others comply with it out of a concern that needed public funds will not be forthcoming unless they do; and that others simply note their consideration in a pro forma manner. The overriding fact, however, is that the SDGP is being used, to a greater or lesser extent, by municipalities in planning for their future development, and in particular is being used to determine where future development, including housing, should be located by referring to those areas of the SDGP classified as "growth areas."

██ While its impact is not clear, the SDGP is being used by the state in commenting on all applications for major subdivi-

---

would the Plan affect the private sector?" it states that a "developer ... may be attracted to Growth Areas by the prospect that assistance for sewage treatment facilities and road improvements will be easier to obtain there than elsewhere.... By influencing such decisions the Plan could encourage its own implementation." It notes that most development should occur in growth areas and that it is there "that much of the State's investment in development encouraging facilities and services should be made." "What would this growth be like?"—the brochure responds that "[d]evelopment within growth areas would occur, as it has to the present, in a variety of patterns: clusters of apartments and townhouses, areas of single family houses on individual lots, and places of commercial and industrial development interspersed with open lands and parks. The planning decisions which underlie these development patterns would be based as they are now on conservation of natural areas and existing conditions and on the balance each municipality wants to achieve among land uses."

sions exceeding either 150 acres or 500 dwelling units. The Municipal Land Use Law requires that the Division of State and Regional Planning be notified of hearings on such applications (*N.J.S.A.* 40:55D–12(g)), the Legislature presumably intending that the location of such proposed developments be reviewed by the Division to determine if they conform with sound statewide comprehensive planning—and ultimately if they conform with the comprehensive guide plan that the Legislature required all master plans to consider. The obvious purpose of this provision is to enable the Division to advise local agencies, before they act on such applications, of the relationship of the proposed development to statewide comprehensive planning and of the recommendations of the Division concerning either approval or disapproval, and of the conditions that might be considered in connection with such applications. The Division has used the SDGP "as a reference in its review of major subdivisions," SDGP at iii, "to evaluate the suitability of major subdivision proposals [of this kind]" in order to "assess [ ] major development proposals in terms of statewide priorities and policies ... [and to] shar[e] such assessments with the private sector and local governments concerned," SDGP at 80 (in other words to let the municipality and the proposed developer know of the Division's recommendations concerning the proposed development based on the SDGP). The direction by the Legislature provides a practical support for its declared policy that municipal land use regulations shall be applied in accordance with regional and statewide planning objectives, for it brings the Division of State and Regional Planning and the SDGP directly onto the stage where the development decisions are made.

The SDGP is also used by the state and its agencies in reviewing their own "functional plans." "Some agencies have found the plan useful and have incorporated its major recommendations within their own programs. Some progress has been made, though on an informal basis, toward establishing a unified statewide land use and investment policy." SDGP at iii. The Governor's Office of Policy and Planning, created in 1978,

designed to assure that the policies of state departments are complementary and mutually enforcing, has "given impetus to the movement toward coordinated comprehensive land use policies." *Id.* The SDGP is "designed to assist the Governor's Office of Policy and Planning and the various cabinet committees it serves," *id.* at iv, in this function. The clear implication is that in accordance with its intent, the SDGP is being used to help guide state investment policies, capital growth strategies, and overall programmatic policies.

The SDGP has been used, since 1977, by the Division in its review of and for its comments on "applications for federal assistance processed through the Project Notification and Review System." SDGP at iii. This is a system designed to obtain comments that will enable the federal government to determine whether its grant programs are in conflict with comprehensive planning projects of regions and states, to what extent in conflict, all for the purpose of determining whether or not to approve or reject an application, or to attach varying conditions to it. Many of the projects for which federal aid is sought are development-inducing (sewage construction, roads, water treatment, etc.); they may determine as much as any other governmental policy where residential development will occur and where it will not.

A brochure issued by the Division in September 1981 notes that its review of a federal aid application is to determine, among other things, the application's "conformance with the State Development Guide Plan" as mandated by the federal legislation. Case studies in the brochure show the extent to which the SDGP's classification of the State into growth areas and others has actually been used in influencing decisions affecting the State's development.[14]

---

[14]The present project notification system has been rescinded by executive order of President Reagan, effective April 30, 1983. Alternative methods of commenting on proposed federally aided projects are being devised. It is

The lessons of history are clear, even if rarely learned. One of those lessons is that unplanned growth has a price: natural resources are destroyed, open spaces are despoiled, agricultural land is rendered forever unproductive, and people settle without regard to the enormous cost of the public facilities needed to support them. Cities decay; established infrastructures deteriorate for lack of funds; and taxpayers shudder under a financial burden of public expenditures resulting in part from uncontrolled migration to anywhere anyone wants to settle, roads leading to places they should never be—a pattern of total neglect of sensible conservation of resources, funds, prior public investment, and just plain common sense. These costs in New Jersey, the most highly urbanized state in the nation, are staggering, and our knowledge of our limited ability to support them has become acute. More than money is involved, for natural and man-made physical resources are irreversibly damaged. Statewide comprehensive planning is no longer simply desirable, it is a necessity recognized by both the federal and state governments.

Based on all of the foregoing, we are able to fashion judicial relief through means not available to us when we established the "developing municipality" remedial doctrine. These considerations, founded in sound public policy relating to comprehensive planning, are compelling in favor of a remedial solution that imposes the *Mount Laurel* obligation only in those areas designated as "growth areas" by the SDGP. For reasons shortly to be noted, we have decided to allow some limited variation from that rule. The point here is that we see every reason to modify what is generally regarded as one of the doctrines of *Mount Laurel I,* namely, that the *Mount Laurel* obligation applies only in developing municipalities, and no reason, either in the constitutional doctrine or in the *Mount Laurel* case itself, not to do so.

impossible to predict how or if the SDGP will be used on such proposals in the future. *See* Executive Order No. 12372, 47 Fed.Reg. 30, 959 (1982).

That we are not inhibited by the Constitution from making this change is apparent when one analyzes the constitutional obligation itself. *Mount Laurel I* held that in the exercise of the zoning power a municipality could not constitutionally limit to its own citizens those whose housing needs it would consider, but was required to consider the housing needs of all of the citizens of the region of which that municipality was a part. Put differently, the zoning power that the State exercised through its municipalities would have constitutional validity only if regional housing needs were addressed by the actions of the municipalities in the aggregate. The method selected by this Court in *Mount Laurel I* for achieving that constitutionally mandated goal was to impose the obligation on those municipalities that were "developing." Clearly, however, the method adopted was simply a judicial remedy to redress a constitutional injury. Achievement of the constitutional goal, rather than the method of relief selected to achieve it, was the constitutional requirement.

Since our imposition of the *Mount Laurel* obligation on municipalities containing growth areas as defined by the SDGP (rather than on "developing" municipalities) is just as clearly related to achieving the constitutional goal, it is equally constitutionally valid. Furthermore, it is significantly preferable for other reasons. The constitutional obligation of the State of New Jersey in exercising its zoning power through its municipal subdivisions to provide a realistic opportunity for lower income housing for its citizens can just as well be met by requiring housing in municipalities in conformance with sound planning concepts as with judicially devised characterizations that may or may not advance other important policies of the state.

As this Court pointed out in *Mount Laurel I*, it might be "sounder" to have one municipality in the region have more lower income housing than another "because of greater availability of suitable land, location of employment, accessibility of public transportation or some other significant reason"—in other

words for the combination of reasons that add up to a sound planning decision. Though it might be sounder, we reluctantly concluded that "*every* municipality [in a region] must bear its fair share of the regional burden." 67 *N.J.* at 189 (emphasis supplied). We thought then that our hands were tied, that we could not distribute the *Mount Laurel* obligation in accordance with sound planning criteria both because of the method of distributing the tax burden in New Jersey and because zoning was not permitted on a regional basis. *Id.* at 189 & n. 22. Today, however, zoning in accordance with regional considerations is not only permissible, it is mandated as noted above. Furthermore, while we are far from achieving tax equality among all the municipalities of the state, our present programs of State aid to education (financed through an income tax that was not in effect at the time of our decision in *Mount Laurel I*) are designed to reduce significantly the differential school tax burden between municipalities that accept residential development and those that do not. As we view it, therefore, there is no reason today not to impose the *Mount Laurel* obligation in accordance with sound planning concepts, no reason in our Constitution to make every municipality a microcosm of the entire state in its housing pattern, and there are persuasive reasons based on sound planning not to do so.

The Constitution of the State of New Jersey does not require bad planning. It does not require suburban spread. It does not require rural municipalities to encourage large scale housing developments. It does not require wasteful extension of roads and needless construction of sewer and water facilities for the out-migration of people from the cities and the suburbs. There is nothing in our Constitution that says that we cannot satisfy our constitutional obligation to provide lower income housing and, at the same time, plan the future of the state intelligently.

Sound planning requires that municipalities containing "growth areas" have a *Mount Laurel* obligation and that, together, all of those municipalities affirmatively provide a

realistic opportunity for the construction of sufficient lower income housing to meet the needs of New Jersey's lower income population. And, as among those municipalities containing "growth areas," the Constitution does not prohibit further distinctions, some municipalities being required to take more than others because a combination of factors suggests that they are more suitable for such development. The thought that "suitability" may determine and validate distinctions in uses between municipalities was expressed by Chief Justice Vanderbilt in *Duffcon Concrete Products v. Borough of Cresskill,* 1 *N.J.* 509 (1949), one of the first cases to evaluate a zoning ordinance in the context of regional characteristics and needs.

There may be inequities between and among these municipalities located within growth areas, as there undoubtedly are between all of them and municipalities outside of growth areas, for the tax and other burdens caused by the location of lower income housing will not be fairly spread. The state, however, has made its decision as to where this development should occur. If location in accordance with that state plan has adverse economic consequences, it would be appropriate for the state, rather than this Court, to correct them.

█ As noted above, we have decided not to make the SDGP the absolute determinant of the locus of the *Mount Laurel* obligation. Our reluctance to give it conclusive effect is based on the fact that while it has the legitimacy of legislative authorization, the Legislature has neither explicitly authorized its use for *Mount Laurel* purposes nor mandated that the actual use of land, as permitted in zoning ordinances, conform to the SDGP. Given these circumstances, we deem it prudent to allow parties to attempt to persuade the trial court, in a particular case, that the SDGP should not determine whether the *Mount Laurel* doctrine applies to the particular municipality involved in the case. While we believe important policy considerations are involved in our decision not to make the SDGP conclusive, we think it even more important to point out that it will be the

unusual case that concludes the locus of the *Mount Laurel* obligation is different from that found in the SDGP. Subject to those cases, we hold that henceforth, only those municipalities containing "growth areas" as shown on the concept map of the SDGP (or any official revision thereof) shall be subject to the *Mount Laurel* prospective need obligation.[15]

Any party in *Mount Laurel* litigation seeking a ruling that varies the locus of the *Mount Laurel* obligation from the SDGP growth areas will have to prove one of the following: (1) accepting the premises of the SDGP, the conclusion that the municipality includes any growth area, or as much growth area as is shown on the concept map, is arbitrary and capricious, or, alternatively, the conclusion that the municipality does *not* contain any growth area whatsoever is arbitrary and capricious; (2) since the preparation of the concept map (or any revision thereof) the municipality has undergone a significant transformation that renders the SDGP's characterization of it inappropriate, admitting that at the time of the preparation of the SDGP and the concept map (or any revision thereof) the classification of the municipality was correct; or (3) (and this exception shall apply only if the concept map is not revised before January 1, 1985) subsequent to the date of this decision the municipality, containing no "growth area," encourages or allows commercial,

---

[15]The developing/non-developing distinction is therefore no longer relevant and the conclusion that fully developed municipalities have no *Mount Laurel* obligation is no longer valid. *See Pascack Ass'n Ltd. v. Washington Twp.*, 74 *N.J.* 470 (1977), and *Fobe v. Demarest*, 74 *N.J.* 519 (1977). The application of the *Mount Laurel* doctrine to fully developed municipalities will undoubtedly pose difficult problems. We note only that sound land use planning and *Mount Laurel* should remain compatible both at the state and municipal level, and that, in particular, where fully developed municipalities are involved, great care may be required to assure that the benefit of *Mount Laurel* is not offset by damage to legitimate zoning and planning objectives. The *Mount Laurel* doctrine should ordinarily be able to be accommodated, for example, without placing lower income housing projects in the middle of long-settled middle or upper income sections of a town. A satisfactory resolution of the occasionally conflicting interests may at times require creativity and cooperation.

residential or industrial development or, if it contains some "growth area," encourages or allows development outside of that area.

The foregoing exceptions will allow a party to have the court impose a *Mount Laurel* obligation on a municipality that has no growth area as shown on the concept map, or to impose a greater *Mount Laurel* obligation by, in effect, proving that the growth area should be enlarged, or, conversely, to relieve a municipality from any *Mount Laurel* obligation even though the concept map shows it as including a "growth area," or to diminish the obligation by proving that the "growth area" shown on the concept map should be cut down.

The first exception recognizes the possibility of errors on the part of the planning group that prepared the SDGP. No trial court should, however, simply substitute its judgment for the state's planners' under that exception. Not only must the evidence show that the conclusion and the classification were arbitrary and capricious, but the party challenging the characterization must contend with the obvious fact that lines must be drawn somewhere and that merely to show that one municipality containing a "growth area" is remarkably similar to a neighboring one that includes no "growth area" is not enough: the party must show that it was arbitrary and capricious not to place the line *somewhere else.*

The second exception requires proof of substantial change. Those who prepared the SDGP and the concept map obviously realized that conditions would change after its publication, that planning is a dynamic process, and that plans like the SDGP must remain current. Changes, therefore, sufficient to warrant reclassification of a municipality in whole or in part should be addressed not by the court, but by the Division when it revises the SDGP. The second exception, however, recognizes the possibility that prior to such a revision a municipality may change sufficiently so that it is inappropriate to retain its present SDGP classification. If a municipality that is substan-

tially rural changes only to the extent of an added industrial use and a fairly large residential subdivision, that might or might not constitute a substantial change, depending on all of the circumstances; if in addition there was further development of its infrastructure and *several* new substantial places of work and residential subdivisions, that municipality's SDGP classification should probably be changed. Furthermore, if the trial court finds that subsequent to the date of this decision the municipality has encouraged or allowed development, it should more readily conclude that the challenged SDGP "non-growth" characterization has become inappropriate. We do not intend to allow the SDGP to be used as a wall behind which municipalities may create or expand exclusionary developments.

The third exception recognizes that if the planning process does *not* remain a continuing one, the categories set forth in the SDGP might become unrealistic and certainly would lose a considerable degree of their legitimacy. It is one thing for a court to defer to the judgment of the planners, even where it disagrees; it is another to defer to a document that is clearly out of date where deferral might frustrate a constitutional obligation. In order for it to remain a viable remedial standard, we believe that the SDGP should be revised no later than January 1, 1985 (and, in the absence of proof of a more appropriate period, every three years thereafter).[16] If it is not, then courts shall have considerable discretion to vary the locus of the *Mount Laurel* obligation from that shown on the present SDGP concept map. For instance, if, after the date of this decision, a municipality containing no growth area allows the construction

---

[16]We will continue to rely on revisions of the SDGP as long as the procedures by which it is amended and the substantive recommendations it contains demonstrate that it is a sound planning document. Given the significance this opinion attributes to the SDGP, it becomes even more important that the state authorities responsible for it continue to act on the basis of sound planning principles. Failure to do so would not only have adverse consequences for the state, but would cause us to reconsider use of the SDGP as a remedial guide to the *Mount Laurel* obligation.

of a significant industrial use creating significant employment opportunities, that would be sufficient to justify a court in imposing a *Mount Laurel* remedy on that municipality as if a portion of it had been characterized as "growth area"; the same conclusion would follow if such a municipality, after the date of this decision, encourages or allows the construction of a residential subdivision, or if, though unsuccessful, it *attempts* to attract development of either kind or of a commercial nature. Such relative ease of variance from the SDGP shall cease, however, when the SDGP is thereafter brought up to date by a future revision.

We believe that this use of the SDGP is the best way to satisfy the requirements of our Constitution consistent with the requirements of sound planning. If events indicate, however, that this new direction given to the *Mount Laurel* doctrine is somehow inadequate, or needs further revision or refinement, the Court remains open to any party to advance such a contention. While there are numerous advantages to certainty in this area, it is much too complex to be dogmatic about almost anything. Flexibility is needed here, for our work is partially legislative in character. We do it not by choice, but because of our understanding of our Constitution and the Legislature's failure to act.

 As noted before, *all* municipalities' land use regulations will be required to provide a realistic opportunity for the construction of their fair share of the region's present lower income housing need generated by present dilapidated or overcrowded lower income units, including their own. Municipalities located in "growth areas" may, of course, have an obligation to meet the present need of the region that goes far beyond that generated in the municipality itself; there may be some municipalities, however, in growth areas where the portion of the region's present need generated by that municipality far exceeds the municipality's fair share. The portion of the region's present need that must be addressed by municipalities in growth areas

will depend, then, on conventional fair share analysis, some municipality's fair share being more than the present need generated within the municipality and in some cases less. In non-growth areas, however (limited growth, conservation, and agricultural), no municipality will have to provide for more than the present need generated within the municipality, for to require more than that would be to induce growth in that municipality in conflict with the SDGP.

It is our intention by this decision generally to channel the *entire* prospective lower income housing need in New Jersey into "growth areas." It is clear that that is what the SDGP intends and there is nothing to indicate that those areas are not more than sufficient to accommodate such growth for the foreseeable future.[17]

■ The SDGP does not purport to apply its growth, limited growth, conservation and agricultural classifications to lands subject to the jurisdiction of the Division of Coastal Resources under the Coastal Area Facility Review Act, *N.J.S.A.* 13:19–1 to –21, or the Pinelands Commission under the Pinelands Protection Act, *N.J.S.A.* 13:18A–1 to –29. While the maps that form part of the SDGP and some of its text suggest such classifica-

---

[17]Our approach may be contrasted with that taken by the Division's Housing Allocation Report, discussed *infra* at 250. The Housing Allocation Report suggested that limited growth municipalities had the same obligation to provide for the region's prospective lower income housing needs as did growth municipalities. HAR at 21–23. That is, limited growth municipalities were expected to take immediate action with respect to their allocations of present and prospective housing needs. HAR at 23. Only municipalities that were exclusively categorized as open space (conservation) or prime agricultural areas could have deferred compliance with their prospective (and non-indigenous present) housing need allocations. *Ibid.* By treating the growth and limited growth municipalities the same, the HAR would have promoted development of limited growth areas, despite the SDGP's explicit policy of discouraging growth there. See *supra* at 231. In keeping with the policy of the SDGP, we distinguish between limited growth and growth municipalities, and group limited growth areas with conservation and agricultural areas. As noted *infra* at 251, the HAR has been rescinded by virtue of the Governor's action in rescinding Executive Orders 35 and 46.

tion,[18] it is clear that the Division intended to defer to these operational state planning agencies. In referring to the Coastal Area Facilities Review Act and its administration, the SDGP notes that "the designations and growth patterns recommended by the Department of Environmental Protection . . . have been incorporated." SDGP at 43. As for the Pinelands, it states that "[t]he Concept Map classifies the entire Pinelands Area as Conservation. When an approved management plan has been completed by the Pinelands Commission, appropriate amendments to the Guide Plan and the Concept Map will be made." SDGP at 67.

In the case of both the Pinelands and Coastal Areas, state agencies have been created with direct responsibility and power to classify areas for purposes of encouraging and discouraging growth, indeed with power to prohibit it completely. Our review of the present plans and policies of both the Division of Coastal Resources and the Pinelands Commission indicates that their classification process is well-advanced and most complex. Since the relationship of the work of these agencies, and of their classification of the area subject to their jurisdiction, to the SDGP was neither argued nor briefed, we decline to decide in this litigation which municipalities within their bounds are subject to the *Mount Laurel* doctrine.

Trial judges in *Mount Laurel* cases involving municipalities located either in the Pinelands or the coastal zone shall consider in detail the classification systems involved to determine whether imposition of the *Mount Laurel* doctrine would be consistent

---

[18]The concept map of the SDGP, at 44, classifies the coastal areas in accordance with the then-existing classification of the Division of Coastal Resources (which classification was subsequently changed) and the Pinelands Region in accordance with the Pinelands Protection Act, *N.J.S.A.* 13:18A–11. The "growth area" map, SDGP at 51, however, shows as a growth area some of the portions of the coastal zone, while the county detailed maps continue to show the coastal zone's classifications in accordance with those of the Division of Coastal Resources.

with the regional planning goals of the agency, and whether the constitutional obligation will under any circumstances override those goals.

We realize that the construction of lower income housing in these coastal and pinelands areas where the *Mount Laurel* doctrine does apply will require approvals of agencies in addition to the municipality, that the approval procedure can be difficult and time consuming, and that what may appear as a realistic opportunity in a zoning ordinance may turn out not to be so by virtue of the position or regulations of the Division or Commission. These complexities necessarily arise from this double-layered system of municipal and state agency regulation designed to assure the greatest protection and coherence in the development of these highly sensitive environmental areas.[19]

Given the remedial function now assigned by this Court to the SDGP in determining the imposition of the *Mount Laurel* obligation, its admission in evidence in particular litigation poses no evidentiary problems whatsoever. It is admissible subject to *Evid.R.* 67 which requires "[a]uthentication of the original or a copy of a writing ... before it may be received in evidence." *See also Evid.R.* 63(15). Once the document is thus proven to be the authentic State Development Guide Plan, no hearsay problems exist. The document is not introduced to prove the truth of any fact contained in it. It is introduced because the Plan itself is a fact. By virtue of our opinion today, the State Development Guide Plan's delineation of growth areas will in

---

[19]In the coastal zone the rules of the Department of Environmental Protection provide that where feasible, residential developments should include "least cost" or "affordable housing" for low and moderate income households. *N.J.A.C.* 7:7E–7.2(e)(2); 14 *N.J.R.* 206(a) (1982). The rule was recently applied in *In re Egg Harbor Associates,* 185 *N.J.Super.* 507 (App.Div.), certif. granted, 91 *N.J.* 552 (1982), affirming the Division's requirement that 20 percent of a proposed 1,530 housing unit development consist of low and moderate income units.

most cases conclusively determine the existence and location for the imposition of the *Mount Laurel* obligation.[20]

Our use of the State Development Guide Plan for the purpose of determining where *Mount Laurel* applies does not, of course, guarantee that lower income housing will be constructed in the future solely pursuant to this comprehensive rational plan for the development of New Jersey. It simply tends to assure that the judiciary will not contribute to irrational development, discordant with the state's own vision of its future, by encouraging it in areas that the state has concluded should not be developed, areas more suitable for other purposes, or by inadvertently leading municipalities to encourage lower income housing in such areas. There is nothing, however, that prevents municipalities from encouraging growth, including residential growth, in areas designated by the SDGP as limited growth, agricultural or conservation areas. Uninhibited by any statutory restrictions, municipalities may, for a variety of reasons, plan their future in a manner totally inconsistent with the state's plan, bringing factories, retail shopping centers, large-scale housing developments, including lower income housing, into areas where their presence runs completely counter to the objectives of the SDGP. Except for protective legislation (such as that pertaining to the Pinelands and certain coastal areas) limited to particular ecologically sensitive areas, the state has imposed no proscriptions against development. While conformi-

---

[20]It is possible that evidentiary questions that often arise when facts or conclusions are sought to be proven through official records or documents may occur in *Mount Laurel* litigation if one of the parties seeks to prove that an area not designated "growth" has become such. In that case the rationale set forth in the SDGP, as well as some of the supporting facts, many of which are really conclusions, may become important. We do not purport to pass on the evidentiary problems that may arise in that event. Our discussion here assumes a simple direct showing that, for instance, the particular municipality is located fully within a growth area as shown on the SDGP's concept maps. If that is the case, no further proof is required; as a matter of law that municipality is subject to the obligations of the *Mount Laurel* doctrine (unless one of the exceptions mentioned *supra* at 240 applies).

ty of the constitutional obligation to the design of the Plan unquestionably advances the state's purpose, the absence of such proscriptions against development may, in the long run, undermine the regional planning objectives of the SDGP whether we limit the *Mount Laurel* obligation to growth areas or not.[21]

## C. *Calculating Fair Share*

The most troublesome issue in *Mount Laurel* litigation is the determination of fair share. It takes the most time, produces the greatest variety of opinions, and engenders doubt as to the meaning and wisdom of *Mount Laurel*. Determination of fair share has required resolution of three separate issues: identifying the relevant region, determining its present and prospective housing needs, and allocating those needs to the municipality or municipalities involved. Each of these issues produces a morass of facts, statistics, projections, theories and opinions sufficient to discourage even the staunchest supporters of *Mount Laurel*. The problem is capable of monopolizing counsel's time for years, overwhelming trial courts and inundating reviewing courts with a record on review of superhuman dimensions.

---

[21]In the event that the State takes action rendering the use of the SDGP inappropriate for *Mount Laurel* purposes, the trial court shall revert to the prior "developing" test to determine whether the *Mount Laurel* obligation applies, modified, however, as follows: developed municipalities shall be subject to the *Mount Laurel* obligation—that includes the central cities and the built-up suburbs. The most significant question in such cases will ordinarily be whether there is any land available for development, and, if not, what kind of remedy is appropriate to assure that as land becomes available, a realistic opportunity exists for the construction of lower income housing, assuming it is otherwise suitable for that purpose.

In addition to urban areas and the built-up suburbs, "developing" municipalities will be subject to *Mount Laurel*. To the extent that prior decisions imply that the so-called "six criteria" must be satisfied to characterize a municipality as "developing," *see supra* at 223–224, we disavow that implication. Any combination of factors demonstrating that the municipality is in the process of significant commercial, industrial or residential growth, *or* is encouraging such growth, *or* is in the path of inevitable future commercial, industrial or residential growth will suffice.

We have had enough experience with *Mount Laurel* litigation to warrant procedural modifications designed, over a period of time, to simplify these determinations. The procedural modification provided in this opinion (confining all *Mount Laurel* litigation to a limited number of judges) is well within conventional judicial techniques.

The first hint of the troubles ahead in determining fair share is found in *Mount Laurel I:*

> The composition of the applicable "region" will necessarily vary from situation to situation and probably no hard and fast rule will serve to furnish the answer in every case. Confinement to or within a certain county appears not to be realistic, but restriction within the boundaries of the State seems practical and advisable. [67 *N.J.* at 189–90].

The concurrence was more specific. Referring to the three issues mentioned above, it noted that:

> [A]ll of these steps involve difficult factual determinations based upon expert testimony and statistical evidence. It may well be appropriate for the court to appoint independent experts or consultants for its assistance or to invite participation by the Department of Community Affairs as *amicus curiae.* . . . [C]onflicting decisions within a given region would be highly undesirable . . . ." [67 *N.J.* at 216 (Pashman, J., concurring) (citations omitted)].

By the time we reached *Madison,* the full import of what sounded like benign flexibility in *Mount Laurel I* had become apparent. Ruling that the trial court need not make findings either of a specific region or of the precise fair share of a municipality within that region, we noted:

> Firstly, numerical housing goals are not realistically translatable into specific substantive change in a zoning ordinance by any technique revealed to us by our study of the data before us. There are too many imponderables between a zone change and the actual production of housing on sites as zoned, not to mention the production of a specific number of lower cost units in a given period of time. Municipalities do not themselves have the duty to build or subsidize housing. Secondly, the breadth of approach by the experts to the factor of the appropriate region and to the criteria for allocation of regional housing goals to municipal "subregions" is so great and the pertinent economic and sociological considerations so diverse as to preclude judicial dictation or acceptance of any one solution as authoritative. For the same reasons, we would not mandate the formula approach as obligatory on any municipality seeking to correct a fair share deficiency. [72 *N.J.* at 499].

Again:

> The formulation of a plan for the fixing of the fair share of the regional need for lower income housing attributable to a particular developing municipality,

although clearly envisaged in *Mount Laurel*, 67 *N.J.* at 162, 189–190, involves highly controversial economic, sociological and policy questions of innate difficulty and complexity. Where predictive responses are called for they are apt to be speculative or conjectural. [*Madison*, 72 *N.J.* at 533].

A reading of *Madison* with its comprehensive coverage not only of the facts and expert opinions in that case but also of the voluminous literature with its wealth of contrasting doctrine and approaches is still the most convincing argument now, as it was to us then, to modify the doctrine. Confronted with the overwhelming demonstration provided by *Madison* that the factors that make up the *Mount Laurel* doctrine are simply too complex and too interwoven with social, political and economic issues to permit judicial resolution, we ruled, bluntly, that they need not be resolved. We pointed out, not once, but on numerous occasions, that the problem is better addressed by others. ("[T]he basic underlying social problem is far better addressed by administrative action than litigation." 72 *N.J.* at 499 n. 5. Distinguishing fair share determinations by administrative planning agencies from courts adjudicating *Mount Laurel* disputes, we also noted that "[t]he correlative disadvantages of a court adjudicating an individual dispute are obvious." *Id.* at 533.)

One possible resolution of the fair share issue by an administrative agency was contained in "A Revised Statewide Housing Allocation Report for New Jersey" promulgated by the New Jersey Division of State and Regional Planning in May 1978. As noted in *Madison,* a preliminary draft of the HAR had been circulated, and but for its status as "tentative and subject to further public hearings and review," we suggested we might regard the regions and fair share allocations contained therein as "meriting *prima facie* judicial acceptance." *Madison,* 72 *N.J.* at 538.[22] Subsequent to our decision in *Madison* the report was updated (although still designated for public review and comment) to May 1978. Without in any way implying support for

---

[22]*See Madison,* 72 *N.J.* at 528 n. 35, 531 n. 37, and 535 n. 42 for a full discussion of the HAR.

or approval of the legitimacy, method or results of that report, it was the kind of administrative action that arguably provided a means not only for resolving the litigated issues, but for achieving a much more ·substantial degree of voluntary compliance with *Mount Laurel.*

On May 4, 1982, the Executive Orders that provided the legal justification for the HAR·(Executive Order No. 35, April 2, 1976, and No. 46, December 8, 1976) were rescinded by Executive Order No. 6. Any regulations adopted and promulgated under Executive Orders No. 35 and 46 were to be null and void. While the basis for such rescission ("said plan has proven to be inadequate to effectively meet the housing needs of the citizenry of New Jersey"; the orders "have proven inadequate and ineffective in meeting their stated goal"; Executive Order No. 6) did not explicitly foreclose use of the HAR in *Mount Laurel* litigation, we believe such use would not be in keeping with the spirit of the Governor's Executive Order, which is to render the HAR a nullity. Since the Executive's authorization and approval provided the legitimacy for the use of such report in *Mount Laurel* litigation, our authorization of its further use after that rescission would be clearly inappropriate.

With the rescission of Executive Orders 35 and 46 and the consequent unavailability of the HAR for *Mount Laurel* litigation, we remain confronted with precisely the same problem we faced in *Madison.* In that case, it was the determination of fair share that was disturbing, a determination that was comprised of the region, its need, and the allocation of that need. One must necessarily have some humility, based upon the past eight years of experience with *Mount Laurel,* in expressing confidence about its practical effect, but of this we are confident: our approach in *Madison* does not work and is not likely to.

When we relieved the parties and the court of the obligation to determine with precision the region, its need, and the fair share of the municipality, we underestimated the pressures that weigh against lower income housing. Given those pressures, the

test of whether the ordinance in substance provided *some* opportunity for either lower income or least-cost housing, and whether bona fide efforts had been made to minimize cost-generating requirements in a reasonable area of the municipality, has proven insufficient. The temptation for municipalities after our decision in *Madison* to ignore the *Mount Laurel* obligation or to provide the absolute minimum of *apparently* realistic opportunity for *some* lower income housing apparently became irresistable. Some of its results are before us today. Trial courts interpreted *Madison* as shifting the burden of compliance from the judiciary to the municipality and looked sympathetically on ordinances that arguably constituted a bona fide effort to comply. Sometimes, when the litigation was concluded, no one would know what the fair share of that municipality was, for no one had been required to determine it. There was no standard that municipalities could apply if they wanted to comply. This recognition of the complexities of the issue and the consequent reformulation of the rule in *Madison* unfortunately provided no relief from the complexities of *Mount Laurel* litigation, for parties could, and often did, continue to prove region, need, and fair share with the same profusion of facts and expert opinions but without knowing whether the court would regard the evidence as persuasive or even relevant.

In summary, in spite of our intentions, *Madison* has led to little but a sigh of relief from those who oppose *Mount Laurel.*

The situation must be remedied. In the absence of executive or legislative action to satisfy the constitutional obligation underlying *Mount Laurel,* the judiciary has no choice but to enforce it itself. Enforcement, to be effective, will require firm judicial management.

The difficulty in making the *Mount Laurel* obligation a reality is perhaps unique, for it consists of determining the obligation as much as enforcing it. Litigation that at its conclusion leaves everyone in doubt as to just what the constitutional obligation was and just how it was complied with has, in the aggregate,

the effect of leaving the constitutional obligation itself in doubt. Until the regions of New Jersey, their present and prospective lower income housing needs, and the allocation of those needs among all of the municipalities of the state charged with the *Mount Laurel* obligation are determined, uncertainty will prevail, and the weakness of the constitutional doctrine will continue. We intend today to begin a process aimed at ultimately eliminating the uncertainty that surrounds these issues.

The restriction of *Mount Laurel* litigation to three judges should simplify and perhaps, in time, substantially eliminate the issues of "region" and "regional need" from litigation. Of the three major issues in this area, their determination is most susceptible to judicial treatment. We implied as much in *Madison* when we contrasted "[t]he technical details of the basis for fair share allocations of regional goals among municipalities, pertaining as they do to an area of considerable complexity and theoretical diversity . . . " with the "gross regional goal," 72 *N.J.* at 536, and when we noted that "[t]here is much greater diversity among the experts [concerning "fair share allocation"] than in relation to determining pertinent regions." *Id.* at 541. We also noted that the determination of region was more important in achieving the goals of *Mount Laurel* than the fair share allocation itself ("harm to the objective of securing adequate opportunity for lower income housing is less likely from imperfect allocation models than from undue restriction of the pertinent region," *id.*).

As noted above, following the release of this opinion the Chief Justice, with the approval of the Court, will name three judges (the number to be changed if necessary) who will thereafter handle all *Mount Laurel* litigation (except some of the cases before us now and except for other pending matters, as to which transfer to those three judges will be at the discretion of the Chief Justice). Each of these three judges will be exclusively responsible for a particular area of the state; any litigation challenging a land use regulation of a municipality in

that judge's area on *Mount Laurel* grounds shall be assigned to that judge.

We anticipate that after several cases have been tried before each judge, a regional pattern for the area for which he or she is responsible will emerge. Ultimately a regional pattern for the entire state will be established, as will a fairly consistent determination of regional needs on both an area and statewide basis. Given that only three judges are involved, it is also not unreasonable to assume that the method for determining the municipality's fair share of the regional need will be consistent within the judge's area and tend to promote consistency throughout the state.

The determination of region and regional need by any of these judges shall be presumptively valid as to all municipalities included in the region unless the judge hearing the matter indicates otherwise for reasons stated in his or her decision.[23] Given the importance of these determinations, municipalities not named as parties may attempt to intervene or the court may require their joinder if, all things considered, it is thought advisable that such a municipality be bound by the determination even though such joinder may complicate the litigation. The extent of such litigation, whether non-party municipalities should be allowed to participate, and whether they should be joined as parties, shall all be within the discretion of the court, who will be better able to balance the various considerations involved. While it is possible that many municipalities may seek to enter such litigation, we believe that as a practical matter most will be content to abide by litigation in which others are involved. There may be exceptions, but in most cases municipalities will realize that the determination of region will probably not be substantially affected by their participation in the litigation; that while the variations in the definition and deline-

---

[23]This rule of presumptive validity binding on non-party municipalities shall not apply on remand to the six cases before us or to any *Mount Laurel* case in which trial has commenced.

ation of the region are infinite, its general contours are fairly predictable; and that the same applies to some extent to regional need.

In short we foresee that within several years the fair share question will be confined to the allocation issue. Our use of the SDGP should end practically all disputes over the existence of the *Mount Laurel* obligation and, in relatively short time, adjudication by the three judges should end most disputes over region and regional need. In practically all cases the only issue (other than the adequacy of the housing opportunity provided by the ordinance) that may require serious litigation is a particular municipality's fair share of that need. And even as to that issue, the housing allocation methodologies previously adopted should simplify it considerably. It is possible, of course, that the presumptively valid region and regional need determinations may be seriously contested, but we doubt it. Except for municipalities on the outer edges of a region, the regional determinations are not likely to be significantly varied by the judges, given the desirability of consistency and predictability; only the strongest evidence is likely to lead to substantial change. If the importance given to the initial litigation by the rule of presumptive validity results in a case more complex and with more parties than it might otherwise have been, we believe the ultimate potential gains are well worth it.

As implied above in our summary of rulings (Ruling 4, *supra* at 216–217), additional benefits may follow from this procedure. Each of the three judges will become more and more adept in handling *Mount Laurel* litigation, in defining and narrowing the issues early in the litigation, in expediting the case, in determining when an expert should be appointed by the court and when a master should be named to aid the municipality in its revision of a zoning ordinance, and ultimately in devising remedies suitable for the complete redress of exclusionary zoning.

 Such *Mount Laurel* litigation shall proceed using the previously accepted definitions and methods of determining region, regional need, and fair share. For example, we indicated in *Madison* our general approval of Judge Furman's definition of region (72 *N.J.* at 537), slightly modified, as "that general area which constitutes, more or less, the housing market area of which the subject municipality is a part, and from which the prospective population of the municipality would substantially be drawn, in the absence of exclusionary zoning." *Id.* at 543. A trial court's acceptance of any variant of this definition should be premised on special circumstances. Certainly in its ultimate determination the court may consider the factors mentioned in Justice Pashman's concurring opinion in *Mount Laurel I,* 67 *N.J.* at 215 n. 16. We will not attempt here to provide any further guidance for the determination of regional need, but leave that to the experts, including the experts appointed by the trial courts pursuant to our opinion.

As for fair share, however, we offer some suggestions.[24] Formulas that accord substantial weight to employment opportunities in the municipality, especially new employment accompanied by substantial ratables, shall be favored; formulas that have the effect of tying prospective lower income housing needs to the present proportion of lower income residents to the total population of a municipality shall be disfavored; formulas that have the effect of unreasonably diminishing the share because of a municipality's successful exclusion of lower income housing in the past shall be disfavored.

 In determining fair share, the court should decide the proportion between low and moderate income housing unless

---

[24]As a practical matter, there are already statewide growth plans that may be of help; for instance, those developed by the Department of Environmental Protection that deal with water, sewers and air. Many of the master plans formulated by county planning boards discuss fair share. In addition, the Departments of Transportation and Energy have master plans with population projections. All of these sources can be used to generate hard numbers that could be used in allocating a fair share.

there are substantial reasons not to do so. The provisions and devices needed to produce moderate income housing may fall short of those needed for lower. Since there are two fairly distinct lower income housing needs, an effort must be made to meet both.

The proportion between the two is, inevitably, a matter for expert testimony. It will depend, as does the fair share itself, on a complex mix of factors. We note, without comment, the trial court's use in *Carteret*, for this purpose, of the actual proportion between the low and moderate income population of the county. 142 *N.J.Super.* at 36–37: The point here is that it is an issue that should be addressed in passing on the adequacy of land use regulations (and revisions thereof) as well as builder's remedies. *Cf. Madison*, 72 *N.J.* at 549 & n. 48, 551 (builder's remedy conditioned on allocation of "at least 20% of the units to low or moderate income families"; in fact, allocation would be satisfied by moderate income units only).

The ultimate outcome of such litigation in most cases shall be a determination by the court of a precise region, a precise regional present and prospective need, and a precise determination of the present and prospective need that the municipality is obliged to design its ordinance to meet.

We recognize that the tools for calculating present and prospective need and its allocation are imprecise and further that it is impossible to predict with precision how many units of housing will result from specific ordinances. What is required is the precision of a specific area and specific numbers. They are required not because we think scientific accuracy is possible, but because we believe the requirement is most likely to achieve the goals of *Mount Laurel*.

■ While it would be simpler in these cases to calculate a municipality's fair share by determining *its own* probable future population (or some variant thereof), such a method would not be consistent with the constitutional obligation (although it is a factor that could be considered in a fair share calculation in the

absence of other proof). Municipal population projections are based on many factors, but in no case that we know of do they include a value judgment that such municipality should bear its fair share of the region's lower income housing need. In fact, in most cases, we believe, one of the factors necessarily involved in such municipal population projections is the prior and probable future effect of the municipality's exclusionary zoning. If, because of that exclusionary zoning, a suburban municipality with substantial developable land has a very, very small probable growth as shown by the most reliable population projections (resulting in part from its very small past growth caused by exclusionary zoning), it should not be allowed to evade its obligation by basing its fair share of the lower income housing need on that small projected population growth. On the other hand, when that municipality is considered as part of the region and the region's population growth is projected, a value judgment is made, based upon the *Mount Laurel* obligation, that may result in a substantially greater fair share for that municipality and indeed may have the effect of changing what would otherwise be the population projection for that municipality.

It may be that the overall population projections for the State of New Jersey and for its various regions are somewhat affected by the aggregate impact of exclusionary zoning—that is something for experts to determine. Even so, when gross population projections are used for a region, it is more likely that the total lower income housing need will be included and much more likely that whatever lower housing income need is in fact included will be distributed fairly, not in accordance with prior patterns of exclusionary zoning but in accordance with suitability for such housing.

### D. *Meeting the Mount Laurel Obligation*

#### 1. *Removing Excessive Restrictions and Exactions*

In order to meet their *Mount Laurel* obligations, municipalities, at the very least, must remove all municipally created

barriers to the construction of their fair share of lower income housing. Thus, to the extent necessary to meet their prospective fair share and provide for their indigenous poor (and, in some cases, a portion of the region's poor), municipalities must remove zoning and subdivision restrictions and exactions that are not necessary to protect health and safety.[25]

It may be difficult for a municipality to determine how to balance the need to reduce the costs of its regulations against the need to adequately protect health and safety, just as it may be difficult for a court to determine when a municipality has reduced these costs enough. There are, however, relatively objective guides that can help both the municipality and the court. Particularly helpful, though in no way conclusive as to what the minimum standards should be in a particular community, are the Department of Housing and Urban Development's Minimum Property Standards and the suggestions as to minimum zoning and subdivision standards made by the Rutgers Center for Urban Policy Research in *Housing Costs, supra* at 212 n. 6. With these and other such guides, plus specific evidence submitted by the parties, we believe that a court can determine whether municipally-imposed housing costs have been sufficiently reduced.

Once a municipality has revised its land use regulations and taken other steps affirmatively to provide a realistic oppor-

---

[25]For analyses of the extent to which municipal restrictions and exactions increase the cost of housing in New Jersey, *see Mount Laurel I,* 67 *N.J.* at 161–73, 184; *Housing Costs, supra* at 212 n. 6, at 188 (documenting that in 1972 the selling price of a new single family home could be reduced from $57,618 to $33,843 if the lot size and frontage requirements were reduced from 43,500 square feet and 200 feet to 12,000 square feet and 80 feet respectively); *Final Report of the Assembly Housing Emergency Action Team* 16 (1981) (reporting the results of a U.S. Department of Housing and Urban Development Study which showed that in a HUD project in Pittsburgh costs were reduced by 24 percent through the utilization of modern materials, the expedition of approval times, and the reduction of the cost of municipal improvements).

tunity for the construction of its fair share of lower income housing, the *Mount Laurel* doctrine requires it to do no more. For instance, a municipality having thus complied, the fact that its land use regulations contain restrictive provisions incompatible with lower income housing, such as bedroom restrictions, large lot zoning, prohibition against mobile homes, and the like, does not render those provisions invalid under *Mount Laurel.* Obviously, if they are otherwise invalid—for instance if they bear no reasonable relationship to any legitimate governmental goal—they may be declared void on those other grounds. But they are not void because of *Mount Laurel* under those circumstances. *Mount Laurel* is not an indiscriminate broom designed to sweep away all distinctions in the use of land. Municipalities may continue to reserve areas for upper income housing, may continue to require certain community amenities in certain areas, may continue to zone with some regard to their fiscal obligations: they may do all of this, provided that they have otherwise complied with their *Mount Laurel* obligations.

2. *Using Affirmative Measures*

Despite the emphasis in *Mount Laurel I* on the *affirmative* nature of the fair share obligation, 67 *N.J.* at 174, the obligation has been sometimes construed (after *Madison*) as requiring in effect no more than a theoretical, rather than realistic, opportunity. As noted later, the alleged realistic opportunity for lower income housing in *Mount Laurel II* is provided through three zones owned entirely by three individuals. There is absolutely no assurance that there is anything realistic in this "opportunity": the individuals may, for many different reasons, simply not desire to build lower income housing. They may not want to build any housing at all, they may want to use the land for industry, for business, or just leave it vacant. It was never intended in *Mount Laurel I* that this awesome constitutional obligation, designed to give the poor a fair chance for housing, be satisfied by meaningless amendments to zoning or other ordinances. "Affirmative," in the *Mount*

*Laurel* rule, suggests that the *municipality* is going to do something, and "realistic opportunity" suggests that what it is going to do will make it *realistically* possible for lower income housing to be built. Satisfaction of the *Mount Laurel* doctrine cannot depend on the inclination of developers to help the poor. It has to depend on affirmative inducements to make the opportunity real.

It is equally unrealistic, even where the land is owned by a developer eager to build, simply to rezone that land to permit the construction of lower income housing if the construction of other housing is permitted on the same land and the latter is more profitable than lower income housing. One of the new zones in Mount Laurel provides a good example. The developer there intends to build housing out of the reach of the lower income group. After creation of the new zone, he still is allowed to build such housing but now has the "opportunity" to build lower income housing to the extent of 10 percent of the units. There is absolutely no reason why he should take advantage of this opportunity if, as seems apparent, his present housing plans will result in a higher profit. There is simply no inducement, no reason, nothing affirmative, that makes this opportunity "realistic." For an opportunity to be "realistic" it must be one that is at least sensible for someone to use.

Therefore, unless removal of restrictive barriers will, without more, afford a realistic opportunity for the construction of the municipality's fair share of the region's lower income housing need, affirmative measures will be required.[26]

---

[26]In determining whether the removal of barriers, without more, will suffice, or whether affirmative devices are necessary, the trial court will undoubtedly consider the realities of the situation. It is often difficult for a court to assure itself that the municipally generated barriers to lower income housing have truly been removed. For example, provision of a relatively small area where low cost multi-family housing *could* be built—the most common technique used to zone for lower income housing—ordinarily does not result in such housing *actually* being built. This is true because when land available for multifamily housing is made artificially scarce by zoning,

There are two basic types of affirmative measures that a municipality can use to make the opportunity for lower income housing realistic: (1) encouraging or requiring the use of available state or federal housing subsidies, and (2) providing incentives for or requiring private developers to set aside a portion of their developments for lower income housing. Which, if either, of these devices will be necessary in any particular municipality to assure compliance with the constitutional mandate will be initially up to the municipality itself. Where necessary, the trial court overseeing compliance may require their use. We note again that least-cost housing will not ordinarily satisfy a municipality's fair share obligation to provide low and moderate income housing unless and until it has attempted the inclusionary devices outlined below or otherwise has proven the futility of the attempt.

### a. Subsidies

Because the kinds of lower income housing subsidies available are subject to change—and have in fact changed

---

that land will almost surely be preempted by more profitable high-cost apartments and townhouses. *See Housing Handbook, supra* at 201 n. 2, at 5; Mallach, "Do Lawsuits Build Housing?: The Implications of Exclusionary Zoning Litigation," 6 *Rut.-Cam.L.Rev.* 653, 662 (1975). *See also Madison, supra,* 72 *N.J.* at 519 (recognizing the need to "overzone" for lower cost housing in order to achieve "any likelihood" of its actually being built). Also, communities that desire to keep out lower income housing have many means at their disposal in the complex local housing approval process to make it likely that the housing built in zones presumably "available" for lower income housing is not in fact low cost. Mallach, *supra,* at 662; *Housing Costs, supra* at 212 n. 6, at 134. In many cases, the only way for courts to ensure that municipalities with fair share obligations do not, directly or indirectly, hinder the construction of lower income housing is to require affirmative measures encouraging the construction of such housing.

*Mount Laurel I* made it clear that municipalities had to do more than simply refrain from adopting "regulations or policies which thwart or preclude" a realistic opportunity to build lower income housing, 67 *N.J.* at 180; additionally, its obligation was "affirmatively to plan and provide, by its land use regulations, the reasonable opportunity ..." for such housing. *Id.* at 179.

often—it is more important to establish the municipality's general *Mount Laurel* obligation concerning subsidies than its required role as to any particular existing subsidy. The importance of defining that obligation may depend at any particular time on the then extent and impact of available subsidies; if anything, the quantity of housing subsidies varies even more than the kind. For example, the amount of lower income housing subsidies now available is substantially less than several years ago, and there is no indication that subsidies for lower income housing construction are likely to increase in the near future. They are, nevertheless, apparently a permanent part of the housing scene; the long-term importance of defining the municipality's *Mount Laurel* obligation in relation to such subsidies is that the construction of lower income housing is practically impossible without some kind of governmental subsidy.

While *Mount Laurel I* did not come to grips with this issue, its clear import was that the Court at that time expected Mount Laurel, in addition to adopting "appropriate zoning ordinance amendments," to take "whatever additional action encouraging the fulfillment of its fair share of the regional need for low and moderate income housing [as might be] necessary and advisable." 67 *N.J.* at 192. The Court noted that Mount Laurel—at the least—had a "moral obligation" to provide lower income housing through a local housing agency. Simply facilitating subsidies granted by other levels of government is municipal action of a significantly lesser dimension, well within that contemplated by this Court when it noted that "[s]hould Mount Laurel not perform as we expect, further judicial action may be sought." *Id.* at 192. The Court had previously recognized the necessity for such subsidies and optimistically stated its expectation that housing would become a reality "through private or public enterprises, or both." Id. at 188 n. 21. Whatever the Court may have meant then, *Madison* made it clear that not only was public housing a "moral obligation" at most (rather than "at least"), but that some "devices"—which may in fact be absolutely essential if federal or state subsidies are to be forthcoming—

"must be summarily rejected," referring to tax concessions, among other devices. *Oakwood v. Madison,* 72 *N.J.* at 546. We were not, however, directly faced in *Madison* with the extent of a municipality's obligation, if any, to facilitate lower income housing subsidies available from other levels of government.

The implication of the observation that lower income housing cannot be built without subsidies is that if the *Mount Laurel* principle requires municipalities to provide a realistic opportunity for such housing through their land use regulations but leaves them free to prevent subsidies through non-action, that obligation is a charade. *Mount Laurel* was never intended to produce the perfect model of a just zoning ordinance; it was intended to provide a realistic opportunity for the construction of lower income housing.

We do not suggest that a municipality would be required to create a housing authority to meet its *Mount Laurel* obligation. We do, however, expect municipal officials in appropriate cases to do more than pass land use regulations conforming to *Mount Laurel I.* Where appropriate, municipalities should provide a realistic opportunity for housing through other municipal action inextricably related to land use regulations.

On occasion, what is needed to obtain a subsidy may be as simple as a "resolution of need" stating that "there is a need for moderate income housing" in the municipality. *N.J.S.A.* 55:14J–6(b). In addition to the "resolution of need," the most important federal program for providing lower income housing subsidies (the section 8 low and moderate income housing program; 42 *U.S.C.* § 1437f (1982 Supp.)) requires in New Jersey, as a practical matter, that the municipality grant tax abatements to developers. *See N.J.S.A.* 55:14J–8(f).[27]

---

[27]The Community Development Block Grant Program, 42 *U.S.C.* §§ 5301 to 5320 (1982 Supp.), though not providing housing subsidies, is available for a wide range of projects that may be essential in some municipalities for future lower income housing. For instance, these grants can be used to fund the necessary infrastructure for such housing. The Block Grant Program is even

In evaluating the obligation that the municipality might be required to undertake to make a federal or state subsidy available to a lower income housing developer, the fact that some financial detriment may be incurred is not dispositive. Satisfaction of the *Mount Laurel* obligation imposes many financial obligations on municipalities, some of which are potentially substantial. By contrast, a tax abatement for a low or moderate income housing project will have only a minimal effect on the public fisc. Thus viewed, the asserted fiscal reasons justifying the failure to provide a tax abatement may be nothing more than a red herring. The direct and immediate financial impact of a tax abatement agreement between the municipality and the developer may be unimportant when compared with increases in municipal and school district costs caused by the advent of lower income housing. The trial court in a *Mount Laurel* case, therefore, shall have the power to require a municipality to cooperate in good faith with a developer's attempt to obtain a subsidy and to require that a tax abatement be granted for that purpose pursuant to applicable New Jersey statutes where that abatement does not conflict with other municipal interests of greater importance.

### b. *Inclusionary Zoning Devices*

There are several inclusionary zoning techniques that municipalities must use if they cannot otherwise assure the construction of their fair share of lower income housing. Although we will discuss some of them here, we in no way intend our list to be exhaustive; municipalities and trial courts are encouraged to

---

more important today since it seems to be one of the housing programs that may even increase in the next few years. Housing and Urban Development at 11 (1981) (a study by the New Jersey Housing Finance Agency).

Section 8 subsidies, of course, remain the most important for aiding new construction. In New Jersey those subsidies are often provided indirectly to developers through the New Jersey Housing Finance Agency (NJHFA). As implied above, that Agency will not allow any Section 8 subsidies unless the municipality has granted tax abatements to the developer.

create other devices and methods for meeting fair share obligations.[28]

The most commonly used inclusionary zoning techniques are incentive zoning and mandatory set-asides. The former involves offering economic incentives to a developer through the relaxation of various restrictions of an ordinance (typically density limits) in exchange for the construction of certain amounts of low and moderate income units. The latter, a mandatory set-aside, is basically a requirement that developers include a minimum amount of lower income housing in their projects.

### (i) *Incentive Zoning*

Incentive zoning is usually accomplished either through a sliding scale density bonus that increases the permitted density as the amount of lower income housing provided is increased, or through a set bonus for participation in a lower income housing program. *See* Fox & Davis, 3 *Hastings Const. L.Q.* 1015, 1060–62 (1977).

Incentive zoning leaves a developer free to build only upper income housing if it so chooses. Fox and Davis, in their survey of municipalities using inclusionary devices, found that while developers sometimes profited through density bonuses, they were usually reluctant to cooperate with incentive zoning programs; and that therefore those municipalities that relied exclu-

---

[28]For useful discussions of how inclusionary techniques have been utilized in New Jersey municipalities see the *Housing Handbook, supra* at 201 n. 2 and Department of Community Affairs, *The Princeton Housing Proposal: A Strategy to Achieve Balanced Housing without Government Subsidy* (1977) (Housing Proposal). *See also Oakwood at Madison, Inc. v. Township of Madison,* 72 *N.J.* 481, 611–16 (1977) (Pashman, J., concurring and dissenting); Fox & Davis, "Density Bonus Zoning to Provide Low and Moderate Cost Housing," 3 *Hastings Const. L.Q.* 1015 (1977); Kleven, "Inclusionary Ordinances—Policy and Legal Issues in Requiring Private Developers to Build Low Cost Housing," 21 *U.C.L.A.L.Rev.* 1432 (1974); H. Franklin, D. Falk, A. Levin, *In-Zoning: A Guide for Policy Makers on Inclusionary Land Use Programs* (1974).

sively on such programs were not very successful in actually providing lower income housing. *Id.* at 1067.[29]

Sole reliance on "incentive" techniques (or, indeed, reliance exclusively on any one affirmative device) may prove in a particular case to be insufficient to achieve compliance with the constitutional mandate.

### (i) *Mandatory Set-Asides*

 A more effective inclusionary device that municipalities must use if they cannot otherwise meet their fair share obligations is the mandatory set-aside.[30] According to the De-

---

[29]*See* Fox & Davis, *supra* at 266 n. 28, 3 *Hastings Const. L.Q.* at 1028 (reporting the results of a Stanford University Study which provides such evidence). Also, Real Estate Research Corporation (RERC), after conducting an economic feasibility study for the proposed Princeton mandatory set aside program, concluded that the program could be devised in such a way as to assure an adequate profit for developers. *Housing Proposal, supra* at 266 n. 28, at 13–26 (1977). In particular, RERC recommended that developers not be required to provide more than 34 percent of their units for lower income people, with at most 14 percent for low income, *id.* at 17; and that the lower income requirement be met in stages, ideally three stages of 5 year periods, *id.* at 18. The RERC conclusions were based upon a Princeton Plan under which land zoned for low density development would be rezoned for higher densities (with a mandatory lower income set aside) only *after* a developer bought it. This would, according to the framers of the Plan, permit developers to realize significant increases in land value. *Id.* at 13–15.

[30]Mandatory set-asides do not give rise to the legal issues treated in *Property Owners Ass'n of N. Bergen v. Twp. of N. Bergen,* 74 *N.J.* 327 (1977). We held in that case that rent control ordinances that exempted units occupied by senior citizens from future rent increases were confiscatory as to the landlord, unfair as to the tenants, and unconstitutional on both grounds. No one suggests here that units created by mandatory set-asides be exempt thereafter from rent increases under a rent control ordinance. Such increases, one aspect of an inflationary economy, generally parallel increases in the median income of lower income families. They would not ordinarily result in rentals beyond the lower income range. As for confiscation, the builder who undertakes a project that includes a mandatory set-aside voluntarily assumes the financial burden, if there is any, of that condition. There may very well be no "subsidy" in the sense of either the landlord or other tenants bearing some burden for the benefit of the lower income units: those units may be

partment of Community Affairs, as of 1976 there were six municipalities in New Jersey with mandatory set-aside programs, which varied from a requirement that 5 percent of developments in a certain zone be composed of low and moderate income units (Cherry Hill, Camden County) to a requirement that between 15 and 25 percent of all PUDs be reserved for low and moderate income housing (East Windsor, Mercer County). *Housing Handbook, supra* at 201 n. 2 at 12–16.[31] Apparently, judging from the Handbook itself and from responses to our inquiries at oral argument, lower income housing is in fact being built pursuant to these mandatory requirements.

The use of mandatory set-asides is not without its problems: dealing with the scarcity of federal subsidies, maintaining the rent or sales price of lower income units at lower income levels over time, and assuring developers an adequate return on their investments. Fox and Davis found that the scarcity of federal subsidies has greatly undermined the effectiveness of mandatory set-asides where they are triggered only when a developer is able to obtain such subsidies. Fox & Davis, *supra,* 3 *Hastings Const. L.Q.* at 1065–66. Where practical, a municipality should use mandatory set-asides even where subsidies are not available.[32]

---

priced low not because someone else is subsidizing the price, but because of realistic considerations of cost, amenities, and therefore underlying values.

[31]A similar requirement is now being enforced by the Department of Environmental Protection in reviewing development proposals in the State's protected coastal areas. In a recent Department opinion, a developer in Egg Harbor Township was ordered to provide 20 percent of its units for lower income families in order to receive Department approval for its development. The regulation was sustained in the Appellate Division. *See In re Egg Harbor Associates,* 185 *N.J.Super.* 507 (App.Div.), certif. granted, 91 *N.J.* 552 (1982).

[32]Where set-asides are used, courts, municipalities, and developers should attempt to assure that lower income units are integrated into larger developments in a manner that both provides adequate access and services for the lower income residents and at the same time protects as much as possible the value and integrity of the project as a whole. For a helpful discussion of how this can be done see O. Newman, *Community of Interest* (1980).

As several commentators have noted, the problem of keeping lower income units available for lower income people over time can be a difficult one. *See id.* at 1034–36; *Housing Handbook, supra* at 201 n. 2, at 11; Kleven, *supra* at 266 n. 28, at 1445. Because a mandatory set-aside program usually requires a developer to sell or rent units at below their full value so that the units can be affordable to lower income people, the owner of the development or the initial tenant or purchaser of the unit may be induced to re-rent or re-sell the unit at its full value.

This problem, which municipalities *must* address in order to assure that they continue to meet their fair share obligations, can be dealt with in two ways. First, the developer can meet its mandatory quota of lower income units with lower cost housing, such as mobile homes or "no-frills" apartments, which may be affordable by lower income families at close to the units' market value. The other, apparently more common, approach for dealing with the re-sale or re-rent problem is for the municipality to require that re-sale or re-rent prices be kept at lower income levels. For example, the Cherry Hill ordinance requires that there be "regulations which reasonably assure that the dwelling units be occupied by [lower income persons]." Similarly, the Franklin Township (Somerset County) ordinance requires that a developer demonstrate in writing that the rentals and prices of lower income units remain low enough to benefit lower income persons. *Housing Handbook, supra* at 201 n. 2, at 11. These provisions appear to place the burden on the developer to devise the precise mechanism for maintaining the units at lower income levels.

A more sophisticated approach, considered by Princeton Township, would have established a two part control mechanism. First, disposition covenants would have been created for all the lower income units binding the owners and renters of such units to sell or rent only at lower income levels. Second, a Public Trust would have been created whose trustees would have administered the covenants and determined what would be

"lower income levels" over time. *See Housing Proposal, supra* at 266 n. 28, at 68–70.

■ Mandatory set-asides can be rendered ineffective if a developer builds all its conventional units first and then reneges on the obligation to build the lower income units. To avoid this problem, municipalities and courts should require that a developer phase-in the lower income units as the development progresses. That is, if a developer is required to set aside 20 percent of a development for lower income units, 20 percent of *each* stage of the development should be lower income, to the extent this is practical.

In addition to the mechanisms we have just described, municipalities and trial courts must consider such other affirmative devices as zoning substantial areas for mobile homes and for other types of low cost housing and establishing maximum square footage zones, *i.e.,* zones where developers cannot build units with *more* than a certain footage or build anything other than lower income housing or housing that includes a specified portion of lower income housing. In some cases, a realistic opportunity to provide the municipality's fair share may require over-zoning, *i.e.,* zoning to allow for *more* than the fair share if it is likely, as it usually is, that not all of the property made available for lower income housing will actually result in such housing.

■ Although several of the defendants concede that simply removing restrictions and exactions is unlikely to result in the construction of lower income housing, they maintain that requiring the municipality to use affirmative measures is beyond the scope of the courts' authority. We disagree. Before directly answering their objections, we note, as we did in *Robinson v. Cahill,* 69 *N.J.* 133 (1975), that unless an "appropriate remedy" is formulated to "redress a violation of [constitutional] rights," our Constitution "embodies rights in a vacuum, existing only on paper." *Id.* at 147, quoting *Cooper v. Nutley Sun Printing Co., Inc.,* 36 *N.J.* 189, 197 (1961). *See also Swann v. Charlotte-Meck-*

*lenburg Bd. of Ed.,* 402 *U.S.* 1, 15, 91 *S.Ct.* 1267, 1275, 28 *L.Ed.*2d 554 (1971). If it is plain, and it is, that unless we require the use of affirmative measures the constitutional guarantee that protects poor people from municipal exclusion will exist "only on paper," then the only "appropriate remedy" is the use of affirmative measures.

The specific contentions are that inclusionary measures amount to a taking without just compensation and an impermissible socio-economic use of the zoning power, one not substantially related to the use of land. Reliance is placed to some extent on *Board of Supervisors v. DeGroff Enterprises, Inc.,* 214 *Va.* 235, 198 *S.E.*2d 600 (1973), to that effect. We disagree with that decision. We now resolve the matter that we left open in *Madison,* 72 *N.J.* at 518–19. We hold that where the *Mount Laurel* obligation cannot be satisfied by removal of restrictive barriers, inclusionary devices such as density bonuses and mandatory set-asides keyed to the construction of lower income housing, are constitutional and within the zoning power of a municipality.

In *Taxpayers Ass'n of Weymouth Twp. v. Weymouth Twp.,* 80 *N.J.* 6 (1976), we upheld a zoning ordinance that allowed mobile homes in a particular zone, limited however to "elderly" persons or families. Our decision was based, in part, on the conclusion that meeting the special housing needs of the elderly served the general welfare, and that the restriction of this use to a mobile home district satisfied the requirement that the zoning ordinance be related to the physical use of the land. *See also Shepard v. Woodland Twp. Comm. & Planning Bd.,* 71 *N.J.* 230 (1976); *DeSimone v. Greater Englewood Housing Corp. No. 1,* 56 *N.J.* 428 (1970).[33]

---

[33]*State v. Baker,* 81 *N.J.* 99 (1979), and *Kirsch Holding Co., v. Borough of Manasquan,* 59 *N.J.* 241 (1971), do not hold that the zoning power is incapable of accomplishing desirable social purposes (in each of those cases the municipalities attempted, through zoning, to control obnoxious uses of

The rationale of *Weymouth* could, under appropriate circumstances, sustain a zoning ordinance that restricted a particular district exclusively for mobile homes for the elderly (the actual restriction allowed other uses). If that is permissible, then the comparable special need of lower income families for housing, and its impact on the general welfare, could justify a district limited to such use and certainly one of lesser restriction that requires only that multi-family housing within a district *include* such use (the equivalent of a mandatory set-aside). Since the objective here goes beyond serving the special needs of a particular class of citizens for the general welfare and extends to the fulfillment of a constitutional obligation, the constitutionality of such devices, and the power of the municipality to impose them, is even clearer.

■ The contention that generally these devices are beyond the municipal power because they are "socio-economic" is particularly inappropriate. The very basis for the constitutional obligation underlying *Mount Laurel* is a belief, fundamental, that excluding a class of citizens from housing on an economic basis (one that substantially corresponds to a socio-economic basis) distinctly disserves the general welfare. That premise is essential to the conclusion that such zoning ordinances are an abuse of the zoning power and are therefore unconstitutional.

It is nonsense to single out inclusionary zoning (providing a realistic opportunity for the construction of lower income hous-

residential premises by prohibiting unrelated individuals, as defined and limited in each ordinance, in those zones). They held that where the zoning approach to the problem resulted, as it did in those cases, in both over-inclusiveness and under-inclusiveness and where less restrictive alternatives were available to address the social problem without impinging on important individual rights, the specific use of the zoning power in such cases was invalid. Over-inclusiveness and under-inclusiveness do not appear to be involved in the case of density bonuses or mandatory set-asides and, as suggested above, the only time these inclusionary devices are to be used is when the less restrictive alternative of eliminating restrictive barriers will not produce the realistic opportunity that *Mount Laurel* requires.

ing) and label it "socio-economic" if that is meant to imply that other aspects of zoning are not. Detached single family residential zones, high-rise multi-family zones of any kind, factory zones, "clean" research and development zones, recreational, open space, conservation, and agricultural zones, regional shopping mall zones, indeed practically any significant kind of zoning now used, has a substantial socio-economic impact and, in some cases, a socio-economic motivation. It would be ironic if inclusionary zoning to encourage the construction of lower income housing were ruled beyond the power of a municipality because it is "socio-economic" when its need has arisen from the socio-economic zoning of the past that excluded it.

Looked at somewhat differently, having concluded that the constitutional obligation can sometimes be satisfied only through the use of these inclusionary devices, it would take a clear contrary constitutional provision to lead us to conclude that that which is necessary to achieve the constitutional mandate is prohibited by the same Constitution. In other words, we would find it difficult to conclude that our Constitution both requires and prohibits these measures.

 We find the distinction between the exercise of the zoning power that is "directly tied to the physical use of the property," *Madison,* 72 *N.J.* at 517, and its exercise tied to the income level of those who use the property artificial in connection with the *Mount Laurel* obligation, although it obviously troubled us in *Madison.*[34] The prohibition of this kind of affirm-

---

[34]In any event the relationship of lower income units to "the physical use of the land" (*i.e.,* their mandatory inclusion as part of a multi-family project) appears as substantial as the relationship of units for the elderly to a mobile home district. *See Weymouth,* 80 *N.J.* 6 (1976). The inclusion of some lower income units in a multi-family housing project that may also house families with other income levels may be socially beneficial and an economic prerequisite to the creation of lower income units.

This problem does not arise when a municipality wants to create upper income housing since the physical requirements of the zoning district ("directly tied to the land") combined with housing market forces are

ative device seems unfair when we have for so long allowed large lot single family residence districts, a form of zoning keyed, in effect, to income levels. The constitutional obligation itself is not to build three bedroom units, or single family residences on very small lots, or high-rise multi-family apartments, but rather to provide through the zoning ordinance a realistic opportunity to construct *lower income housing.* All of the physical uses are simply a means to this end. We see no reason why the municipality cannot exercise its zoning power to achieve that end directly rather than through a mass of detailed regulations governing the "physical use" of land, the sole purpose of which is to provide housing within the reach of lower income families. We know of no governmental purpose relating to zoning that is served by requiring a municipality to ingeniously design detailed land use regulations, purporting to be "directly tied to the physical use of the property," but actually aimed at accommodating lower income families, while not allowing it directly to require developers to construct lower income units. Indirection of this kind has no more virtue where its goal is to achieve that which is permitted—indeed, constitutionally mandated—than it has in achieving that which is prohibited.

### 3. *Zoning for Mobile Homes*

As the cost of ordinary housing skyrockets for purchasers and renters, mobile homes become increasingly important as a source of low cost housing. The evidence clearly supports a finding that mobile homes are significantly less expensive than site-built housing. See Legislature's Mobile Home Study Commission, *Report and Recommendations* (1980) (finding that while

---

sufficient. The *explicit* requirement of lower income units in a zoning provision may be necessary if the municipality's social goals are to prevail over neutral market forces. Zoning does not require that land be used for maximum profitability, and on occasion the goals of zoning may require something less.

it would take a household income of at least $21,000 to afford a medium priced site-built home in 1979, an income of $11,700 would be sufficient for a family to afford a mobile home and lot); *Housing Handbook, supra,* at 32. We agree fully with the finding of Judge Wood in *Mount Laurel II* that mobile homes are "economically available for persons of low and moderate income." 161 *N.J.Super.* at 357. Therefore, subject to the qualifications noted hereafter, we rule that municipalities that cannot otherwise meet their fair share obligations must provide zoning for low-cost mobile homes [35] as an affirmative device in their zoning ordinances.

Townships such as Mount Laurel that now ban mobile homes do so in reliance upon *Vickers v. Gloucester,* 37 *N.J.* 232 (1962), in which this Court upheld such bans. *Vickers,* however, explicitly recognized that changed circumstances could require a different result. *Id.* at 250. We find that such changed circumstances now exist. As Judge Wood found in *Mount Laurel II,* mobile homes have since 1962 become "structurally sound [and] attractive in appearance." 161 *N.J.Super.* at 357. Further, since 1974, the safety and soundness of mobile homes have been regulated by the National Mobile Home Construction and Safety Standards Act, 42 *U.S.C.* 5401 (1974). *Vickers,* therefore, is overruled; absolute bans of mobile homes are no longer permissible on the grounds stated in that case. Strong support for this new rule can be found in the report of the Legislature's Mobile Home Study Commission, *Report and Recommendations,* at 10–

---

[35]Not all mobile homes are low-cost. Many mobile homes are beyond the reach of even middle income households. However, the important point is that mobile homes apparently can be built that are affordable—without subsidy—by lower income families. Thus, a municipality that is not able, even with mandatory set-asides or other affirmative devices, to provide its fair share of lower income housing with site-built units may be able to meet its obligation by providing zoning for mobile homes and requiring developers in such zones to construct a certain number of lower income units.

11, and in the DCA's *Housing Handbook, supra* at 201 n. 2, at 32–33.[36]

Lest we be misunderstood, we do *not* hold that every municipality must allow the use of mobile homes as an affirmative device to meet its *Mount Laurel* obligation, or that any ordinance that totally excludes mobile homes is *per se* invalid. Insofar as the *Mount Laurel* doctrine is concerned, whether mobile homes must be permitted as an affirmative device will depend upon the overall effectiveness of the municipality's attempts to comply: if compliance can be just as effectively assured without allowing mobile homes, *Mount Laurel* does not command them; if not, then assuming a suitable site is available, they must be allowed.

Insofar as the arbitrariness of a total exclusion is concerned, such conclusion will depend upon the facts and circumstances of each case, regardless of the *Mount Laurel* doctrine. While the question is not directly before us, there may be municipalities whose development is such that the otherwise inoffensive appearance of a mobile home park may be quite offensive. There may be municipalities whose only vacant land has been legitimately set aside for commercial, industrial or residential uses other than mobile homes, where such planning is quite legitimate. But just as *Vickers* is hereby overruled to the extent that it held that *any* developing municipality may totally exclude mobile homes, we hold that such attempt at a total exclusion will have to be justified by the same doctrines that

---

[36]As a result of recent economic trends, mobile homes have become an increasingly significant factor in America's housing composition. In 1980, new mobile homes constituted 20.6 percent of all single-family private home construction starts and 14.6 percent of all new residential construction. Statistical Abstracts of the United States, *No. 1368. Private Housing Starts, by Region, and Mobile Homes: 1970–1980* 758 (1981). Provisional statistics from the 1980 census also indicate that mobile homes now account for 4.99 percent of the country's year-round housing stock. United States Bureau of the Census, *Provisional Estimates of Social, Economic and Housing Characteristics,* PHC 80–S1–1 (1980).

would justify a total exclusion of apartment houses, townhouses, or even single family residences. We recognize the propriety of aesthetic considerations in zoning, but the "subjective sensibilities" of present residents are not a sufficient basis for the exclusion. *See Vickers,* 37 *N.J.* at 269 (Hall, J., dissenting).

### 4. Providing "Least Cost" Housing

There may be municipalities where special conditions such as extremely high land costs make it impossible for the fair share obligation to be met even after all excessive restrictions and exactions, *i.e.,* those not essential for safety and health, have been removed and all affirmative measures have been attempted. In such cases, *and only in such cases,* the *Mount Laurel* obligation can be met by supplementing whatever lower income housing can be built with enough "least cost" housing to satisfy the fair share. Least cost housing does not, however, mean the most inexpensive housing that developers will build on their own; it does not mean $50,000-plus single family homes and very expensive apartments. Least cost housing means the least expensive housing that builders can provide after removal by a municipality of *all* excessive restrictions and exactions and after thorough use by a municipality of all affirmative devices that might lower costs. Presumably, such housing, though unaffordable by those in the lower income brackets, will be inexpensive enough to provide shelter for families who could not afford housing in the conventional suburban housing market. At the very minimum, provision of least cost housing will make certain that municipalities in "growth" areas of this state do not "grow" only for the well-to-do.

The form that "least cost" housing will take can vary with the particular characteristics of individual municipalities. Municipalities that must resort to "least cost" housing to meet their *Mount Laurel* obligations should, if appropriate, zone significant areas for housing that most closely approaches lower income housing, *e.g.,* mobile homes. Furthermore, "overzoning"

for such housing will greatly increase the likelihood that some of these units, even if not "lower income," will be affordable by those close to the top of the moderate income bracket. *See Madison,* 72 *N.J.* at 519.

It is important for us to emphasize here that unless it meets the stringent "least cost" requirements set out above, middle income housing will not satisfy the *Mount Laurel* obligation. This is so despite claims by some defendant-municipalities that the provision of such middle income housing will allow less expensive housing to "filter down" to lower income families. The problem with this theory is that the housing that has been built and is now being built in suburbs such as Mount Laurel is rapidly *appreciating* in .value so that none of *it* will "filter down" to poor people. Instead, if the only housing constructed in municipalities like Mount Laurel continues to be middle and upper income, the only "filter down" effect that will occur will be that housing on the fringes of our inner cities will "filter down" to the poor as more of the middle class leave for suburbs, thereby exacerbating the economic segregation of our cities and suburbs. *See* A. Downs, *supra* at 221 n. 8, at 9–12. Only if municipalities like Mount Laurel begin now to build lower income or least cost housing will some part of *their* housing stock ever "filter down" to New Jersey's poorer families. *See Madison,* 72 *N.J.* at 513–14 & n. 22.

E. *Judicial Remedies*

 If a trial court determines that a municipality has not met its *Mount Laurel* obligation, it shall order the municipality to revise its zoning ordinance within a set time period to comply with the constitutional mandate; if the municipality fails adequately to revise its ordinance within that time, the court shall implement the remedies for noncompliance outlined below; and if plaintiff is a developer, the court shall determine whether a builder's remedy should be granted.

## 1. Builder's Remedy

Builder's remedies have been one of many controversial aspects of the *Mount Laurel* doctrine. Plaintiffs, particularly plaintiff-developers, maintain that these remedies are (i) essential to maintain a significant level of *Mount Laurel* litigation, and the only effective method to date of enforcing compliance; (ii) required by principles of fairness to compensate developers who have invested substantial time and resources in pursuing such litigation; and (iii) the most likely means of ensuring that lower income housing is actually built. Defendant municipalities contend that even if a plaintiff-developer obtains a judgment that a particular municipality has not complied with *Mount Laurel,* that municipality, and not the developer, should be allowed to determine how and where its fair share obligation will be met.

In *Madison,* this Court, while granting a builder's remedy to the plaintiff appeared to discourage such remedies in the future by stating that "such relief will ordinarily be rare." 72 *N.J.* at 551–52 n. 50. Experience since *Madison,* however, has demonstrated to us that builder's remedies must be made more readily available to achieve compliance with *Mount Laurel.* We hold that where a developer succeeds in *Mount Laurel* litigation and proposes a project providing a substantial amount of lower income housing,[37] a builder's remedy should be granted unless the municipality establishes that because of environmental or

---

[37]What is "substantial" in a particular case will be for the trial court to decide. The court should consider such factors as the size of the plaintiff's proposed project, the percentage of the project to be devoted to lower income housing (20 percent appears to us to be a reasonable minimum), what proportion of the defendant municipality's fair share allocation would be provided by the project, and the extent to which the remaining housing in the project can be categorized as "least cost." The balance of the project will presumably include middle and upper income housing. Economically integrated housing may be better for all concerned in various ways. Furthermore, the middle and upper income units may be necessary to render the project profitable. If builder's remedies cannot be profitable, the incentive for builders to enforce *Mount Laurel* is lost.

other substantial planning concerns, the plaintiff's proposed project is clearly contrary to sound land use planning. We emphasize that the builder's remedy should not be denied solely because the municipality prefers some other location for lower income housing, even if it is in fact a better site. Nor is it essential that considerable funds be invested or that the litigation be intensive.

Other problems concerning builder's remedies require discussion. Care must be taken to make certain that *Mount Laurel* is not used as an unintended bargaining chip in a builder's negotiations with the municipality, and that the courts not be used as the enforcer for the builder's threat to bring *Mount Laurel* litigation if municipal approvals for projects containing no lower income housing are not forthcoming. Proof of such threats shall be sufficient to defeat *Mount Laurel* litigation by that developer.

It is within the power of trial courts to adjust the timing of builder's remedies so as to cushion the impact of these developments on municipalities where that impact would otherwise cause a sudden and radical transformation of the municipality. This adjustment is analogous to the phasing-in of the satisfaction of present and prospective need mentioned in Ruling 10, *supra* at 218–219.

The trial court (and the master, if one is appointed) should make sure that the municipal planning board is closely involved in the formulation of the builder's remedy. This does not mean that the planning board should be permitted to delay or hinder the project or to reduce the amount of lower income housing required. However, with this caveat, the trial court and master should make as much use as they can of the planning board's expertise and experience so that the proposed project is suitable for the municipality.

Finally, we emphasize that our decision to expand builder's remedies should not be viewed as a license for unnecessary

litigation when builders are unable, for good reason, to secure variances for their particular parcels (as Judge Muir suggested was true in the *Chester Township* case). Trial courts should guard the public interest carefully to be sure that plaintiff-developers do not abuse the *Mount Laurel* doctrine. Where builder's remedies are awarded, the remedy should be carefully conditioned to assure that in fact the plaintiff-developer *constructs* a substantial amount of lower income housing. Various devices can be used for that purpose, including prohibiting construction of more than a certain percentage of the non-lower income housing until a certain amount of the lower income housing is completed.

2. *Revision of the Zoning Ordinance: the Master*

If the trial court determines that a municipality's zoning ordinance does not satisfy its *Mount Laurel* obligation, it shall order the defendant to revise it. Unless it is clear that the requisite realistic opportunity can be otherwise provided, the trial court should direct the municipality to incorporate in that new ordinance the affirmative devices discussed above most likely to lead to the construction of lower income housing. The trial court shall order the revision to be completed within 90 days of its original judgment against the municipality. For good cause shown, a municipality may be granted an extension of that time period.

To facilitate this revision, the trial court may appoint a special master to assist municipal officials in developing constitutional zoning and land use regulations.[38] The use of such special masters, sometimes called "hybrid" masters, is not un-

---

[38]Prior to the commencement of the master's service, the trial court should determine the method, amount and other details of compensation. The master's compensation shall be paid in its entirety by the municipality, and is due upon entry of final judgment. Partial payments may be directed to be made in the court's discretion as the master's work progresses. *See R.* 4:41–2.

common in litigation resulting in some form of institutional change.[39] *See, e.g.,* T. Eisenberg & S. Yeazell, "The Ordinary and the Extraordinary in Institutional Litigation," 93 *Harv.L. Rev.* 465 (1980); T. Mayo, "Exclusionary Zoning, Remedies, and the Expansive Role of the Court in Public Law Litigation," 31 *Syracuse L.Rev.* 755 (1980); "Special Project—The Remedial Process in Institutional Reform Litigation," 78 *Colum.L.Rev.* 784, 794 (1978); Berger, "Away from the Court House and Into the Field: The Odyssey of a Special Master," 78 *Colum.L.Rev.* 707 (1978); "The *Wyatt* Case: Implementation of a Judicial Decree Ordering Institutional Change," 84 *Yale L.J.* 1338, 1344 (1975). These impartial experts use their skills to help the parties formulate a remedy that will comply with the trial court's order and supply information that the parties may not have available to them. 78 *Colum.L.Rev.* at 794. They differ from traditional masters, whose roles are usually limited to serving as fact-finders and supervising procedural tasks, *id.* at 805, in that special masters work with the parties to devise a remedy that will meet with the court's approval. *Id.* at 805–06; 84 *Yale L.J.* at 1344.

While the appointment of a master is discretionary, we believe that such appointment is desirable in many cases where the court orders a revision of the land use regulations, especially if that revision is substantial. We do not view the appointment of

---

[39]In *United States v. City of Parma,* 661 *F.*2d 562, reh. den., 669 *F.*2d 1100 (6th Cir.1981), the court reversed the trial court's appointment of a special master to oversee implementation of a broad range of remedies ordered to correct the defendant's violations of the Fair Housing Act, 42 *U.S.C.* § 3601 to 3619. The court relied heavily on the testimony of plaintiff United States' chief witness on remedies, who stated that no master was needed. It also implicitly concluded that the requirements for appointing a master found in the Federal Rules of Civil Procedure were not met.

That rule is more limited than our own. The federal rule directs that a master be appointed only if, among other things, "some exceptional condition requires it." F.R.Civ.P. 53(b). Our own rule provides for appointment of a master "upon approval by the Chief Justice . . . or under extraordinary circumstances." *R.* 4:41–1.

a master as punitive in the least; it is not designed to settle scores with recalcitrant municipalities. The point here is that we intend that the appointment of masters be viewed by the court as a readily available device, one to be liberally used. In our view the master is of potential help to all concerned: to the municipality, to the plaintiffs, to the court and counsel. He or she is an expert, a negotiator, a mediator, and a catalyst—a person who will help the municipality select from the innumerable combinations of actions that could satisfy the constitutional obligation, the one that gives appropriate weight to the many conflicting interests involved, the one that satisfies not only the Constitution but, to some extent, the parties as well.

Where the court, however, has solid reason—more than faith—to believe that the municipality will promptly attempt to rezone in accordance with the spirit of the court's order, the better part of judicial discretion would be not to appoint a master.

This form of supervision is neither as intrusive nor as novel as it might seem. It is not overly intrusive since the municipality itself develops the ordinance with the advice and assistance of the special master and the participation of the other parties. 78 *Colum.L.Rev.* at 809. The final result, of course, is subject to the trial court's approval. *Id.* Nor is it especially novel. In addition to the increasing use of special masters in the implementation of remedies in institutional litigation, courts necessarily intrude into parties' affairs in all litigation—that is the very nature of a lawsuit and its consequences. Such intrusions have traditionally taken the form of supervising a party's business, whether as a result of bankruptcy, probate, or corporate litigation; compelling parties to appear as witnesses to testify, which may entail considerable disruption of those persons' lives and affairs; creating special tribunals; and in many other ways becoming involved itself with the lives and activities of the parties. 93 *Harv.L.Rev.* at 474–92. We have however become accustomed to seeing courts and their delegates function in those "traditional" roles and therefore do not object to their

activities, while the use of special masters is a relatively new remedial device.

The special master may also free the court from unwise direct over-involvement in the revision of the zoning ordinance, saving the court's time and eliminating the need for the court to develop even greater expertise in the intricacies of land use regulation. The municipality receives the assistance of an expert in the zoning field to aid in its revision process. Obviously the court must select a planning expert who has had no previous connection with the litigation.

The master will work closely not only with the governing body but with all those connected with the litigation, including plaintiffs, the board of adjustment, planning board and interested developers. He or she will assist all parties in discussing and negotiating the requirements of the new regulations, the use of affirmative devices, and other activities designed to conform to the *Mount Laurel* obligation. The parties will presumably give the master's suggestions great weight, since the revised ordinance will be submitted to the master for his or her review and recommendations prior to its submission to the court. During the course of the revision process, the master will report periodically to the court on the progress of the revision process. At the end of the 90 day period, on notice to all the parties, the revised ordinance will be presented in open court and the master will inform the court under oath, and subject to cross-examination, whether, in his or her opinion, that ordinance conforms with the trial court's judgment. That opinion, however, is not binding on the trial court. The master's powers are limited to rendering opinions, proposing findings, issuing recommendations, and assisting the court in other similar ways as it may direct.[40] *See, e.g., Fidelity Union Trust Co. v. Ritz Holding Co.,* 126 *N.J.Eq.* 148 (Ch. 1939). It is the trial court

---

[40]Given the sensitive nature of the function, the master should not communicate privately with the court.

that must ultimately determine, independently, whether or not the municipality has conformed to its judgment and to the *Mount Laurel* doctrine.

 The municipality may elect to revise its land use regulations and implement affirmative remedies "under protest." If so, it may file an appeal when the trial court enters final judgment of compliance. Until that time there shall be no right of appeal, as the trial court's determination of fair share and non-compliance is interlocutory. Stay of the effectiveness of an ordinance that is the basis for a judgment of compliance where the ordinance was adopted "under protest" shall be determined in accordance with the usual rules. Proceedings as ordered herein (including the obligation of the municipality to revise its zoning ordinance with the assistance of the special master) will continue despite the pendency of any attempted interlocutory appeals by the municipality.

### 3. Remedies for Non-Compliance

 If within the time allotted by the trial court a revised zoning ordinance is submitted by the defendant municipality that meets the municipality's *Mount Laurel* obligations, the trial court shall issue a judgment of compliance. If the revised ordinance does not meet the constitutional requirements, or if no revised ordinance is submitted within the time allotted, the trial court may issue such orders as are appropriate, including any one or more of the following:

(1) that the municipality adopt such resolutions and ordinances, including particular amendments to its zoning ordinance, and other land use regulations, as will enable it to meet its *Mount Laurel* obligations;

(2) that certain types of projects or construction as may be specified by the trial court be delayed within the municipality until its ordinance is satisfactorily revised, or until all or part of its fair share of lower income housing is constructed and/or firm commitments for its construction have been made by responsible developers;

(3) that the zoning ordinance and other land use regulations of the municipality be deemed void in whole or in part so as to relax or eliminate building and use restrictions in all or selected portions of the municipality (the court may condition this remedy upon failure of the municipality to adopt resolutions or ordinances mentioned in (1) above); and

(4) that particular applications to construct housing that includes lower income units be approved by the municipality, or any officer, board, agency, authority (independent or otherwise) or division thereof.

In determining remedies for non-compliance, the trial court may use the assistance and advice of a master subject to the guidelines set forth above.

The remedies permitted herein upon judgment of non-compliance go beyond what had previously been allowed by this Court in *Mount Laurel* cases. They were clearly anticipated by the Court, however, in *Madison*, where we explicitly approved and adopted remedies far beyond our actions in *Mount Laurel I*. As we noted in *Madison*:

> In *Mount Laurel* we elected not to impose direct judicial supervision of compliance with the judgment "in view of the advanced view of zoning law as applied to housing laid down by [the] opinion." 67 *N.J.* at 192. The present case is different. The basic law is by now settled. Further, the defendant was correctly advised by the trial court as to its responsibilities in respect of regional housing needs in October 1971, over five years ago. [*Oakwood at Madison Inc. v. Township of Madison*,] 117 *N.J.Super.* 11. It came forth with an amended ordinance which has been found to fall short of its obligation. Considerations bearing upon the public interest, justice to plaintiffs and efficient judicial administration preclude another generalized remand for another unsupervised effort by the defendant to produce a satisfactory ordinance. The focus of the judicial effort after six years of litigation must now be transferred from theorizing over zoning to assurance of the zoning opportunity for production of least cost housing. [72 *N.J.* at 552–53].

That step itself was anticipated in *Mount Laurel I,* when we said that "[s]hould Mount Laurel not perform as we expect, further judicial action may be sought by supplemental pleading in this cause." 67 *N.J.* at 192.

It is now five years beyond *Madison*. The direct orders we issued to the municipality then, 72 *N.J.* at 553, may appropriately now be issued by trial courts initially and with complete specificity. And that which we intimated in *Madison might* be the ultimate outcome after so many years of litigation— adoption by the trial court of a master's recommendations to achieve "compliance," *id.* at 553–54—may now be the appropriate initial judicial remedy at the trial level.

We adhere to the belief that where conventional remedies are adequate to vindicate a right, they should be employed, that it is unwise to devise remedies that partake more of administrative and legislative than of judicial power where traditional remedies will do. Judicial legitimacy may be at risk if we take action resembling traditional executive or legislative models; but it may be even more at risk through failure to take such action if that is the only way to enforce the Constitution.[41]

In short, there being a constitutional obligation, we are not willing to allow it to be disregarded and rendered meaningless by declaring that we are powerless to apply any remedies other than those conventionally used. We intend no discourse on the history of judicial remedies, but suspect that that which we deem "conventional" was devised because it seemed perfectly adequate in view of the obligation it addressed. We suspect that the same history would show that as obligations were recognized that could not be satisfied through such conventional remedies, the courts devised further remedies, and indeed the history of Chancery is as much a history of remedy as it is of obligation. The process of remedial development has not yet been frozen.

We should be clear as to what is new here and what is conventional and about the extent of remedial change, regardless of the labels used. The use of a master to aid in resolution of a dispute is not new. Indeed, here it is not a remedy at all

---

[41]Some of the remedies approved here, while different in tenor from that which is ordinary, are really no more intrusive than that which is conventional. A "conventional" remedy might include a declaration that the entire zoning ordinance is void, yet it is hard to imagine a more intrusive remedy. The entire municipality remains unzoned. Anyone can build whatever is desired. That total absence of regulation is more radical than the attempt to persuade the municipality to rezone through the use of a master, or the temporary prohibition of certain kinds of construction, or indeed even the ordering of an amendment: these at least retain intact a substantial portion of the municipality's regulations.

but a method of aiding the parties in complying with a court order.[42]

When the court orders that an ordinance be amended, it does very little different from ordering that a variance be granted, actions taken by our courts in New Jersey for many years. It does very little different from declaring that a zoning ordinance is invalid on equal protection grounds, the effect of that often being not simply to allow a plaintiff to use his property in a manner not permitted by the ordinance, but to give the same right to an entire class. The ordinance is effectively amended to permit a use explicitly excluded, or in some cases to exclude one explicitly permitted. Sometimes the action of the court comes even closer to ordering, indeed declaring, that an ordinance has been changed, *see West Point Island Ass'n v. Township Committee of Dover Twp.*, 54 *N.J.* 339 (1969), where this Court, in effect, affirmed the decision of a trial court ordering a municipality to take certain action, which action could be taken only by the adoption of a resolution that the municipality had not adopted. As noted above, we did not hesitate, in *Madison,* to order amendment of the municipal zoning ordinance. Similarly, in *Lusardi v. Curtis Point Property Owners Ass'n,* 86 *N.J.* 217 (1981), relying on the judiciary's power to regulate zoning in the public interest, we effectively modified an ordinance that conflicted with the state's policy of affording recreational opportunities on the Atlantic seafront for as many citizens as possible.

The scope of remedies authorized by this opinion is similar to those used in a rapidly growing area of the law commonly referred to as "institutional litigation" or "public law litiga-

---

[42]Realistically it may be the most effective method of achieving compliance with *Mount Laurel* but there is nothing "remedial" about it, for neither the parties or the court need accept the master's suggestions or recommendations. The master may well have substantial influence on the outcome but only because his expertise is persuasive to the defendant, or because defendant believes he will be persuasive to the court.

tion." [43] While it may not have been appropriate at the time of *Mount Laurel* to employ those remedies, regularly used in such public law litigation, we clearly recognized "the further extent of judicial power in the field" by citing the lower court's decision in *Pascack*, 131 *N.J.Super.* 195 (Law Div.1974), a case in which the panoply of remedies appropriate in institutional litigation was used. What we said in *Mount Laurel* in reference to remedy eight years ago was that such remedies were "not appropriate at this time, particularly in view of the advanced view of zoning law as applied to housing laid down by this opinion . . . ." 67 *N.J.* at 192. That view is no longer "advanced," at least not in this state. It is eight years old. Our warning to Mount Laurel—and to all other municipalities—that if they do "not perform as we expect, further judicial action

[43]These cases have involved school desegregation, prison overcrowding, reapportionment and, significantly, housing. In them the courts, and they are usually federal courts, have found that the scope of a particular constitutional obligation, and the resistance to its vindication, are such as to require much more active judicial involvement in the remedial stage of litigation than is conventional if the constitutional obligation is to be satisfied. Federal district courts have retained particular school desegregation disputes for many years, fashioning remedies year after year as the circumstances seem to require; in some, they have actually taken over school districts, administered prisons, hospitals, and other institutions, ordered housing authorities to build housing in certain areas, in some cases even outside of the municipality involved. The authorities, both case and comment, are unanimous in their conclusion that exclusionary zoning cases fall within this category, that they are "institutional litigation" or "public law litigation" for the purpose of determining what kinds of procedures, including remedies, are appropriate. T. Mayo, "Exclusionary Zoning, Remedies, and the Expansive Role of the Court in Public Law Litigation," 31 *Syracuse L.Rev.* 755, 775 (1980); McDougall, "The Judicial Struggle Against Exclusionary Zoning: The New Jersey Paradigm," 14 *Harv. C.R.C.L.L.Rev.* 625, 647–54 (1979); Jennings, "The Chancellor's Foot Begins to Kick: Judicial Remedies in Public Law Cases and the Need for Procedural Reforms," 83 *Dick.L.Rev.* 217, 218 n. 9 (1979); "Developments-Zoning," 91 *Harv.L.Rev.* 1427, 1694–1708 (1978); "The Inadequacy of Judicial Remedies in Cases of Exclusionary Zoning," 74 *Mich.L.Rev.* 760, 768 (1976); "The Mount Laurel Case, A Consideration of Remedies," 37 *U.Pitt.L.Rev.* 442, 452–58 (1975); Rabinowitz, "Exclusionary Zoning: A Wrong in Search of a Remedy," 6 *U.Mich.J.L.Ref.* 625, 634–43 (1973).

may be sought . . .," *id.* at 192, will seem hollow indeed if the best we can do to satisfy the constitutional obligation is to issue orders, judgments and injunctions that assure never-ending litigation but fail to assure constitutional vindication.

### 4. Summary of the Remedial Stage

The remedies authorized today are intended to achieve compliance with the Constitution and the *Mount Laurel* obligations without interminable trials and appeals. Municipalities will not be able to appeal a trial court's determination that its ordinance is invalid, wait several years for adjudication of that appeal, and then, if unsuccessful, adopt another inadequate ordinance followed by more litigation and subsequent appeals. We intend by our remedy to conclude in one proceeding, with a single appeal, all questions involved. There will be either a judgment of compliance (from which a municipality that acted "under protest" may appeal with or without stays) signifying the trial court's conclusions that there are land use regulations and affirmative devices in place conforming to the constitutional obligation; or there will be a judgment containing one or more of many orders available in the event of non-compliance along with the action of the municipality conforming to such orders. On appeal, the appellate court will have before it everything needed to determine fully the issues.

It may ultimately turn out on appeal, of course, that the trial court's initial determination that the ordinance before it failed to comply with *Mount Laurel* was incorrect. In that case, all of the steps subsequently taken by the municipality to comply at the trial level may have been wasted energy. Our requirement of this procedure, however, is based upon our belief that much more time has been (and would continue to be) wasted, and much less compliance effected, as a result of the multiple appeals that have been allowed in the past. In the most unusual circumstances stays may be granted either by the trial or appellate courts and interlocutory appeals taken (or

attempted); furthermore, there may even be circumstances in which the trial court declines to handle the litigation in one package. It may, for instance, enter as final judgment (upon certification pursuant to R.4:42–2) what would otherwise be an interlocutory order invalidating the ordinance before it. It should ordinarily do so only where it entertains substantial doubts as to the correctness of its position and concludes that on balance an immediate appeal is clearly preferable to any procedures that might otherwise follow the interlocutory judgment of invalidation.

We intend to administer the *Mount Laurel* doctrine effectively. It is complex. Its administration is important not simply to those seeking lower income housing, but to the municipalities as well. We have no desire to deprive municipalities of their right to litigate each and every determination affecting their interests, but we believe that the present procedures, allowing numerous appeals, retrials, and ordinarily resulting in substantial delay in meeting the obligation, do not strike the proper balance. While we cannot totally satisfy both the plaintiffs' and defendants' interests, we think the procedures required above come closer than those that have existed in the past to achieving a just balance of all the polices involved.

That balance also requires modification of the role of *res judicata* in these cases. Judicial determinations of compliance with the fair share obligation or of invalidity are not binding under ordinary rules of *res judicata* since circumstances obviously change. In *Mount Laurel* cases, however, judgments of compliance should provide that measure of finality suggested in the Municipal Land Use Law, which requires the reexamination and amendment of land use regulations every six years. Compliance judgments in these cases therefore shall have *res judicata* effect, despite changed circumstances, for a period of six years, the period to begin with the entry of the judgment by the

trial court.[44] In this way, municipalities can enjoy the repose that the *res judicata* doctrine intends, free of litigious interference with the normal planning process.

## F. *Judicial Management*

This topic is listed under "Resolution of the Issues," the subject heading of one of the three major portions of the opinion. Strictly speaking, it is not an "issue" at all. Judicial management of a *Mount Laurel* trial, however, is as important to the constitutional obligation as our substantive rulings today. Confusion, expense, and delay have been the primary enemies of constitutional compliance in this area. This problem needs the strong hand of the judge at trial as much as the clear word of the opinion on appeal.

The judges assigned to *Mount Laurel* cases should confer with counsel as soon as the pleadings are complete, or before, if that seems desirable. Those conferences should result in special orders that establish definite limits and schedules for discovery, determine what motions will be required and when they shall be prepared and argued, what experts will be used and on what subject, when the pretrial shall be held and for what purposes, and whether the court should retain an expert for trial purposes (testifying as to region, regional need, fair share, etc.) and/or for remedial purposes (as a master). The trial court should remain in close touch with counsel, keeping itself informed as to the status of the case on a regular basis and calling status conferences whenever they seem needed. There is no reason why, if such procedures are used, the factual and legal issues in the matter cannot be identified early in the litigation; nor any reason why issues of region, regional need, fair share, and compliance cannot be promptly disposed of, followed immediately by resolution of the remedial stage of the litigation. The

---

[44]A substantial transformation of the municipality, however, may trigger a valid *Mount Laurel* claim before the six years have expired.

trial court should use any aids that may sensibly dispose of this litigation fairly, practically, promptly, and effectively. There are experts in this field who are prepared to testify,[45] who have studied this subject matter for many years, and who will not be in the pay of any of the parties, although their general bias may be well known. They should be liberally used by the trial court. They include those in the public sector, in particular in the Department of Community Affairs, as well as those working in the private sector. As for the compensation of court-appointed experts—and compensation will not always be required—the trial court should determine that matter at the time the expert is retained. One or more of the parties will have to pay; on occasion the ultimate liability may await the outcome of the litigation.

We hope that individualized case management, the constant growth of expertise on the part of the judges in handling these matters, the simplification and elimination of issues resulting both from our rulings and from the active involvement of judges early in the litigation, and the requirement that, generally, the matter be disposed of at the trial level in its entirety before any appeal is allowed, will result in an example of trial efficiency that needs copying, not explaining.

### III.

### Resolution of the Cases

A. *Mount Laurel II*

1. *The 1976 Revised Zoning Ordinance*

Plaintiffs here are the same as in *Mount Laurel I* (Southern Burlington County N.A.A.C.P., Camden County C.O.R.E., Camden County N.A.A.C.P. and several individuals). They are, or represent, lower income persons seeking housing in Mount Lau-

---

[45]We refer to experts appointed by the court for the purpose of giving trial testimony.

rel. They are joined by Davis Enterprises, a mobile home developer permitted, on remand after our original decision, to intervene as plaintiff. They attack Mount Laurel's amended zoning ordinance passed in response to *Mount Laurel I*, which invalidated those portions of the existing zoning ordinance inconsistent with it. The remand in that decision required adoption of an amended ordinance within 90 days (or as extended by the trial court) and allowed the plaintiffs to file a supplemental complaint 30 days after such adoption if they wished to challenge the amended ordinance. *Mount Laurel I*, 67 *N.J.* at 191. The amended ordinance was adopted on April 19, 1976, 13 months, rather than 90 days, after our opinion. The action now before us was filed shortly thereafter.

After ruling that all developing municipalities were required, through their land use regulations, affirmatively to provide a realistic opportunity for lower income housing, we had held Mount Laurel's zoning ordinance invalid "only to the extent and in the particulars set forth in this opinion." *Mount Laurel I*, 67 *N.J.* at 191.[46] Instead of attempting to amend those specific deficiencies, Mount Laurel simply added three new zones to meet its fair share obligation, presumably assuming that such action would conform to the underlying intent of our ruling.

We find that the amended ordinance falls far short of what was required, that it neither corrects the particular deficiencies of the prior ordinance nor otherwise affirmatively provides a realistic opportunity for Mount Laurel's fair share of lower

---

[46]The specific deficiencies were: the severe bedroom restrictions in the Township's planned unit development agreements, which this Court found to be "so clearly contrary to the general welfare as not to require further discussion," 67 *N.J.* at 183; the restrictive minimum lot area, lot frontage and building size requirements that "preclude single-family housing for even moderate income families," *id.;* and the zoning of an "unreasonable amount of land" for non-residential industrial and related uses. *Id.* at 184. The *only* thing that the 1976 revised zoning ordinance does is create the three new zones discussed below; the revision plainly does not address the basic deficiencies of the ordinance as a whole.

income housing. It is little more than a smoke screen that attempts to hide the Township's persistent intention to exclude housing for the poor.

In our original decision we gave Mount Laurel the opportunity to amend its ordinance. Stating that "[w]e trust it will do so in the spirit we have suggested . . . ," *Mount Laurel I,* 67 *N.J.* at 192, we declined to impose any judicial supervision over the municipality's efforts to comply. Our trust was ill placed. Therefore, to assure compliance with our mandate, all further proceedings to conform to today's decision shall be strictly supervised by the trial court, including not only any further litigation that may be required by this opinion, but all municipal action needed to conform to this and the trial court's judgment.

The original Mount Laurel ordinance under trial court review in 1972 provided for several zones: an industrial zone (about 30 percent of the land—although there is some dispute about that), a retail business zone (1.2 percent of the land), and five residential zones that included approximately 10,000 of the Township's 14,000 acres. Four of those five residential zones allowed only detached single family residences, the requirements being such as would prevent low and moderate income families from buying them. The fifth residential zone was the only one allowing multi-family housing, but it consisted of only 200 of the 10,000 residential acres, was designed for single-ownership development of the entire zone, was limited to senior citizens, and contained restrictions and requirements that again brought the price or rental beyond the means of low and moderate income retirees. Additionally, Mount Laurel had approved four planned unit developments (PUDs) pursuant to *N.J.S.A.* 40:55–54 to –67 (subsequently repealed by the Municipal Land Use Law),[47]

---

[47]Under the new statute a planned unit development is defined as "an area with a specified minimum contiguous acreage of 10 acres or more to be developed as a single entity according to a plan, containing one or more residential clusters or planned unit residential developments and one or more public, quasi-public, commercial or industrial areas in such ranges of ratios of

which, when completed, would provide for approximately 10,000 units by the year 2000. While allowing multi-family housing, these PUDs (which were carved out of the industrial and three residential zones) were similarly too expensive for lower income families. The resolutions authorizing them noted that they would "attract a highly educated and trained population base . . .," *Mount Laurel I*, 67 *N.J.* at 168, and it was clear that "only persons of medium and upper income [were] sought as residents." *Id.* at 167.

This Court's conclusion that no low or moderate income housing could be built in Mount Laurel was based on numerous restrictions and cost-generating provisions contained in its land use regulations as well as on the total absence (except for the PUDs and the senior citizen housing) of any provision for multi-family housing. Those restrictions included large lot zoning (or more accurately, the absence of small lot zoning), limitations on multi-bedroom homes and units, penalties for a large number of children per unit, contribution requirements for multi-family units, excessive minimums for frontages, setbacks, front yards, and home sizes, overall density maximums for sections and projects, paving requirements, and more. This Court specifically declared some of these restrictive devices invalid.

Nothing has really changed since the date of our first opinion, either in Mount Laurel or in its land use regulations. The record indicates that the Township continues to thrive with added industry, some new businesses, and continued growth of middle, upper middle, and upper income housing.[48] As far as

---

nonresidential uses to residential uses as shall be specified in the zoning ordinance." *N.J.S.A.* 40:55D–6.

[48]Between 1970 and 1977, Mount Laurel added 1,300,000 square feet to its industrial floor space and 700,000 square feet to its office space. Between 1970 and 1980, 2,784 new housing units were built in Mount Laurel, *all* of them under the restrictive conditions that this Court held in *Mount Laurel I* could not produce lower income housing. The total population of Mount

lower income housing is concerned, from the date of that opinion to today (as far as the record before us shows) no one has yet constructed one unit of lower income housing—nor has anyone even tried to.[49] Mount Laurel's lower income housing effort has been either a total failure or a total success—depending on its intention.

We realize that given today's economy, especially as it affects housing, the failure of developers to build lower income housing does not necessarily prove that a town's zoning ordinances are unduly restrictive. One might have expected, however, that in the eight years that have elapsed since our decision, Mount Laurel would have something to show other than this utter cipher—that is, unless one looked at the amended ordinance.

Mount Laurel's notion of providing a realistic opportunity to build lower income housing has led to the rezoning of less than one-fourth of one percent of its land (about 20 out of 14,700 acres). This miniscule acreage consists of three zones, R–5, –6, and –7, each one owned by a different individual (apparently not residential developers in the cases of R–5 and R–6) who may very well elect never to take "advantage" of the alleged opportunity to build lower income housing.

The zone designated R–5, consisting of 13 acres, allows the construction of townhouses and garden apartments with a maxi-

---

Laurel has increased tremendously, from 11,221 in 1970 to 17,614 in 1980, a 57 percent increase during a decade when the total population of the state increased by less than 5 percent and the total population of Burlington County increased by only 12 percent.

[49]There has been a continuing application for construction of mobile homes, *see infra* at 307–309, but no applications of any kind other than this and certainly none pursuant to the new ordinance.

If this continues, and no new lower income housing is built in Mount Laurel to the year 2000, then by that year the percentage of lower income families in the Township will have dropped to 7.7 percent, from 25.5 percent in 1970 and 41.4 percent in 1960. The percentage of lower income families in the Burlington, Gloucester, Camden region has been, and will, it is assumed, continue to be through 2000, roughly 40 percent.

mum of 10 units per acre. It is owned by an industrial developer, is totally surrounded by industrially zoned land, virtually isolated from residential uses, has no present access to other parts of the community, no water or sewer connections nearby, is in the path of a proposed high speed railroad line, and is subject to possible flooding. It would be hard to find (other than R–6) a less suitable parcel for lower income or indeed any kind of housing. Furthermore, as one of plaintiffs' experts pointed out, no experienced industrial developer would allow this parcel to become a pocket of protesting residents objecting to his planned industrial uses surrounding them.

The R–6 zone is for detached single family residences on 6,000 square foot lots, which is an effort to comply with the *Mount Laurel I* requirement that there be some residential development permitted on "very small lots." *Mount Laurel I,* 67 *N.J.* at 187. It includes, however, only 7.45 acres. It has an extremely serious drainage problem, lying so low compared to the surrounding area that it would cost $10,000 per acre, according to plaintiffs' experts, to raise it so as to minimize that problem. In addition, there are no water or sewer connections nearby. There are cost-generating requirements concerning parking, street widths, and others, that will subsequently affect the price of homes, if they are ever to be built. The size of the zone itself is so small that it is highly unlikely that any developer would consider building low and moderate income housing there, for the necessary economies of scale could never be achieved. Defendant's planner estimated that only 30 units could be built in this zone, and conceded that under no circumstances would *anything* be built for five to six years since there would be no sewer or water access available until then. Lower income housing on this tract is a phantom.

The R–7 zone is somewhat more complex. It does not consist of any specific land but rather is defined as being a maximum of 10 percent of the units to be built in Section VII of an existing approved PUD known as Larchmont. The only thing certain

about this zone is that there will be no construction started until 1984, according to defendant's planner.

R–7 is really not a zone at all, but rather a waiver by Mount Laurel of certain restrictions and requirements that would otherwise have been imposed on the Larchmont Section VII units. As noted in *Mount Laurel I,* the price of units scheduled to be built in this development would be far beyond the reach of low or moderate income families because of these restrictions. Plaintiffs' planner concluded that even without them, the developer would have no incentive to build lower income housing. In other words, R–7 provides the "realistic opportunity for the construction of lower income housing" by allowing, not requiring, such construction by an existing developer whose plans for middle and upper income housing are already intact and who will be permitted to build precisely what he had intended to build at a higher profit than could be realized from lower income housing.

Unless something changes radically, it is certain that no builder will construct lower income housing in R–7. There is no evidence that the present developer has any intention to do so, especially in light of the benefits available to him when he builds upper and middle income housing in the R–7 zone.

Mount Laurel's view of these zones is, of course, somewhat different. The Township itself, however, concedes that at the very most the three new zones could accommodate only 131 units of lower income housing. Their belief that this would be sufficient to comply with our mandate was based upon an analysis of Mount Laurel's fair share obligation that we find to be wholly inadequate.

To determine its fair share, Mount Laurel first conducted an on-site study to determine its indigenous lower income housing need and concluded that this was 103 units based upon the number of deteriorated or dilapidated units in the Township and the number of lower income families presently residing in

Mount Laurel paying rent beyond their means.[50] Mount Laurel then calculated its fair share of the prospective regional lower income housing need to the year 2000 as 515 units. The Township then incorrectly assumed that its indigenous housing obligation was part of its *prospective* need obligation and therefore concluded that its total obligation until the year 2000 was 515 units, 103 of which met its present indigenous need.

The final step of the Township's fair share analysis was a determination that these 515 units should be phased in through the year 2000. The Township would allow immediately for the 103 units to meet its indigenous need, and permit the remaining 412 units in segments of 17 per year through 2000. The Township maintained at trial that once its three new zones were filled to capacity with lower income housing, it would create additional zones where necessary to meet its yearly quota.

The shortcomings of Mount Laurel's fair share calculations are obvious: Mount Laurel adopted an approach calculated to lead to the smallest possible share of lower income units in order to keep such units out, as it has done successfully for so long. The Township began by adopting the estimate of its region's lower income housing need derived by another entity, the Delaware Valley Regional Planning Commission. We will for the moment assume the correctness of that Authority's conclusion that 22,900 units represents the prospective need to the year 2000 for Burlington County, although one could make a case—as plaintiffs' experts did—that that figure should be closer to 40,000.

It is the allocation of this need among the municipalities of the county that is so blatantly self-serving. The sole factor used by Mount Laurel's planners in allocating this regional need for 22,900 lower income units was "developable land." Its studies indicated that Mount Laurel had 5,936 acres of such land, and

---

[50]"Beyond their means" is greater than 25 percent of annual income. *See* discussion *supra* at 221 n. 8.

Burlington County 263,282 acres, and concluded that this 2.25 percent ratio, when applied to the county need of 22,900 units through the year 2000, meant that Mount Laurel's fair share was 515 units. Vacant developable land, at this point, may be regarded as land not legally committed to other uses. The formula, therefore, assigns the same share to 100 acres located 100 miles from Camden, totally unsuitable for lower income housing and totally devoid of any demand for such use, as it does to 100 acres 10 miles from the center of Camden, near shopping centers, transportation facilities, and highly suited for lower income housing and subject to intensive demand for such use. In fact Mount Laurel's formula equates the highly desirable vacant acreage of Mount Laurel with that of the Pine Barrens. Its analysis would lead to the conclusion that Bass River, located far from any activity that would suggest, at least at the present time, its desirability for lower income housing and with a present population of 1,000, has a "fair share" of 2,500 lower income units while Mount Laurel, located at the heart of the regional housing demand, and with a population of 17,614, has a fair share of 515 units.

As one of the plaintiffs' experts noted, the Mount Laurel plan is "not a fair share plan, virtually by definition."[51] More

---

[51]Even accepting the premise of the Mount Laurel approach to fair share, which basically deals with the proportion of vacant land in the municipality measured against that in the region, its refinements make it even more absurd. "Developable land" excludes land that may be vacant for many years but that has been the subject of an approved plan by a developer. There is a great deal of such vacant land in Mount Laurel Township, land that is not used in the formula as vacant land and that therefore does not increase Mount Laurel's fair share. It is one thing to exclude in a fair share calculation land that has actually been developed for middle and upper income people—land with houses on it—but a totally different thing to exclude land that may in some sense be said to be "committed" to the same exclusionary uses even though not one single home has been built. Our society may not be willing to rip down what we now have in order to right the wrongs of the past, but we certainly will not allow what are no more than present *intentions* —in the form of an approved subdivision to be developed over the next 20 years—to perpetuate those wrongs.

importantly, Mount Laurel failed to take certain critical factors into consideration in its allocation formula, namely, the land's suitability and the need for lower income housing. As for suitability, plaintiffs' expert noted that the distance from Camden was a fair measure of suitability (and perhaps need) in this analysis. She also noted that any respectable fair share formula took into consideration the "need" for lower income housing, usually using some kind of employment statistic as a measurement of that need, reflecting the obvious fact that people want to live near where they work. Plainly, consideration of these factors and reduction of the weight given to vacant developable land would substantially increase Mount Laurel's fair share allocation.[52]

In sum, we find that Mount Laurel's 1976 revised zoning ordinance fails completely to comply with the mandate of *Mount Laurel I.* The three new zones created by the revised ordinance do not provide a "realistic opportunity" for the construction of *any* lower income housing. Further, even if those zones could realistically accommodate as much lower income housing as Mount Laurel claims (131 units), this would fall far short of Mount Laurel's fair share of the prospective regional lower

---

Furthermore, the measurements were made for different times—Burlington's vacant "developable" land being taken as of 1970, and Mount Laurel's as of 1976, guaranteeing a consequently smaller fair share for Mount Laurel. As Mount Laurel's planner noted, use of the same year for both, namely 1976, would have increased Mount Laurel's fair share only from 515 units to 687 units. This was, according to the planner, "just not significant [enough] to really worry about."

[52]We leave it to the trial judge on remand to determine what the allocation should actually be, noting only the total unacceptability of Mount Laurel's estimate. This unacceptability is further demonstrated by the fact that even if all 515 lower income units were built by 2000, the percentage of lower income families in Mount Laurel would only be 13.2 percent, compared with 7.7 percent if *no* new lower income units are built, and compared with the approximately 40 percent projected for the Burlington, Gloucester, Camden region. *See supra* at 297 n. 49.

income housing need—as would the 515 units that Mount Laurel claims it will accommodate by the year 2000.

The conflicting testimony offered by Mount Laurel on these issues was unpersuasive. The Township planner responded to criticism that the use of vacant land as the exclusive criterion in determining fair share would result in allocating an enormous amount of lower income housing to the Pine Barrens (30 percent of the entire regional need, according to plaintiffs' expert) by noting "that it is a very reasonable allocation method because the total units . . . get equitably distributed over the entire county; and . . . there are a lot of townships in the county land." Given the likelihood that areas such as the Pine Barrens that are reserved as conservation zones by the SDGP should not have any prospective fair share allocations, we find wholly unacceptable Mount Laurel's allocation formula, which would place a *greater* obligation on Pine Barrens municipalities.

Mount Laurel also tried to deflect criticism of its zoning ordinance by contending once again that its PUDs, which this Court in *Mount Laurel I* found totally unsuited for lower income housing, did in fact provide a realistic opportunity for such housing. For the reasons outlined in *Mount Laurel I, 67 N.J.* at 167–69, 182–83, we again reject this contention.[53]

Finally, Mount Laurel maintained that it had made an "honest attempt in an unknown area" and that the courts should defer to a municipality's good faith effort to determine and meet its fair share obligation. It was this argument that seems to have particularly impressed the trial court when it upheld the Township's revised zoning ordinance. Relying upon this Court's statement in *Madison,* that the "entire problem" of formulating fair share plans "is essentially and functionally a legislative and administrative, not a judicial one," 72 *N.J.* at 541–42 (footnote

---

[53]A detailed analysis of the exclusionary nature of Mount Laurel's PUDs is provided in Note, "Exclusionary Use of the Planned Unit Development: Standards for Judicial Scrutiny," 8 *Harv.C.R.–C.L.L.Rev.* 384, 394–99 (1973).

omitted), and having concluded that Mount Laurel acted in "good faith and with the express intent of compliance," *Mount Laurel II*, 161 *N.J.Super.* at 344, the trial court upheld Mount Laurel's fair share analysis and the resulting 1976 revised zoning ordinance.[54]

The trial court's initial finding of compliance [55] is understandable in light of *Madison*. Under the objective tests of today's opinion, however, Mount Laurel's revised ordinance is plainly insufficient to meet the Township's *Mount Laurel* obligation. The plaintiffs not only show that Mount Laurel had failed

---

[54]The trial court did, however, strike down as impermissibly exclusionary three provisions of the revised ordinance: one that imposed excessive bonding requirements in the new zones, one that mandated exhaustive studies to be made by developers in these zones, and a "control provision" that made Mount Laurel's obligation to provide its fair share dependent on whether other townships in the county were meeting their obligations. 161 *N.J.Super.* at 348. We affirm the rulings on all three provisions.

The trial court also struck down Mount Laurel's ban on mobile homes. *Id.* at 359–60. Although we affirm this holding also, *see* discussion *infra* at 307–309, we note that this ruling is inconsistent with the court's finding that Mount Laurel was meeting its fair share obligation. While that ruling might be predicated on a determination that such exclusion in *this* case for *this* municipality is so unreasonable as to be arbitrary, it would appear that the conclusion was based upon the municipality's obligation to provide a realistic opportunity for lower income housing. If that opportunity is already provided in the 515 units, or if Mount Laurel has already made a bona fide attempt to afford that opportunity and, as the court viewed it, has therefore satisfied its obligation, the *Mount Laurel* doctrine would not be of any importance on the issue of the validity of the mobile home exclusion.

Finally, the trial court rejected the plaintiffs' contention that the Township was unconstitutionally discriminating against its resident poor in the provision of municipal services such as paving and lighting streets. *Id.* at 352–53. We affirm on this point also.

[55]We note that subsequent to the commencement of oral arguments in these cases, the trial court granted plaintiff intervenor's motion made in aid of litigant's rights, and granted a building permit to Davis, which decision we certified for direct review, but which was not briefed or argued before us. In its opinion, the trial court questioned Mount Laurel's "good faith" in light of its ongoing dilatory tactics in remedying the deficiencies in the amended ordinance that the trial court invalidated. Our decision today affirms this portion of the trial court judgment as well. *Infra* at 307–309.

to provide a realistic opportunity for the construction of its fair share of lower income housing, however that fair share is reasonably measured, but, even absent such evidence, also proved that the land use regulations of Mount Laurel remained *facially* invalid. The demonstration of "facial invalidity" does not depend upon an ordinance being totally bereft of provisions for multi-family dwellings; it is enough to show either that such provisions are woefully inadequate or are simply a smoke screen that diffuses the underlying exclusionary intent or effect.

 Moreover, a much more significant burden, different in kind although not in weight, was cast on Mount Laurel in this case. Mount Laurel's actions in this matter, commencing even prior to 1971 (for 1971 marks simply the date of the commencement of the original action, as distinguished from the date when Mount Laurel began to exclude lower income people, which undoubtedly occurred long before), require a modification of the rule that attaches presumptive validity to municipal ordinances. Its actions not only make such a presumption inappropriate, but, given the importance of the constitutional obligation, require just the reverse, namely, that the burden be cast on Mount Laurel to prove that its ordinances are valid.

 Presumptive validity of governmental action serves many important values. It acts as the most effective check on judicial interference with executive and legislative actions. It is justified by the fact that those in government generally act within the powers granted to them and do so properly. Ultimately it represents an assertion of faith in government, including an obligation on the part of the governed to abide by the rules of constituted authority, for it casts a heavy imprint of validity on any governmental action challenged by an individual. Absent particular fundamental interests (such as freedom of speech) that may be impinged upon, *any* governmental action from the issuance of a parking ticket to the seizure of a steel plant is presumptively valid. The genius of our system of laws is that it is only a presumption, for both may be set aside upon

proper proof that the presumption was unwarranted. The exception, however, is a rare one, for the presumption goes deep, and indirectly includes the assumption of any conceivable state of facts, rationally conceivable on the record, that will support the validity of the action in question.

 Given the importance of the societal interest in the *Mount Laurel* obligation and the potential for inordinate delay in satisfying it, presumptive validity of an ordinance attaches but once in the face of a *Mount Laurel* challenge. Equal treatment requires at the very least that government be as fair to the poor as it is to the rich in the provision of housing opportunities. That is the basic justification for *Mount Laurel.* When that clear obligation is breached, and instructions given for its satisfaction, it is the municipality, and not the plaintiffs, that must prove every element of compliance. It is not fair to require a poor man to prove you were wrong the second time you slam the door in his face.

This ruling is similar to *Kruvant v. Mayor & Council Twp. of Cedar Grove,* 82 *N.J.* 435 (1980), where we announced a "time of decision" rule that precluded a municipality from blocking a particular use of land by continually adopting prohibitory ordinances, one just as invalid as the next. There was a time to stop, we said, and while it may have taken six ordinances in *Kruvant* before we called a halt to dilatory municipal action, the principle is the same: depending upon the circumstances, a time must come when the courts will cease to defer in the conventional manner to municipal action. In *Kruvant,* we refused to consider the most recently adopted municipal ordinance; here we refuse to accord presumptive validity to Mount Laurel's revised ordinance. The delay in this matter exceeds that in *Kruvant,* for the rights of those represented by plaintiffs have been denied for at least ten years and undoubtedly far longer. Furthermore, the interests protected here dwarf those involved in *Kruvant,* as important as they might have been, for *Kruvant*

involved only the economic interests of the plaintiffs. Here we have plaintiffs who assert interest in one of the basic necessities of life,[56] and seek protection that, if denied, would similarly affect many, many other poor people.[57]

■ We therefore remand this matter to the trial court for further proceedings to determine Mount Laurel's fair share, and upon such determination to require further actions by the municipality to assure the expeditious revision of Mount Laurel's land use regulations (and other actions) all in accordance with this opinion. While we have held that the bona fides of Mount Laurel is irrelevant in determining its compliance with the underlying constitutional obligation, it is not irrelevant in determining the remedy adopted herein. Where, as here, there is evidence of lack of municipal good faith and/or interminable delay, trial courts must closely supervise orders designed to compel compliance. Here that supervision must include the appointment of a master.

## 2. The Builder's Remedy

■ Davis Enterprises was permitted to intervene as plaintiff in this case after *Mount Laurel I* was decided. Davis proposed a 535 unit, 107 acre mobile home park for the Township. Davis committed itself to securing federal Section 8 subsidies for 20 percent of the units. Mount Laurel originally rejected the Davis project because its zoning ordinance barred all mobile homes. Although this rationale for excluding Davis is no longer tenable after our overturning of *Vickers, supra* at

---

[56]In our society access to adequate housing has become a fundamental part of decent living. *See* Hartman, *supra* at 212 n. 6, at 1–5.

[57]As mentioned in *supra* at 221 n. 8 the Department of Community Affairs estimates that there will be about 1,100,000 lower income households in New Jersey by 1990.

275 we must still decide whether Davis is entitled to the builder's remedy it seeks.

The trial court granted the builder's remedy, ordering the Mount Laurel Planning Board to consider the Davis application and review it in a "manner consistent with the least-cost housing principles enunciated in *Oakwood v. Madison,*" 161 *N.J.Super.* at 359. We affirm the grant of a builder's remedy. It is clearly appropriate in this case under the new standard enunciated in this opinion. First, the Davis project *will* provide lower income housing for Mount Laurel. Beside the fact that mobile homes are generally much less costly than site-built housing, the trial court's decision requires that Davis construct *at least* 20 percent of its units for lower income persons. In addition, the site chosen by Davis is plainly suited for mobile home development and Mount Laurel has presented no real evidence to the contrary. Finally, we feel that after ten years of litigation it is time that *something* be built for the resident and non-resident lower income plaintiffs in this case who have borne the brunt of Mount Laurel's unconstitutional policy of exclusion.

The Mount Laurel Planning Board held hearings on the Davis project after this Court had already granted direct certification of the original trial court decision in *Mount Laurel II.* On May 8, 1980, after Davis had submitted a revised plan to the Board that reduced the number of proposed units from 535 to 456, the Board rejected the Davis project. On December 2, 1980, the trial court granted a motion made by Davis in aid of litigant's rights, *R.*1:10–5, and ordered Mount Laurel to grant Davis a building permit on condition that Davis apply to HUD for Section 8 subsidies for 20 percent of its units. On March 17, 1981, we granted Davis' motion for direct certification pending an appeal of the trial court's order by the Township. We now affirm the December 2, 1980, order with the added condition that if Davis is not able to obtain the Section 8 subsidies being sought, the developer must use whatever other means are available to make certain that *at least* 20 percent of the units built

are affordable by lower income households, with *at least* half of these being affordable by low income households.[58]

## B. *Caputo v. Chester*

Plaintiffs, brothers Joseph and Aldo Caputo, who have owned the property in question since 1960, brought suit against defendants Chester Township and its planning board (Chester) after their efforts to obtain rezoning were unsuccessful. The suit was originally filed on July 22, 1975. By the next year it became apparent that Chester, having been advised by its counsel that its zoning ordinance violated the *Mount Laurel* doctrine, intended to effect a substantial rezoning of the entire Township. After Chester adopted a new zoning ordinance in October 1976, settlement efforts came close to terminating this litigation but ultimately collapsed. An amended complaint was filed December 16, 1976 and a trial was conducted over 25 days between October 11, 1977 and March 7, 1978. At that trial plaintiffs sought a declaration that the Chester ordinance was unconstitutional under the *Mount Laurel* doctrine along with appropriate relief, including an order that Chester rezone and include provisions in such rezoning that would enable plaintiffs to develop their land for multi-family units in accordance with their proposed plan (a builder's remedy). The trial court, three years after the action was originally filed, in a 111 page decision held that the ordinance was unconstitutional and ordered rezoning in accordance with its opinion; the builder's remedy was denied, however, primarily on environmental grounds, because the court concluded that Chester's decision to allow multi-family dwellings elsewhere (and *not* allow them on plaintiffs' property) was reasonable. The court specifically invalidated provisions of the

---

[58]It is true that because it did not institute this suit, Davis is not a typical plaintiff-developer. Consequently, it could be argued that the primary reason for granting a builder's remedy, encouraging *Mount Laurel* suits by developers, is not present here. However, this is more than outweighed by the reasons set forth in the text for granting the remedy, especially the fact that the Davis project will provide a significant amount of lower income housing.

ordinance that limited development to single family dwellings, and held that minimum five acre lot requirements were illegal *per se*. Plaintiffs appealed from the portion of the trial court's decision denying the builder's remedy; defendants appealed only from the invalidation of the five acre restriction—they did not appeal from the court's determination that the ordinance violated *Mount Laurel* or from its order requiring rezoning. As a result, it would appear that the only issues before us involve the trial court's refusal to grant a builder's remedy and the legality of the five acre restrictions imposed by the Township.

Since Chester is characterized as a "limited growth" area by the SDGP, our decision to abide by the Plan's policy of limiting development to growth areas requires us to note that were the trial court's decision imposing a fair share obligation on Chester Township appealed, we would remand to enable the trial court to consider the effect of the SDGP in accordance with this opinion.[59] It appears that close examination of the Township itself and of its zoning history lends support to the legitimacy, and perhaps the wisdom, of accepting the policy of the SDGP in limited growth municipalities as the suitable remedy to meet the *Mount Laurel* obligation.

Chester is in the southwest corner of Morris County, completely surrounding Chester Borough, which, by comparison, is fairly well developed. Chester has very little commerce or industry, and consists mostly of residences and farms. While its population growth in the 1970–80 decade was at a substantial rate (a 22 percent growth compared to a statewide increase of less than 3 percent), the total population and its density give a truer picture of the Township. The population in 1980 was 5,198, and its density 179.9 people per square mile, as compared to Morris County's 866.9 and the state's 983.3. Chester is described as being 42 percent developed and 58 percent undeveloped, al-

---

[59] If the "developing" rule were preserved, Judge Muir's order to rezone would appear to be correct.

though we suspect that picture does not adequately convey its lack of development, since a very substantial portion of that 42 percent undoubtedly consists of vacant land (the one, two or five acres on which homes are found, as well as a very substantial portion of public parks). Of Chester's more than 18,000 acres, 12.3 percent are residentially developed, 25.9 percent are developed for public purposes (almost completely consisting of parklands), 19.6 percent are in agricultural use, 38.4 percent are undeveloped, and the remaining several percent are devoted to commercial, recreational, and industrial uses.[60]

Chester's infrastructure, other than some of its highways and bus service, is far from well developed. Furthermore, its topography, water resources, and agricultural suitability are objective facts that support a policy of non-development. One portion of the Township consists of a plateau, a portion of which is developable, while the balance consists of rugged, fairly hilly terrain, with steeply rising slopes, which is unsuitable for development. The two are divided by a "fault" marked by a ravine through which a stream flows bordered by steep hills and slopes. The fault, the stream, the steeply rising slopes and the consequent plateau and contrasting rugged terrain all traverse the Caputos' tract. Chester contains the source and early portions of some of the streams that ultimately flow into and constitute the Raritan River. It also is located over substantial underground water supplies, which presumably provide the source of the streams themselves. The well-known effects of residential development—pollution of surface waters that run into streams, pollution of underground water supplies through sewage percolation, erosion of slopes during development (and thereafter) and conse-

---

[60]The developed residential property is almost exclusively (95 percent) single family. The residential property is relatively expensive, single family dwellings in 1976 ranging in price from $30,000 to $100,000, with 87 percent of all sales being over $50,000. These figures suggest the relatively wealthy economic makeup of the population. The median income for Chester in 1970 (as in 1980) was higher than comparable figures for Morris County and substantially higher than the state figure.

quent pollution of streams—are particularly critical in Chester. If uncontrolled, such residential development could seriously affect this part of the Raritan River water basin, its downstream owners, the people who directly and indirectly depend upon the purity of the river, and the underlying water supplies. Because the Caputo tract is strategically located, its development would contribute to the effects mentioned above. Finally, Chester has within its borders a substantial portion of prime agricultural land, which no one disputes should remain free of development.

The record suggests that the duly elected and appointed officials of Chester, given all of these factors, had adopted a non-development policy. While they legitimately ascribed their decision to the many objective factors mentioned above (preservation of open spaces, agricultural land, maintenance of the purity of the watershed, unsuitability of terrain for development, dangers of erosion), it is clear that there was an additional equally important one: they simply wanted to keep Chester the way it was.

Some professional planners saw Chester in a different light. Without exception, every study of the area, no matter how defined, indicated that Morris County, including Chester, was, and would continue to become, an important focal point for ever-increasing development radiating from the general metropolitan region as well as from its own major centers of growth, Morristown and Dover. The demand for land in areas similar to and including Chester for all purposes—commercial, industrial and residential—was apparently intense. Whatever relevant projection might be considered, be it population growth, employment growth or ratable growth, Morris County and Chester, along with other county municipalities, would be shown as anticipating more businesses, factories, jobs, people, and ultimately homes. Presumably the projections were not simply mathematical formulas, but reflected an actual and ever-growing demand for land in the area. It was generally acknowl-

edged that the question was not whether Chester would be developed but how and under what controls.

Whatever the future may hold, it would appear that this development has still not really begun, for despite the 22 percent population growth during the last decade, it has been desultory, insofar as Chester is concerned, consisting only of a few homes built here and there over this ten year period. It may be assumed that the existing zoning regulations themselves have been one of the factors contributing to this very slow pace of growth.

Chester's zoning history might almost be predicted from the foregoing statement of facts. The consistent overriding development pattern has been the construction of single family residences on very substantial parcels. A municipality that has more than 85 percent of its developed land (excluding publicly owned land, parklands and farms) in residential use, 95 percent of which consists of single family homes, could be expected to have a zoning ordinance in which more than 70 percent of the entire acreage of the Township is set aside for single family residences on either two acre or five acre plots. The zoning ordinance under attack, adopted in 1976, contains eight districts (as did the original ordinance of 1964). Of the four residential districts, three are limited to single family residences, one with two acre minimum lots (40 percent of the entire municipality), another with a five acre minimum (31 percent of the Township), and the third with a one acre minimum (0.5 percent of the total). The fourth residential zone permits, in addition to two acre single family residences, multi-family development at a density of five units per acre with a limit of ten bedrooms per acre. Furthermore, no more than 150 units may be built on any tract and no more than 300 in the entire Township. While cluster development was permitted, it was limited to tracts of at least 30 acres in the two acre zone and 50 acres in the five acre zone. Total acreage available for multi-family dwellings constitutes 1.5 percent of the Township. There were only three tracts so zoned, and two of them were not likely to be developed in the

foreseeable future since they were owned by substantial long-term residents of the community.

The balance of Chester's zoning consisted of parklands (22 percent), business (about 0.5 percent), industrial (1 percent) and residential/office (no acreage total or percentage determination was provided in the record).

The trial court found the ordinance facially invalid because it did not provide a realistic opportunity for the construction of a variety of housing, rejecting all of the justifications advanced by Chester. Additionally the court held the bedroom limitation in the multi-family zone and the five acre zoning provision invalid. It did not order any specific plan of rezoning but simply required revisions of the zoning. ordinance "consonant with this opinion," noting that the five acre zone must be eliminated and that while there may be an allowance for low density zoning, small acre zoning and some lower income housing must be provided, along with provisions for "all variety and types of housing ... based upon the needs of the area"; bedroom restrictions and all cost generating restrictions should be removed in the multi-family zone and, generally, all of the provisions of the Municipal Land Use Law must be complied with.[61]

Municipalities that are in "growth" areas (unlike Chester) and have resulting fair share duties can satisfy them in a variety of ways, including density adjustments. We hold, however, that low density limitations like five acre lot minimums are not necessarily in violation of the *Mount Laurel* fair share obligation so long as municipalities are able to satisfy that obligation in spite of apparently "exclusionary" devices.[62]

---

[61]The trial court also held, and the record below supports it, that the 1976 zoning provisions did not amount to confiscation of plaintiffs' property and that the fee schedules of the ordinances were not unreasonable.

[62]Of course, these devices will continue to serve as evidence of facial invalidity in exclusionary zoning litigation. The presumption of invalidity

Therefore, such devices are subject to the same level of scrutiny as other municipal regulations, once compliance with fair share requirements has been demonstrated. Moreover, we hold that the preservation of open spaces itself may, under proper circumstances, be sufficient justification for large lot zoning, including five acre zoning. Where a municipality's zoning provides for its fair share of low and moderate income housing, as well as for other uses it deems appropriate, it is not obliged, in its other zones, to allow for the maximum density of construction that environmental factors will permit. In an area like Chester, it may decide that the value of preserving open space is sufficient to warrant such zoning. We therefore reverse the trial court's ruling on five acre lot minimums, intending thereby to leave Chester free to make its own decisions on the advisability of such zoning, subject to challenge on some basis other than *Mount Laurel.*

 Similarly, the need for agriculture, open space, and, perhaps most importantly, for geographic and aesthetic heterogeneity and variety in different areas of this state convince us that the SDGP's characterization of a presently predominantly rural area like Chester as "limited growth" is presumptively sound. More to the point, there is no showing even approaching that which would be required for us to replace the plan with our own planning judgments.[63]

 The builder's remedy sought by plaintiffs must of necessity be denied. One of the conditions for awarding such remedy is that the builder establish that the municipal ordinance fails to comply with the *Mount Laurel* obligation. Since we have held that Chester is not subject to that obligation (insofar as the prospective need for lower income housing is concerned),

---

that results may simply be rebutted by a showing of compliance elsewhere with the *Mount Laurel* fair share obligation.

[63]The issue, of course, did not exist at the time the case was tried or the appeal argued.

plaintiffs' claim has not succeeded. Assuming, pursuant to the remand ordered hereafter, that Chester is required to further amend its ordinance or take other steps to provide a realistic opportunity for lower income housing for its indigenous poor, this denial of a builder's remedy shall not be disturbed. We are satisfied that Chester established very substantial reasons for denying such a remedy. The environmentally sensitive nature of much of Chester's lands, and the location of plaintiffs' property within that sensitive area, were fully documented. We interpret the trial court's decision as a determination not simply that there were better places in Chester for lower income housing, but that plaintiffs' property was unsuitable for substantial environmental reasons. The record adequately supports that determination.

We therefore affirm the judgment of the trial court denying a builder's remedy. Given the new principles set forth in this opinion, plaintiffs should be given the opportunity at the trial level to challenge the adequacy of the amended ordinance to meet Chester's indigenously generated present need. We therefore reverse and remand for such further proceedings as plaintiffs may wish to pursue on that issue alone, in accordance with our opinion.

## C. Glenview Development Co. v. Franklin Township

The SDGP's treatment of agricultural areas is similar to that of limited growth municipalities: municipalities, like Franklin, classified as exclusively agricultural and/or conservation have no obligation to provide a fair share of the prospective regional housing need. The validity of this policy judgment is made clear by an examination of Franklin Township and its zoning history.

Franklin Township is a predominantly rural municipality in the center of Hunterdon County comprised of 23.3 square miles (14,718 acres), characterized as exclusively "agricultural" by the SDGP. It is located approximately 45 miles from Newark, 40

miles from Trenton, and 35 miles from Allentown, Pennsylvania. Seventy-six percent of the Township is under "farmland assessment" pursuant to the New Jersey Farmland Assessment Act of 1964, *N.J.S.A.* 54:4–23.1 to –23.24. Less than 3 percent of the Township is devoted to industrial and commercial uses. The population of Franklin, 2,294 in 1980, though substantially greater than its 1950 population of 1,255, has grown by only 140 since 1970. Franklin's 1980 population density of 98.4 people per square mile is significantly fewer than Hunterdon County's 203.4 and the state's 983.3.

Franklin's infrastructure network is relatively undeveloped. The Township itself has no public sewer or water utilities, although such services may be available from the adjacent Town of Clinton. Roads in the Township amount to only 2.58 linear miles per square mile, compared with a state mean of 10.24 linear miles per square mile. Mass transit is non-existent. There is only one public elementary school and one volunteer fire department.

The challenged Franklin zoning ordinance contains four zones: R–3 (agricultural, residential single family with three acre minimum, home occupations in a residence, public buildings, roadside stands, industrial) (12,798 acres or 87 percent of total); R–5 (same as R–3 with five acre minimum) (1,143 acres or 8 percent); Business (206 acres or 1.5 percent); and Flood Plain (only agricultural and recreational uses—no structures permitted) (279 acres or 2 percent). No multi-family dwellings are permitted. Plaintiff Glenview's property is wholly within the R–3 zone.

Glenview owns 242 acres in Franklin that are presently zoned primarily for residential or agricultural uses on three acre or larger lots. On September 7, 1976, it brought an action in lieu of prerogative writ against Franklin challenging both the Township's zoning ordinance as a whole and its application to plaintiff's land. Glenview claimed that the ordinance failed to provide for Franklin's fair share of the regional low and moderate income housing need and was therefore invalid under both

*Mount Laurel* and the Municipal Land Use Law (MLUL), *N.J. S.A.* 40:55D–1 to –92. On December 18, 1978, two and one half years after the original complaint was filed and after a seven day trial, the trial court, in an opinion reported at 164 *N.J.Super.* 563 (1978), held that because Franklin Township has not yet shed its rural characteristics, it was not a "developing" municipality and therefore was not subject to the mandate of *Mount Laurel.* The court further held that no distinct obligation to provide low and moderate income housing was imposed on municipalities by certain sections of the MLUL. Finally, the court rejected plaintiff's claim that the Township's zoning ordinance was confiscatory as applied to plaintiff's property.[64]

▪▪▪ Clearly, imposition of a fair share requirement on Franklin at this time would be terribly costly and would result in tremendous change. The SDGP's classification of Franklin as an area where growth should be discouraged appears logical. The SDGP's conclusion was that high density development should be located elsewhere; that agricultural areas such as those found in Franklin should be preserved. We see no reason for the judiciary to disturb this conclusion of the state's comprehensive plan. We therefore affirm the trial court's determination that Franklin has no prospective fair share obligation. This does not, of course, relieve Franklin of its obligation to meet the present housing needs of its indigenous poor.

▪▪▪ Plaintiff suggests that the MLUL is, in large part, a codification of the *Mount Laurel* fair share duty, particularly sections 55D–2(a), (d), and (e). Moreover, plaintiff claims that the MLUL extends the application of a fair share duty to *all* municipalities in the state, making the "developing" distinction obsolete. We do not believe that the MLUL in any way at-

---

[64]Glenview had claimed that the three acre zoning of its property was confiscatory and therefore constituted an illegal taking of plaintiff's property without just compensation. We affirm the trial court's rejection of this claim for the reasons set out in that opinion, 164 *N.J.Super.* at 578–86.

tempts to define or codify the *Mount Laurel* obligation, although, as noted above, the MLUL explicitly recognizes the municipal obligation to zone with regional consequences in mind, and certain of its provisions strongly support the use of the SDGP to determine the locus of the obligation.

The legislative history of the MLUL leads us to conclude that while the Legislature was cognizant of our *Mount Laurel I* decision and drafted the MLUL so as not to conflict with it, it did not incorporate the doctrine into the legislation.

This legislative intent was made clear by the MLUL's sponsor, Senator Greenberg, during a public hearing on the bill (S–3054):

> The bill is a codification of five basic land use statutes enacted at different points in time, including the Planning Acts and the Zoning Enabling Acts, the Official Map and Building Act, the Plan Unit Development Act, and the Regional Planning Act.
>
> Now as everyone in this room and throughout the State, I would suspect, knows by this time the Supreme Court of the State of New Jersey has rendered a decision which is commonly referred to as the Mt. Laurel Decision. So that the record is clear, this bill is not a response to that decision. This bill, as I have stated, is a procedural bill in concept and it should not be confused with any other bills which are pending dealing with the Mt. Laurel decision, one of which is mine and that may have given rise to some confusion. I have introduced a bill, the number of which is 3100,[65] which deals with a balanced housing concept. That is not the subject of this hearing, and I want to make that very, very clear. *Public Hearing Before Senate County and Municipal Government Committee on Senate Bill No. 3054,* April 3, 1975, at 2.

Other speakers reiterated Senator Greenberg's point:

> This Bill is void of any provision concerning the problem of exclusionary zoning as set forth in the recent New Jersey Supreme Court decision of *Southern Burlington County, N.A.A.C.P., et al. v. Township of Mount Laurel,* which was decided on March 24, 1975. [*Id.* at 32.] [Robert Molnar, Housing and Urban Affairs Committee of the New Jersey State Bar Association];
>
> It should also be noted that S–3054 does *not* affect the zoning powers of a municipality with respect to that municipality's power to determine use and density, lest the bill be confused with the recent Mt. Laurel Supreme Court decision. The key element of S–3054 is its *procedural* streamlining. [*Id.* at 13.] [Stewart Hutt, General Counsel, New Jersey Builder's Assn.]

---

[65]The Comprehensive and Balanced Housing Plan Act, which was never passed.

In fact, Mr. Molnar expressed his Committee's regret that the proposed MLUL did not address the substantive zoning duties announced in *Mount Laurel I:*

> Although we realize this hearing is not on Senate Bill 3100, we think the time and attention of this Committee would be better directed to the provisions of that Bill in terms of meeting the issues raised by the *Mount Laurel* decision. Our Committee feels that the time has long passed for any half-way measures and that strong affirmative action will have to be taken by the New Jersey legislature so that these vital matters can be settled here where they rightly belong, not in the Courts by default. [*Id.* at 33.]

Senator Greenberg's response is self-explanatory:

> SENATOR GREENBERG: Well, I appreciate your views. Since you were not here, let me just succinctly state again that this bill has been approximately one and a half years in the drafting at the direction of this Committee. It is true that the Mount Laurel decision was making its way up through the courts at that time. And almost simultaneously with the drafting of this bill, I have been engaged in the drafting of a bill dealing with housing which is presently pending in our Committee, to which you have also referred. I do not agree that the matters must be considered at the same time, and I have so stated. This is a bill which I deem to be procedural in nature and will permit, in my judgment, the implementation of any modifications which the Legislature sees fit to make as a result of the mandate directed to the Legislature in the Mount Laurel decision. I have very carefully attempted to read the Mount Laurel decision and I have only read it three times, so I am not quite yet sufficiently familiar with all of the ramifications to comment on it, nor do I think it's appropriate today. But I have also re-read this bill that is under consideration today in the light of the Mount Laurel decision to determine whether or not there is anything in it which runs contrary to the concepts and principles of the Mount Laurel decision, and I do not find such conflict. I do find that local municipalities will have to function in some capacity with some element of home rule maintained in this State in the future but in conformity with the decision in the Mount Laurel opinion.
>
> My view, and I speak for myself on this subject, is that this bill would permit those municipalities to function more effectively from a procedural point of view, regardless of any ultimate legislation that the Legislature may see fit to adopt in conformity with Mount Laurel. [*Id.* at 35–36.]

In other words, the MLUL was viewed as a procedural device. It did not interfere with the satisfaction of the constitutional duty. It was not a legislative effort aimed at creating balanced housing opportunities in New Jersey. *See, e.g.,* The Comprehensive and Balanced Housing Plan Act, S–505 (1978). Given the realities of the political process discussed previously, the actual passage and enactment of the MLUL serve as further evidence of its limited purpose. We therefore agree with the trial court's

rejection of plaintiff's claim that the MLUL legislative imposes a fair share duty on all municipalities.

As in *Caputo v. Chester,* we necessarily decide that no builder's remedy is warranted here, since Glenview did not prevail either at the trial or appellate level. Furthermore, since its claim essentially was for *Mount Laurel* relief that would require Franklin to provide its fair share of the region's *prospective* need, a builder's remedy would be inappropriate even if, on further proceedings authorized below, it is determined that the ordinance does not adequately provide for Franklin's present indigenous lower income housing needs.

We therefore affirm the judgment of the trial court denying a builder's remedy. Given the new principles set forth in this opinion, plaintiff should be given the opportunity at the trial level to challenge the adequacy of the amended ordinance to meet Franklin's indigenously generated present need. We therefore reverse and remand for such further proceedings as plaintiff may wish to pursue on that issue alone, in accordance with our opinion.

### D. Round Valley v. Township of Clinton

In this case, we apply the *Mount Laurel* doctrine, as modified by our decision today, to what is essentially a rural but nonetheless "developing" community (as that term has been previously understood) that is partially comprised of a "growth area" as determined by the SDGP. This case also requires the application of our new standard for granting a builder's remedy where the interests of the builder conflict with environmental concerns of the municipality, as well as a review of the trial court's appointment of a master in light of our rulings on that subject.

#### 1. Procedural and Factual Setting

Plaintiff-developer, Round Valley, Inc., sought invalidation of the land use regulations of defendant Township of Clinton under the *Mount Laurel* doctrine (as well as on other grounds), along

with a builder's remedy. Its *Mount Laurel* claim was typical, its proofs directed at a showing of facial invalidity, along with a showing of Clinton's actual fair share and the failure of its land use regulations to provide a realistic opportunity for construction of that fair share. The additional remedy sought was the development of a 790 acre, two parcel tract so as to permit construction of 3,500 units accommodating approximately 10,000 people. The trial court granted the developer the relief it sought, both invalidating the ordinance and granting a builder's remedy. The Appellate Division reversed that judgment in all respects, and we certified the matter.

Clinton is a large municipality (about 22,000 acres) consisting in large part of farmland, public land, and residential uses. Though parts of it are more densely populated than most other portions of Hunterdon County, it is nevertheless appropriately characterized as "rural" (the total density being 244.3 people per square mile compared to the state's 983.3). Its zoning ordinances for many years effectively prohibited all multi-family housing. As a matter of fact, there were only five to six multi-family units in the entire municipality at the time of trial. Similarly, low cost housing of any kind has been practically non-existent, 95 percent of the housing being beyond the reach of 75 percent of New Jersey residents.

Plaintiff's tract was originally divided by Route 31 into an easterly portion (known as the Gobel tract) of 469 acres and a westerly portion (known as Beaverbrook) of about 321 acres. The easterly portion is well suited to many different kinds of residential development, including high density multi-family. The Beaverbrook tract, on the other hand, is hilly and therefore topographically not as suitable for development. Plaintiff's proposed project would have placed most of the high density development on the Gobel tract. The project consisted of a planned unit development including a small commercial area, but devoted otherwise to construction of 3,500 new residential units: 90 percent of the units planned were townhouses and garden apartment units, with a minimum unit price of $29,900,

and an average price range from $30,000 to $40,000, suitable at the lowest range for purchase by moderate income residents, or, with subsidization, by low income residents (market estimates in the region indicated that moderate income families could be accommodated in housing priced at $35,000 or below). If constructed, it would have added 10,000 people over a period of nine years to the population of Clinton, more than doubling its 1980 population of 7,345.

Plaintiff first presented its project to Clinton authorities in 1973. It was legitimately delayed for many reasons, including the changing development of the municipality itself as well as the changing law. In terms of zoning, what plaintiff sought was a rezoning of the Gobel tract. The Beaverbrook tract allowed residential development at the rate of three units per acre: plaintiff was apparently satisfied with that in terms of its overall project. The Gobel tract, however, allowed no residential development at all but was zoned for research, office and light manufacturing purposes (ROM). Plaintiff sought an amendment that would have given it the right to erect a planned unit development (a PUD option). When the proposed revisions of the land use regulations (pursuant to the Municipal Land Use Law) had progressed to the point where it became apparent to plaintiff that the amendment would not be forthcoming, plaintiff brought this lawsuit, filing the original complaint on April 15, 1975. The ordinance was in fact amended in 1977, shortly before trial began, in accordance with the Township's plans; plaintiff's complaint was then amended to assert all of its claims against the new ordinance.

Trial began on May 31, 1977, and ended October 12, 1977, with 29 days of hearings. The trial court found that since its alleged provision of multi-family housing was "camouflage" (if it allowed multi-family housing at all, it would have been much beyond the reach of lower income families), since it contained numerous excessive cost exactions, and since it was clearly over-zoned for commercial and industrial uses, the ordinance was facially invalid. Furthermore, it found that the *Mount*

*Laurel* doctrine applied to Clinton as a "developing" municipality and accepted plaintiff's contention that Clinton's prospective fair share obligation was between 2,833 and 3,457 units. It found that the existing (1977) land use regulations did not provide for such fair share, ordered revisions to accomplish same, and invalidated numerous cost exaction provisions in the form of specific revisions to the ordinance, namely, the inclusion of a PUD option on the Gobel tract. As to all of this, the court provided for the appointment of a master, not only to help implement the judgment and the ordinance revisions, but apparently actually to determine, for the court, whether the revisions complied with the judgment in all respects.

### 2. *The Appellate Division Opinion*

The judgment invalidating the zoning ordinance and awarding a builder's remedy was stayed by the trial court pending appeal. The Appellate Division, in an opinion reported at 173 *N.J.Super.* 45 (1980), found that the trial court's judgment did *not* invalidate the entire ordinance but simply accorded a builder's remedy that was indistinguishable from a variance and reversed what it believed to be the only significant determination of the trial court, namely, the award of a builder's remedy. It concluded that there was nothing before it regarding the ordinance as a whole. *Id.* at 52. It also reversed the trial court's invalidation of specific portions of the zoning ordinance—the 120 percent performance bond, the two year maintenance bond, and the 50 acre minimum for a planned unit residential development. *Id.* at 53. It pointed out that the appointment of a master was "premature" in view of the fact that there had been no allowance for voluntary compliance by Clinton, apparently being of the opinion that until there had been some showing of intransigence on the part of the municipality, a master was inappropriate. *Id.* The court's decision to reverse on the builder's remedy was heavily influenced by the fact that after the trial court's decision, Round Valley had sold the Gobel tract to Exxon for ROM uses. As the Appellate Division viewed it, this sale

"renders most of the substantive issues presented on appeal moot." *Id.* at 51.

We disagree with the Appellate Division's characterization of the trial court opinion. While there is some ambiguity at the end of the trial court's opinion and in its judgment, a reading of the entire record, the opinion and the judgment convinces us that the trial court intended to and did invalidate the entire Clinton land use regulations on *Mount Laurel* grounds. Furthermore, the trial court's articulate and persuasive opinion leaves no doubt as to the correctness of its determinations that Clinton is subject to *Mount Laurel* (under the "developing" doctrine that then applied) and that its land use regulations were both facially invalid and actually inadequate in meeting its demonstrated fair share. Furthermore, the court's appointment of a master was not only appropriate but most desirable under the circumstances, as was its award of a builder's remedy. That relief, however, must be modified in view of the sale of the Gobel tract, as must the court's delegation of certain powers to the master.

The Appellate Division's interpretation of the trial court's decision as addressing itself solely to the appropriateness of a builder's remedy without invalidating the entire Clinton ordinance (or put differently, invalidating the ordinance only insofar as it applies to plaintiff's lands) was based upon certain portions of the trial court's opinion that were actually directed at indicating that the only portions of the ordinance *immediately* invalidated were those applicable to plaintiff's lands. The trial court did not want to strip Clinton *completely* of any land use regulations pending the enactment of new and complying ordinances. That is what the trial court was referring to when it stated that the ordinances were invalid *only as to plaintiff's lands* "in the interim," meaning until the new ordinances could be prepared and adopted.

There are innumerable indications in the trial court's opinion and judgment that all of the zoning ordinances of Clinton were

to be revised to conform to the opinion, which itself clearly invalidated them on *Mount Laurel* grounds, and that the functions of the master were not simply to assure the provision of builder's remedy, but to implement the provisions of the opinion including those invalidating all of the ordinances.

The Appellate Division incorrectly believed that "plaintiff neither sought nor succeeded in having the township's land use ordinances declared unconstitutional generally." 173 *N.J. Super.* at 52. The fact is that in both its original and amended complaint, and in both the original and subsequent pretrial order, a declaration was sought that the land use regulations of Clinton were invalid under *Mount Laurel.* In the issues section of both pretrial orders the question is stated quite clearly. If indeed plaintiff had sought and the trial court had granted on *Mount Laurel* grounds a builder's remedy only, without invalidating the ordinance, we would agree with the Appellate Division that such action would be improper. *Mount Laurel* is not to be used as a substitute for a variance. That, however, is not at all the case here.

Nor do we agree that the disposition of the Gobel tract after judgment in the trial court rendered most, or indeed any, of the issues moot. We are not sure whether the Appellate Division meant to rule in that fashion as a matter of law or whether it concluded that since plaintiff was satisfied at the trial level with the zoning in Beaverbrook and had now disposed of the only portion where it sought relief (namely, the Gobel tract), it no longer had any serious interest in the litigation. On the record before us, it is clear that plaintiff continues to seek a builder's remedy that must now be limited to the Beaverbrook tract. We do not believe that plaintiff's right to a builder's remedy in cases of this kind must depend upon standing absolutely still until the litigation is completed. A sale of a portion, even a large portion, of plaintiff/developer's land during the litigation does not necessarily mean that a remedy is no longer sought as to the remainder, and the mere fact that plaintiff

continues to pursue the litigation indicates that indeed it is. Furthermore, a plaintiff in these actions, given the very broad rule we announce today on standing in *Mount Laurel* litigation, may continue to pursue an action simply to vindicate the *Mount Laurel* right without seeking a builder's remedy.[66]

The only effect a disposition of a portion of a plaintiff's land should have is on the appropriateness and form of the builder's remedy. As we have noted elsewhere, a builder's remedy is no longer to be considered "extraordinary." It is to be given where appropriate, in view of our perception that it is one of the most effective tools for implementing *Mount Laurel.* A builder who has endured intensive litigation and succeeded in vindicating the *Mount Laurel* right in the interest of the public should not be deprived of his remedy simply because, during the course of litigation, he sold some of his land and thereby was required to revise his plans.[67] It is true that such a disposition could well result in some further litigation, but if such further litigation were to be the basis for denying the builder his remedy, then the price of that remedy would consist not only of the enormous risks imposed by the litigation itself, but also of a freezing of all of the builder's land from any advantageous disposition during the pendency of litigation lest it be totally disqualified from *any* builder's remedy at all.

Plaintiff's counsel has represented to this Court that plaintiff still seeks a builder's remedy; that given the fact that the Gobel tract has been disposed of, the zoning of Beaverbrook is no

---

[66]The builder's remedy, and the entire remedy given by the trial court, rather than becoming moot because of the sale of Gobel to Exxon, becomes even more appropriate. Since Exxon has acquired the Gobel land, presumably even more employment is being attracted to Clinton. Depending on the income level of prospective employees, this might be an added—and very strong—reason to require revision of these restrictive ordinances, and to provide housing next door to this new industrial use.

[67]As noted *supra* at 280, a builder's remedy does not require that substantial funds be invested or that the litigation extend over a long period of time.

longer satisfactory to it; that it seeks permission to build at higher densities on Beaverbrook than now permitted; that it understands it must comply with environmental regulations and generally construct an environmentally acceptable development; and that it must provide a substantial portion of low and moderate income units in that development. We will treat these questions later, as we will the specific problems of the builder's remedy sought, but mention them now only as those factors bear on the Appellate Division's view of the matter. Even if a builder's remedy were inappropriate, for any reason, we would rule on the other issues before us as long as plaintiff demonstrated some legitimate interest in vindicating the *Mount Laurel* right.

In view of the conclusions stated above, we now deal with those issues that the Appellate Division dismissed as moot, namely, the correctness of the trial court's findings concerning Clinton's *Mount Laurel* obligation and the propriety of the remedy granted, including the appointment of a master.

### 3. *Analysis of Clinton's Fair Share Responsibility*

#### (a) *The Fair Share Determination*

As we explained above, the "developing" characterization used by the trial court has been discarded as a remedial standard in favor of the "growth" characterization contained in the SDGP. Clinton Township, unlike the bulk of Hunterdon County, contains a substantial growth area, and is part of the SDGP's "Clinton Corridor." The "Current Development Character" of this Corridor is defined as follows:

> This corridor extends westward from the Northeast Area along Interstate 78 to Clinton. The area includes older centers such as Somerville, Raritan and Clinton, but much of the land is either open or developed at very low densities. Many communities are within easy reach of northeastern New Jersey and New York employment centers by improved highways and interstates. [SDGP at 55].

In keeping with the planned growth policies of the SDGP, we hold that Clinton Township has the obligation to provide a realistic opportunity for the construction of its fair share of the

region's lower income housing need. A determination of the extent of that fair share obligation shall be made by the trial court on remand, consistent with the principles and procedures outlined in this opinion.

Our remand for a fair share determination does not reflect disagreement with the fair share findings below. On the contrary, those findings were well reasoned and solidly grounded in the evidence at trial. We remand on this issue for the sole purpose of allowing the trial court to determine whether our rulings concerning the SDGP have any impact on what would otherwise be an unassailable holding as to Clinton's fair share. The SDGP placed approximately 40 percent of the township in a "growth" area, the balance being "limited growth" and "agriculture areas." On remand the trial court should determine whether the fair share can be accommodated completely in the growth area consistent with sensible planning. If it can, then the fair share determination below shall stand; if not, it shall be revised appropriately. The trial court need not be concerned with the general growth pressure that any development in a "growth" area may exert on the neighboring "limited growth" or "agriculture" area, since those pressures are implicit in and presumably acceptable to the State Plan. They are, obviously, inevitable. Such general pressures, however, are to be distinguished from the site specific pressure of locating a large-scale development in such a fashion in a growth area as to make it highly likely that growth will occur where it is intended not to, namely, in the "limited growth" area. These matters are best left to the municipality and planners in redesigning the zoning ordinance. In that connection, the revised ordinance should obviously be tailored to encourage lower income housing only in the "growth" area.

Once the trial court has determined Clinton's fair share obligation, it must ensure that this obligation will be met, using the remedies and procedures set forth above. We will comment separately here on the builder's remedy and the master.

(b) *The Builder's Remedy*

As previously explained, builder's remedies will no longer be "rare" and will be granted as a matter of course where (i) the plaintiff-developer will provide a substantial amount of lower income housing, and (ii) the proposed project accords with sound land use planning. Satisfaction of both of these preconditions may be difficult in this case.

As noted above, the topography of the Beaverbrook tract (which plaintiff still owns) makes construction much more difficult than on the Gobel tract (which plaintiff sold), especially if costs are to be kept down so that construction of lower income housing is economically feasible. In fact, plaintiff had originally planned to construct its lower cost housing only on the Gobel tract and may be unable to construct it on Beaverbrook. If, on remand, the trial court finds that Round Valley in fact has no plans to build lower income housing on its remaining Beaverbrook tract, no builder's remedy should be granted.

We emphasize that it will not be sufficient for plaintiff to show that its proposed development on Beaverbrook will supply "least cost housing." Our prior observations that least cost housing cannot be used to satisfy the *Mount Laurel* obligation unless and until it is demonstrated that the numerous affirmative devices set forth above cannot produce actual lower income housing relates to the overall ordinance and its validity; it is only in that respect that "least cost housing" is an acceptable substitute for the *Mount Laurel* obligation. When it comes to a builder's remedy, however, there is *no* substitute for low and moderate income housing. If the builder wants his remedy, he must prove to the satisfaction of the trial court that lower income housing, not just least cost housing, will actually result from it. Obviously, this may require very high density construction, subsidies, mandatory set-asides, and other devices; but whatever is required, lower income housing must result. What a "substantial portion" is will be up to the trial court. We do not mean to indicate that the presence of a substantial amount

of "least cost housing" will not be influential in persuading the trial court that the provision of a lesser amount of lower income housing will be satisfactory. One may influence the other.

As for the suitability of plaintiff's tract, there was some evidence offered suggesting environmental problems in the construction of multi-family dwellings on this property.[68] Therefore on remand there shall be further inquiry by the trial court as to the environmental factors affecting Beaverbrook in view of whatever plaintiff's new plans may be, for those plans have not yet been formulated. When these plans have been completed and the trial court is satisfied that they will indeed provide a substantial portion of low and moderate income housing, the environmental issue shall then be determined, including, as the trial court did in its initial decision, requirements that the appropriate environmental agencies pass on the development. We emphasize again that the mere fact that there may be a better piece of land for this kind of development does not justify rejection of plaintiff's builder's remedy. It is only if the proposed development of Beaverbrook is contrary to sound planning principles, or represents a substantial environmental hazard, that it should be denied.

If, on remand, plaintiff is awarded a builder's remedy, the trial court shall determine whether the scope of the proposed project would effect a "radical transformation" of Clinton and,

---

[68]We emphasize here that our concern for protection of the environment is a strong one and that we intend nothing in this opinion to result in environmentally harmful consequences. *See Mount Laurel I,* 67 *N.J.* at 186–87. We are, however, convinced that meeting housing needs is not necessarily incompatible with protecting the environment. In fact, according to the Middlesex-Somerset-Mercer Regional Study Council (MSM), the kind of higher density development that is necessary to provide lower income housing can actually result in far less environmental pollution than traditional suburban development patterns. See MSM, *Our Region's Response to the Mount Laurel Decision and the New Municipal Land Use Law* (1978). Where a particular proposed lower income development will result in substantial environmental degradation, such a development should not be required or encouraged by trial courts' enforcement of the constitutional doctrine.

if so, whether it should be "phased-in" at a rate slower than now planned by plaintiff.

(c) *The Master*

The appointment of a master by the trial court was not "premature," contrary to the Appellate Division's determination. As stated above, we believe that upon invalidation of an ordinance and the issuance of an order to rezone, trial courts may, in their discretion, freely appoint a master to aid in the implementation of their order, and need not await "voluntary compliance" on the part of the municipality, as suggested by the Appellate Division. We disapprove, however, of the apparent delegation of judicial power by the trial court to the master in this case. It must in the end be the *judge* and not the master who decides what actions will constitute compliance with our mandate. In this case it is quite clear, at least from the trial court's language, that the court intended simply to adopt the master's determination as to compliance.

We therefore reverse the Appellate Division judgment and remand to the trial court for proceedings consistent with this opinion.

E. *Urban League of Essex County v. Township of Mahwah*

1. *Procedural and Factual Setting*

Exclusionary zoning litigation involving Mahwah Township has, in one form or another, been going on for more than a decade.[69] In the present action, plaintiffs, Urban League of

---

[69]The record of the case preceding the filing of the 1977 amended complaint has not been placed before the Court. Prior to this litigation, a challenge to the Mahwah zoning scheme was brought by the UAW before the Department of Law and Public Safety, Division of Civil Rights. It was decided that the Division lacked jurisdiction to hear the action. *U.A.W., et al., v. Tp. of Mahwah,* 119 *N.J.Super.* 389 (App.Div.1972). In a separate action involving Mahwah, the Appellate Division rejected a claim brought by the Township of Allendale seeking to block construction of higher density housing in a section

Essex County, the North Jersey Community Union, and three individuals who seek housing in Mahwah (representing themselves and all others similarly situated), brought suit in February, 1972 against the northern Bergen County municipalities of Mahwah, Ramsey, Saddle River, and Upper Saddle River, alleging that these municipalities had failed to provide their fair share of low and moderate income housing as required by *Mount Laurel*. In December 1977, the Assignment Judge for Bergen County ordered a severance of the defendant municipalities. Plaintiffs decided to proceed initially against Mahwah only, and a trial was held in January and February of 1979.

On March 8, 1979, seven years after the plaintiffs had originally filed their complaint, the trial court, in an unreported decision, dismissed plaintiffs' claims. While finding that Mahwah Township was a "developing" municipality and therefore had an obligation to provide opportunities for lower income housing under *Mount Laurel* and *Madison,* the court concluded that this obligation was being met by the Township's *"bona fide"* efforts to provide least cost housing through its new multi-family and mobile home zones. The court rejected plaintiffs' contention that the housing that could be built in Mahwah's new zones was not "least cost" (it was being priced at $70,000 and above). It was the court's finding that it was simply impossible to build housing at lower costs in northern Bergen County. Finally, the court refused to order Mahwah to take affirmative action to assure the construction of lower income housing, reasoning that such affirmative action was not required by this Court's decisions in *Mount Laurel* and *Madison.*

On direct certification before this Court, plaintiffs' basic contention is that Mahwah's provision for very expensive multi-family dwellings should not be considered sufficient to meet the Township's *Mount Laurel* obligation. Instead, they maintain

of Mahwah adjacent to Allendale. *Allendale v. Mahwah Tp. Comm.,* 177 *N.J.Super.* 230 (1981).

that the trial court should have ordered Mahwah to take the necessary affirmative steps to insure that the housing built would actually be affordable to low and moderate income families. Finally, plaintiffs argue that the trial court erred by basing its finding that lower cost housing could not be built in Mahwah largely upon the judge's own personal experience.

Although the municipality urges affirmance of the trial court's decision, it disagrees with it in two respects. First, Mahwah had urged the trial court, and urges this Court now, to deny standing to the organizational plaintiffs in this case (the Urban League of Essex County and the North Jersey Community Union). Mahwah relies upon the United States Supreme Court's holding in *Warth v. Seldin,* 422 *U.S.* 490, 95 *S.Ct.* 2197, 45 *L.Ed.2d* 343 (1975), that such organizations do not have standing in federal court to challenge allegedly exclusionary zoning ordinances. The defendant did not challenge the standing of the individual plaintiffs before the trial court because their standing had been approved in *Urban League of Essex Cty. v. Township of Mahwah,* 147 *N.J.Super.* 28 (App.Div.), certif. den., 74 *N.J.* 278 (1977). However, defendant now argues that this approval may no longer be justified because it was based primarily on the fact that the plaintiffs worked at the Ford plant in Mahwah, which is now closed.

The defendant also disagrees with the trial court's characterization of Mahwah as a "developing" municipality within the ambit of the *Mount Laurel* doctrine. The Township claims that it is composed of two discrete areas, one of which is rural and the other of which is fully developed, both, therefore, outside the scope of *Mount Laurel.*

In urging this Court to affirm the trial court's holding that it has met any *Mount Laurel* obligation it may have, the defendant emphasizes its agreement with the trial court's refusal to order affirmative remedies. Mahwah maintains that such remedies would be either ineffective in actually producing lower income housing (*e.g.,* density bonuses) or of questionable legality (*e.g.,*

mandatory set-asides). Mahwah further contends that the finding that lower cost housing cannot be built in northern Bergen County rests squarely on the evidence.

Mahwah is a 25.7 square mile (16,450 acre) municipality at the northwest corner of Bergen County. Because large areas are wilderness or devoted to public uses (*e.g.*, Ramapo College), only 6,800 of these acres are developed or developable. Of these, between 1,400 and 1,700 are still vacant. Mahwah is about 35 miles from Newark and New York City. Its population has been growing rapidly from 7,376 in 1960 to 10,800 in 1970 to 12,130 in 1980. The population density of 471.9 people per square mile is significantly lower than Bergen County's 3,604 and the state's 983.3.

Mahwah's infrastructure, though not as extensive as that of communities closer to major urban areas, is relatively well developed. The Township has its own public water system and is in the first stages of providing public sewers for its developed areas. Mass transit is readily available between Mahwah and the urban centers to its southeast. The Township is traversed by at least two major highways, Routes 17 and 507, and has 2.77 linear miles of roads per square mile compared with 7.96 linear miles per square mile in Bergen County and a statewide mean of 10.24.

The challenged zoning ordinance, adopted in 1976, divides the Township into 11 districts. Six of these districts permit single-family housing only: R–80 (80,000 square foot lots); R–40 (40,000 square foot lots); R–20 (20,000 square foot lots); R–10 (10,000 square foot lots); R–5 (5,000 square foot lots); and C–80 (a Conservation Zone District that was largely undevelopable but that set aside certain low density zones that permit no more than one unit per 80,000 square foot lot).

Five districts permit multi-family housing. GA–200 permits garden apartments to be built on 20,000 square foot minimum lots. The number of units per lot depends on the number of bedrooms per unit: the more bedrooms, the fewer units. The

ordinance also requires two off-street parking spaces per unit, half of which must be inside a garage. R–11 permits two-family dwellings to be built on 11,000 square foot lots. PRD–4 and PRD–6 allow for planned residential developments with overall densities, respectively, of four and six units, per acre. The planned residential development must be a specified mixture of single-family dwellings, garden apartments, and townhouses. Developers are required to amass a 50 acre lot as a prerequisite to developing any land within this zone, although the Planning Board has discretion to allow 25 acre plots to be added to existing developments. An underlying use of the PRD zones is R–20, without the requirement that the developer amass 50 acres. RM–6 permits mobile homes or, in the alternative, single-family houses on 40,000 square foot plots. Mobile home parks are permitted with 400,000 square foot minimum lot sizes for each park.

In addition to the above districts, there is a CED zone. This zone, which is covered by a separate ordinance, provides for timed commercial development and for the construction of 565 housing units.

Mahwah's zoning provisions, when coupled with the present economic situation, have resulted in extremely high housing costs in the Township. The trial court termed the housing costs throughout Bergen County as "astronomical." Plaintiffs' evidence established that 58.3 percent of Bergen County families and 70 percent of New Jersey families as a whole cannot afford to pay more than $50,000 for housing, but only 15 percent of the housing in Mahwah would sell below that price. Also, 38.8 percent of Bergen's population and 53 percent of New Jersey's population cannot afford to pay more than $40,000 for housing, but only 5.6 percent of Mahwah's residential units would sell below that price.

### 2. Standing to Challenge Mahwah's Ordinance

Before proceeding to a discussion of Mahwah's fair share obligations, we address the Township's claim that plaintiffs lack

standing in this case due to the closing of Ford's Mahwah plant. As mentioned previously, the Appellate Division upheld the standing of the individual non-resident employees at an earlier stage of litigation, and found it unnecessary to rule on the Urban League's standing. The Township claims that the closing of the Ford plant undercuts the individual plaintiffs' right to sue, and therefore makes dismissal appropriate, since they suggest that the Urban League lacks standing to continue the suit on its own. We disagree, and intend to clarify the standing doctrine as it applies to exclusionary zoning cases.

As this Court pointed out in *Crescent Park Tenants Ass'n v. Realty Equities Corp. of N.Y.,* 58 *N.J.* 98 (1971), New Jersey cases have "historically taken a much more liberal approach on the issue of standing than have the federal cases." *Id.* at 101. New Jersey courts, we noted, have never allowed "procedural frustration" to prevent determinations on the merits where the plaintiff can demonstrate a legitimate interest in the lawsuit. *Id.* at 107–08. *See also State v. Alston,* 88 *N.J.* 211, 225–230 (1981); *N.J. Chamb. Commerce v. N.J. Elec. Law Enforce. Comm.,* 82 *N.J.* 57, 67–69 (1980); *Home Builders League of So. Jersey, Inc. v. Twp. of Berlin,* 81 *N.J.* 127, 131–32 (1979).

We believe that the need for a "liberal approach" to standing is especially important in *Mount Laurel* litigation. The people who have the greatest interest in ending exclusionary zoning, non-resident poor people and organizations such as the Urban League, which represent the interests of such people, very often have little or no direct relationship with particular exclusionary municipalities. In fact, the whole problem is that exclusionary zoning prevents such relationships from developing. Thus, we hold that any individual demonstrating an interest in, or any organization that has the objective of, securing lower income housing opportunities in a municipality will have standing to sue such municipality on *Mount Laurel* grounds.

In *Mahwah* itself, we agree with the Appellate Division's holding in *Urban League of Essex Cty. v. Township of*

*Mahwah,* 147 *N.J.Super.* 28, certif. den., 74 *N.J.* 278 (1977), that the individual plaintiffs had standing to sue. We find it irrelevant that the Mahwah Ford plant at which these plaintiffs worked is now closed, since the plaintiffs still express an interest in securing lower income housing opportunities in Mahwah. Further, we hold that the Urban League plainly has standing to sue in this case since, in effect, it represents those nonresident poor most in need of expanded lower income housing opportunities in suburbs such as Mahwah.

### 3. *Determination of Mahwah's Fair Share*

We turn to the trial court's disposition of Mahwah's *Mount Laurel* obligation. The trial court, after deciding that Mahwah was "developing," held that the Township satisfied the resulting *Mount Laurel* obligation by providing "least cost" housing. It rejected plaintiffs' claim that housing costs could be reduced in Mahwah so that housing could be constructed at prices affordable by lower income families, stating instead that the judge's personal knowledge of the economic situation led him to conclude that the housing available reflected a bona-fide attempt at achieving "least cost." [70] We disagree with both the trial court's approach and ultimate conclusion, and therefore reverse and remand.

On remand the trial court will immediately appoint an expert to assist the court in the fair share hearing, which shall be conducted in accordance with this opinion. Assuming the Township does not challenge the SDGP characterization of Mahwah as containing a growth area, and assuming the court finds that Mahwah's present ordinance does not provide a realistic opportunity for the construction of its present and prospective fair share of the regional lower income housing need (and this seems certain from the record before us), it will enter a

---

[70]The trial court also rejected plaintiffs' claim that Mahwah's zoning imposed artificial or unnecessary cost-generating devices.

judgment invalidating the ordinance along with an order requiring Mahwah to revise its ordinance to achieve compliance. To the extent necessary, that revision should eliminate the cost-generating provisions that have made "least cost" housing impossible to construct. That order should require Mahwah fully to utilize the remedial devices set forth above, and should include appointment of a master to aid in the amendment of Mahwah's ordinance. Mahwah, which contains a growth area under the SDGP,[71] will have to document its efforts at providing lower income housing opportunities (efforts that must include use of affirmative devices where necessary), and then if, and only if, provision of such opportunities is shown to be impossible, it will be required to prove that the opportunities it does provide are in fact "least cost."

We therefore reverse the trial court's judgment and remand for further proceedings consistent with this opinion.

F. *Urban League of Greater New Brunswick v. Borough of Carteret*

This case provides a fitting conclusion to our opinion in these matters. The action was started in 1974. Plaintiffs proved beyond any question that there was a present actual need for low and moderate income housing in the 23 Middlesex County municipalities initially joined as defendants and that this need would become overwhelming in the future. They proved a pattern of exclusionary zoning that was clear. They portrayed a county exploding with growth, providing jobs for all, and promising even more in the future, including employment for low and moderate income families, a county where the opportunity for lower income housing shrank faster than its need grew.

---

[71]Because a substantial portion of Mahwah is characterized as "conservation," fair share allocations must be calculated with due regard for that fact. This consideration will not necessarily reduce fair share. See our discussion in *Round Valley, supra* at 331.

Armed with substantial documentation of the need, the exclusionary practices, and the obvious ability of the municipalities to absorb any reasonably calculated fair share of the region's need for lower income housing, the trial court conscientiously attempted to determine the precise regional need and its allocation among the municipalities. In the process it effectively settled the matter as to 11 of the municipalities that have apparently satisfactorily modified their ordinances to comply with *Mount Laurel*. As to the remaining 11 (one was dismissed as being fully developed), it entered an order that, while general, included substantially all of the arsenal of devices available as requirements imposed upon those municipalities to ensure compliance with their constitutional obligation.

As noted later, we disagree in certain important respects with the trial court's decision, but it is otherwise a basically solid decision based on an opinion that rings with the true sound of the constitutional obligation. The recitation of the facts, 142 *N.J.Super.* at 20–35, convinces us of the essential correctness of the court's determinations of the need for housing, the exclusionary practices that contributed to that need, and the remedies to satisfy it, as well as the necessity for judicial action in this area.

Before the appeal was disposed of, we rendered our decision in *Madison*. The impact of the holding and the spirit of *Madison* on *Mount Laurel* cases is nowhere better illustrated than in this case. The Appellate Division's reversal, understandable in view of *Madison,* delivers a clear message to the trial bench in *Mount Laurel* cases, and the message is "hands off." Taking *Madison* and some further restrictive language in *Pascack* as its guide, the Appellate Division read our language in *Mount Laurel* and *Madison* suggesting that a county was probably too small to comprise a region and held that a county could never be a region. The effect of this holding was not to increase the fair share of the municipalities (as might be the case with the expansion of this particular region) but to dismiss plaintiffs' claims. The Appellate Division further held that our language

in *Madison* relieving the trial court of the obligation to determine a precise numerical fair share for defendant-municipalities meant that the trial court was *prohibited* from making any such finding or imposing any numerical fair share in its judgment. And to complete the process, it further held that in any event, it was inappropriate to impose any requirements until the municipalities had had an opportunity to "act without judicial supervision."

As far as the municipalities are concerned, the lesson of all of this litigation is that the *Mount Laurel* obligation is a matter between them and their conscience.

If, after eight years, the judiciary is powerless to do anything to encourage lower income housing in this protracted litigation because of the rules we have devised, then either those rules should be changed or enforcement of the obligation abandoned.

### 1. *Procedural and Factual Setting*

On July 23, 1974, plaintiffs (the Urban League of Greater New Brunswick and 7 individuals representing themselves and others similarly situated) brought this action against 23 of the 25 municipalities in Middlesex County.[72] Plaintiffs alleged that the zoning ordinances of these municipalities failed to provide realistic opportunities for low and moderate income housing as required by *Mount Laurel* and were discriminatory against blacks in violation of the Thirteenth and Fourteenth Amendments to the United States Constitution. The latter federal claim was rejected by both courts below and it does not appear that it is being pressed before this Court.

---

[72]Perth Amboy and New Brunswick were thereafter brought in as third-party defendants. The action against them was dismissed at the end of the trial. 142 *N.J.Super.* at 17. Cranbury, East Brunswick, Monroe, Piscataway, Plainsboro, South Brunswick and South Plainfield are the only municipalities pursuing this appeal.

The defendants responded with a four-pronged procedural challenge to the suit as brought, alleging that plaintiffs lacked standing to sue, were improperly joined as a class, and had failed to exhaust the administrative remedies available to them, and that the defendant municipalities were also joined improperly. The first three claims were rejected by the trial court at an early stage of the proceedings,[73] and a pretrial hearing was conducted on the issue of severance.

After hearing testimony from plaintiffs, defendants and *amicus* Public Advocate, the trial court denied the motion for severance. It determined that since plaintiffs were alleging that defendants (except for Perth Amboy and New Brunswick) were *collectively* responsible for county-wide exclusion of lower income residents, proof of such allegations required the joint presence of all defendants. The trial court also concluded that a total severance would unduly burden plaintiffs[74] and might impair the court's ability to design individual municipal remedies for a regional problem. However, the court also concluded that certain proofs required individual treatment, in particular, proofs regarding the specific provisions of each ordinance being attacked and the individual justifications each municipality

---

[73]All parties were given an opportunity to be heard on the claims before they were denied. We are in accord with the trial court's denial of these claims for substantially the reasons set forth in the trial court opinion. 142 *N.J.Super.* at 18. See also our discussion of the standing issue in *Mahwah, supra* at 336–338. We comment here on the defendants' claim that plaintiffs should have exhausted administrative remedies before bringing this suit. There is no such requirement in *Mount Laurel* litigation. If a party is alleging that a municipality has not met its *Mount Laurel* obligation, a constitutional issue is presented that local administrative bodies have no authority to decide. Thus, it is certainly appropriate for a party claiming a *Mount Laurel* violation to bring its claim directly to court. *See, e.g., Nolan v. Fitzpatrick,* 9 *N.J.* 477 (1952) (holding that no exhaustion of administrative remedies is required where only a question of law is at issue); 2 Cooper, *State Administrative Law* 578 (1965).

[74]If severance were granted, plaintiffs would presumably have to proceed individually against each defendant municipality.

might offer for its failure to provide lower income housing opportunities. In an effort to accommodate these and other competing considerations, the trial court ordered a bifurcated trial.

During the first part of the trial, plaintiffs submitted proofs on the appropriateness of Middlesex County as a lower income housing allocation region, on the inability of individual plaintiffs to find adequate lower income housing in Middlesex County, on the general need for lower income housing in Middlesex County, and on the exclusionary nature of zoning in the county as a whole outside of Perth Amboy and New Brunswick.[75] Based on these proofs, the trial court concluded that there was an unmet need for lower income housing in the County, that the exclusionary zoning practices of the defendant municipalities played a large role in preventing this need from being met, and that

---

[75]The most significant evidence produced by plaintiffs at this part of the trial concerned the relationship between jobs, housing, and zoning practices in Middlesex County. Based on census statistics, the plaintiffs showed that in 1954 there were 16,259 retail, wholesale, and manufacturing jobs in New Brunswick, 15,934 such jobs in Perth Amboy, and 49,653 such jobs in all the rest of the county. New Brunswick and Perth Amboy had about 40 percent of all of these jobs. Eighteen years later, in 1972, New Brunswick had only 12,148 such jobs, Perth Amboy had 10,619, and the rest of the county had 104,523. New Brunswick and Perth Amboy had only 18 percent of such jobs. In other words, while the county as a whole gained 45,444 jobs during these 20 years, New Brunswick and Perth Amboy lost 9,426 jobs. At the same time, according to the plaintiffs' proofs, between 1960 and 1970 the total amount of land in the county zoned for multi-family housing decreased from 2,000 acres to 307 acres (an 84 percent decline), and the amount of land zoned for less than quarter acre single family lots decreased from 20,000 acres to 2,783 acres (an 86 percent decline), while at the same time industrial zoning went from 24.9 percent of total vacant land to 41.7 percent of total vacant land. Plaintiffs concluded that these exclusionary practices were largely responsible for the fact that between 1960 and 1970 only one new unit of housing was built for every 2.2 new jobs created in the community.

Some further indication of the shortage of housing is found in the fact that the number of employees working in but living out of the county increased by 291 percent between 1960 and 1970; that 55,000 people who were employed in the county lived outside of it.

Middlesex County is an appropriate "region" for lower income housing allocation purposes.[76]

At the second part of the trial, plaintiffs isolated five aspects of the municipalities' ordinances that they claimed to be exclusionary:

a. Prohibitions on multi-family housing and mobile homes:

(1) Cranbury, East Brunswick, Helmetta, Monroe, North Brunswick, Piscataway, Sayreville, and South Plainfield prohibit mobile homes. Edison, Middlesex, Plainsboro, South Brunswick, and Spotswood have severe restrictions on mobile homes.

(2) Cranbury and South Plainfield prohibit any new multi-family housing. Monroe permits multi-family units only in its retirement community. Carteret, East Brunswick, Edison, Jamesburg, Middlesex, Milltown, North Brunswick, Old Bridge, Piscataway, Plainsboro, Sayreville, South Amboy, South Brunswick, South River, and Woodbridge place restrictions on multi-family housing.

b. Restrictions on development that are not necessary for health and safety or required by good planning practices: *e.g.,* low densities per acre, excessive lot sizes, excessive frontages, and excessive square footage for buildings themselves. Plaintiffs claim all the municipalities now before the Court have numerous instances of such excessive standards.

c. Bedroom restrictions:

(1) North Brunswick and Plainsboro placed limitations on the number of two bedroom units allowed and prohibit larger units.

(2) Carteret, Highland Park, Middlesex, South Amboy, Spotswood, and Woodbridge limit the number of rooms or bedrooms in multi-family housing.

(3) Old Bridge and Piscataway in effect limit apartments to efficiencies and one bedroom units.

---

[76]The trial court noted, however, that its findings concerning the county as a whole were not necessary to the determination that the zoning ordinances of certain individual municipalities were unconstitutionally exclusionary.

(4) East Brunswick, Sayreville and South Brunswick have low-density requirements that limit the size of units.

(5) Edison limits the number of high rises.

d. Overzoning for industry and too much large-lot zoning:

(1) Cranbury, East Brunswick, Edison, Monroe, North Brunswick, Old Bridge, Plainsboro, Sayreville, South Amboy, South Brunswick and Spotswood are overzoned for industry up to as much as 700 percent over projected demand.

e. The discretionary authority vested in municipal authorities to discourage housing developments:

(1) Edison's cluster options are subject to the discretion of municipal officials.

(2) East Brunswick's Planning Board has the discretionary authority to assess improvement fees against builders.

On May 4, 1976, two years after the complaint was filed and after a trial that lasted two full months, Judge Furman handed down a two part decision. 142 *N.J.Super.* 11 (Ch.Div.1976). First, he divided the defendant municipalities into three categories:

a. All claims against the Township of Dunellen were unconditionally dismissed because the court found Dunellen to be a "developed" community outside the scope of *Mount Laurel.* Plaintiffs did not appeal this dismissal.

b. Claims against 11 communities (Carteret, Helmetta, Highland Park, Jamesburg, Metuchen, Middlesex, Milltown, South Amboy, South River, Spotswood and Woodbridge) were dismissed, conditioned upon the adoption of certain zoning amendments by these municipalities. The court noted that these municipalities were substantially built up, though not quite "developed" for *Mount Laurel* purposes. The plaintiffs agreed at trial to these conditional dismissals.

c. The zoning practices of the remaining 11 municipalities (Cranbury, East Brunswick, Old Bridge (formerly Madison), Monroe, North Brunswick, Plainsboro, South Brunswick, Sayreville, Edison, Piscataway and South Plainfield) were found to be in violation of *Mount Laurel.* In order to remedy these violations the court ordered each of the municipalities to provide a realistic opportunity for the construction of the fair share of the lower income housing allocation determined by the court.

The trial court determined numerical fair share allocations for the 11 municipalities found to be in violation of *Mount Laurel.* 142 *N.J.Super.* at 35–38. It accepted plaintiffs' suggestion that Middlesex County was the appropriate housing region *for remedial purposes.* It concluded that each of the municipalities should accommodate low and moderate income people in proportions equal to that of the County as a whole—15 percent low income and 19 percent moderate income. After finding the prospective low and moderate income housing need of the County through 1985 to be 18,697 units, the trial court allocated 4,030 of these units to remedy imbalances in the provision of low and moderate income housing among the 11 municipalities themselves as follows:

| | | | |
|---|---|---|---|
| Cranbury | 18 | Piscataway | –0– |
| East Brunswick | 1,316 | Plainsboro | –0– |
| Edison | 1,292 | Sayreville | 328 |
| Monroe | 23 | South Brunswick | 156 |
| North Brunswick | 180 | South Plainfield | 416 |
| Old Bridge | 301 | | |

The remaining 14,667 units of the County's lower income housing need were allocated equally among the 11 municipalities, *i.e.,* 1,333 units per municipality. All units allocated to each municipality were to be apportioned as 45 percent low income housing and 55 percent moderate income housing. 142 *N.J.Super.* at 37.

The trial court emphasized that these 11 municipalities were required to do more than just refrain from zoning out their fair share allocation of lower income housing. Affirmative steps to encourage the construction of lower income housing, such as utilizing mandatory set-asides and density bonuses and pursuing federal and state housing subsidies, were required. All but 4 of these 11 municipalities (Old Bridge, North Brunswick, Edison and Sayreville), appealed.

On appeal, the municipalities claimed that the trial court erred by using Middlesex County as a region for fair share purposes. They maintained that this Court specifically rejected the use of counties as regions in both *Mount Laurel I* and *Madison*. This claim was pressed most vigorously by the townships on the outskirts of the County, particularly Plainsboro and South Plainfield, who argued that their fair share allocations could not be properly arrived at without a consideration of the housing needs and obligations of municipalities in adjacent counties.

The following individual defenses were raised by the seven municipalities on appeal:

a. South Plainfield claimed it was "developed" and therefore not bound by *Mount Laurel*.

b. Cranbury, Monroe, and Plainsboro claimed they were "rural" communities and therefore not bound by *Mount Laurel*.

c. Plainsboro also claimed that it had made "bona fide" efforts to provide low and moderate income housing, and therefore had complied with *Madison*.

d. Piscataway claimed to have met its fair share obligation and noted that it had amended its zoning ordinance to comply with the trial court's order.

e. South Brunswick claimed that it met its obligation under *Mount Laurel* through "non-exclusionary timed growth."

f. East Brunswick claimed that it had satisfied its *Mount Laurel* obligations by providing for 1,750 units of lower income housing.

## 2. *The Appellate Division Opinion*

The Appellate Division, in an opinion reported at 170 *N.J.Super.* 461 (1979), reversed the trial court's order allocating to the 11 municipalities a specific fair share quota of lower income housing. The Appellate Division based its decision on the "error" it found in the trial court's decision using Middlesex County as the appropriate housing region. The court emphasized that this Court in both *Mount Laurel I* and *Madison* had criticized the use of counties as regions, and that the trial court in *Madison* had specifically refused to use Middlesex County as the housing region for Madison Township (now Old Bridge). *Id.* at 475. The court concluded that since the plaintiffs had failed to prove an appropriate housing region, they could not have established that the defendant municipalities' zoning ordinances were impermissibly exclusionary. *Id.* at 476–77. The Appellate Division reversed the trial court's order completely and dismissed the plaintiffs' claims.[77]

We believe that the Appellate Division erred, both in its interpretation of the lower court's opinion and in its failure to remand the case to that court for further proceedings. It is

[77]The decision to dismiss (as opposed to a remand) was based on the Appellate Division's determination that the plaintiffs should not be permitted to pursue at a new trial a theory that they had not pressed at the earlier trial. 170 *N.J.Super.* at 47. The court cited for authority *Budget Corp. of America v. DeFelice*, 46 *N.J.Super.*, 489, 494 (App.Div.1957).

It should be noted that the Appellate Division also criticized the trial court's actual allocation of fair share burdens as beyond the province of the judiciary.

clear from a careful reading of Judge Furman's detailed opinion that he did *not* intend to use Middlesex County as the region but simply took advantage of the simplicity of county boundaries in designing a fair share *remedy* in the case before him. Furthermore, while we noted in *Madison* that counties did not appear to be realistically suitable for use as regions, we did not preclude their use for that purpose, 72 *N.J.* at 537, making a summary reversal inappropriate. We therefore reverse the Appellate Division's judgment and remand for a full fair share hearing involving the seven municipalities now before this Court.[78]

Our assumption is that Judge Furman, the author of a definition of region accepted by this Court that clearly would encompass more than Middlesex County, never intended to limit the measurement of housing needs by the boundaries of this particular County whose housing market is so clearly part of a larger region. Unfortunately it is impossible from the decision to determine precisely, or even generally, how the trial court arrived at its figure of 18,697 as the number of units of lower income housing needed by 1985. If that figure represented a portion of the larger region's need, then it might be satisfactory; if, however, it was truly a calculation based solely upon the consideration of Middlesex County, then it might be subject to serious challenge. Again, we do not mean to exclude the possibility that a county might be suitable for characterization as a region under certain circumstances, and we would be reluctant to upset any trial court's conscientious use of same unless convinced that the delay in meeting the need for lower income housing occasioned by such a reversal was clearly justified by the probable difference in figures that would result on remand. Here, however, there is no way of telling, other than

---

[78]We have decided not to rejoin the conditionally-dismissed municipalities since they must soon (if they have not done so already) amend their land use regulations anyway, pursuant to *N.J.S.A.* 40:55D–89, and will obviously be required to take their fair share obligations into account at that time.

the prior pronouncements of Judge Furman, whether Middlesex was viewed as the region, or simply, as suggested above, as part of a larger region, isolated for the purpose of devising a remedy.

Once the region's need is determined, it is not advisable to allocate that need so as to equalize the proportion of lower income units in each municipality, nor to attempt to make that proportion the same as that found in the County. At one step in its provision of a remedy, the trial court did precisely that. The effect of such a remedy, of course, would be to make one municipality a demographic mirror image of another. That is not the purpose of *Mount Laurel.* Nor is there any justification for allocating a particular regional need equally among municipalities simply because they have enough land to accommodate such equal division. There may be factors that render such a determination defensible, but they would have to be strong factors, and certainly not the simple fact that there is enough land there. The issue in these cases is the overall group of factors that must be considered, all subsumed in the word "suitability." Those factors have been described and need not be repeated here.

### 3. Procedure on Remand

In view of the uncertainty in the selection of regions and the calculation of regional need, as well as the error in allocating that need, we cannot accept the trial court's resolution of this matter. As already indicated, however, we believe that the dismissal by the Appellate Division was inappropriate.

On remand there need be no trial concerning non-compliance with the *Mount Laurel* obligation (unless the municipality's land use ordinance has been substantially amended), see *supra* at 199 n. 1, for that has already been amply demonstrated. All that is at issue is the determination of region, fair share and allocation and, thereafter, revision of the land use ordinances

and adoption of affirmative measures to afford the realistic opportunity for the requisite lower income housing. Calculation of the prospective need will undoubtedly be projected beyond 1985, but the precise outside date will be left to the discretion of the trial court.

 The trial court shall consider the existing record, and may also accept further proofs regarding changes in population, development, and land use regulation. It may appoint such experts as are required to assist it in determining region and the fair share allocation plan, and a master to aid the municipality in revising the ordinances and the court in passing on same. We leave the issue of continued joinder of the seven municipalities to the court's discretion, noting only that there are obvious advantages and disadvantages to consider. *See supra* at 254–255.

 In determining fair share, the trial court shall review the SDGP's characterization of each of the municipalities before it. Our own examination of the Plan indicates that each includes growth areas and that some of them consist entirely of such an area. As previously stated, determination of fair share must take into consideration, where it is a fact, the inclusion within particular municipalities of non-growth areas where, according to the plan, growth is to be "discouraged." *See supra* at 331 and 212. We believe that Plainsboro, Cranbury, South Brunswick, East Brunswick and Monroe all contain some non-growth as well as growth areas.

The judgment of the Appellate Division is reversed, and the matter is remanded for proceedings consistent with this opinion.

### Conclusion

We have reexamined the *Mount Laurel* doctrine and we have found it correct. We have reaffirmed the judiciary's commit-

ment to the enforcement of the constitutional right and its resulting remedy. We have found it necessary to rectify the ineffective administration of this doctrine in our courts. We have simplified the scope of litigation; the *Mount Laurel* obligation is to provide a realistic opportunity for housing, not litigation. We have substituted as a remedy the plans for growth in the State Development Guide Plan for the concept of developing municipalities, directed lower courts to dispose of the *Mount Laurel* litigation on a one-stop basis, and provided for the assignment of three judges to manage the cases statewide on a uniform basis. We have required municipalities to take affirmative action to comply with *Mount Laurel* and refocused the litigation on the question of whether low and moderate income housing will be built.

As we said at the outset, while we have always preferred legislative to judicial action in this field, we shall continue—until the Legislature acts—to do our best to uphold the constitutional obligation that underlies the *Mount Laurel* doctrine. That is our duty. We may not build houses, but we do enforce the Constitution.

The provision of decent housing for the poor is not a function of this Court. Our only role is to see to it that zoning does not prevent it, but rather provides a realistic opportunity for its construction as required by New Jersey's Constitution. The actual construction of that housing will continue to depend, in a much larger degree, on the economy, on private enterprise, and on the actions of the other branches of government at the national, state and local level. We intend here only to make sure that if the poor remain locked into urban slums, it will not be because we failed to enforce the Constitution.

In *Mount Laurel,* we reverse the trial court and remand (but affirm as to the builder's remedy); in both *Chester* and *Franklin,* we affirm the trial court in part but reverse and remand for

limited further proceedings described herein; in *Clinton,* we reverse the Appellate Division and remand; in *Mahwah,* we reverse the trial court and remand; and in the Middlesex County cases, we reverse the judgment of the Appellate Division and remand. In all cases the remand is to the trial court for further proceedings consistent with this opinion.

*For reversal and remandment in Nos. A–4, A–18, A–35/36 and A–37*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*Opposed*—None.

*For affirmance in part; reversal in part and remandment in Nos. A–8 and A–7/21*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*Opposed*—None.

*For affirmance as modified in No. A–172*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*Opposed*—None.

*Appendix*

ATLANTIC COUNTY
State Development Guide Plan
And
Coastal Zone

GROWTH AREA
LIMITED GROWTH AREA
AGRICULTURE AREA
CONSERVATION AREA
PINELANDS PROTECTION AREA
PINELANDS PRESERVATION AREA
'RBAN AID MUNICIPALITY

C. Z. REGIONAL TYPES
HIGH GROWTH
MODERATE GROWTH
LOW GROWTH
BARRIER ISLAND

**BERGEN - COUNTY**

State DEVELOPMENT Guide PLAN

GROWTH AREA
LIMITED GROWTH AREA
AGRICULTURE AREA
CONSERVATION AREA

SCALE IN MILES

STATE OF NEW JERSEY
DEPARTMENT OF COMMUNITY AFFAIRS
DIVISION OF STATE & REGIONAL PLANNING

**BURLINGTON COUNTY**

State Development Guide Plan

GROWTH AREA
LIMITED GROWTH AREA
AGRICULTURE AREA
CONSERVATION AREA
PINELANDS PROTECTION AREA
PINELANDS PRESERVATION AREA

CAMDEN - COUNTY

State Development Guide PLAN

GROWTH AREA
LIMITED GROWTH AREA
AGRICULTURE AREA
CONSERVATION AREA
PINELANDS PROTECTION AREA
PINELANDS PRESERVATION AREA

URBAN AID MUNICIPALITY

SCALE IN MILES

STATE OF NEW JERSEY
DEPARTMENT OF COMMUNITY AFFAIRS
DIVISION OF STATE & REGIONAL PLANNING

## CAPE MAY COUNTY
### State Development Guide Plan
### And Coastal Zone

GROWTH AREA
LIMITED GROWTH AREA
AGRICULTURE AREA
CONSERVATION AREA
PINELANDS PROTECTION AREA
PINELANDS PRESERVATION AREA

C. Z. REGIONAL TYPES

HIGH GROWTH

MODERATE GROWTH

LOW GROWTH

BARRIER ISLAND

SCALE IN MILES

STATE OF NEW JERSEY
DEPARTMENT OF COMMUNITY AFFAIRS
DIVISION OF STATE & REGIONAL PLANNING

5-20

**CUMBERLAND COUNTY**

State Development Guide Plan and Coastal Zone

GROWTH AREA
LIMITED GROWTH AREA
AGRICULTURE AREA
CONSERVATION AREA
PINELANDS PROTECTION AREA
PINELANDS PRESERVATION AREA
URBAN AID MUNICIPALITY

C. Z. REGIONAL TYPES

HIGH GROWTH
MODERATE GROWTH
LOW GROWTH
BARRIER ISLAND

ESSEX - COUNTY

State DEVELOPMENT Guide PLAN

GROWTH AREA
LIMITED GROWTH AREA
AGRICULTURE AREA
CONSERVATION AREA
URBAN AID MUNICIPALITY

STATE OF NEW JERSEY
DEPARTMENT OF COMMUNITY AFFAIRS
DIVISION OF STATE & REGIONAL PLANNING

SCALE IN MILES

GLOUCESTER ~ COUNTY

State Development Guide Plan

## HUDSON · COUNTY
### State Development Guide Plan

GROWTH AREA
LIMITED GROWTH AREA
AGRICULTURE AREA
CONSERVATION AREA
URBAN AID MUNICIPALITY

SCALE IN MILES

0 1 2 3 4 5

STATE OF NEW JERSEY
DEPARTMENT OF COMMUNITY AFFAIRS
DIVISION OF STATE & REGIONAL PLANNING

HUNTERDON - COUNTY

State Development Guide PLAN

MERCER - COUNTY
State Development Guide Plan

MIDDLESEX COUNTY
State Development
Guide Plan And
Coastal Zone

GROWTH AREA
LIMITED GROWTH AREA
AGRICULTURE AREA
CONSERVATION AREA
URBAN AID
MUNICIPALITY

C. Z. REGIONAL TYPES

HIGH GROWTH
MODERATE GROWTH
LOW GROWTH
BARRIER ISLAND

**MONMOUTH COUNTY**
**State Development Guide Plan**
**And Coastal Zone**

GROWTH AREA
LIMITED GROWTH AREA
AGRICULTURE AREA
CONSERVATION AREA
URBAN AID MUNICIPALITY

C. Z. REGIONAL TYPES

HIGH GROWTH

MODERATE GROWTH

LOW GROWTH

BARRIER ISLAND

MORRIS - COUNTY

State Development Guide Plan

- GROWTH AREA
- LIMITED GROWTH AREA
- AGRICULTURE AREA
- CONSERVATION AREA

OCEAN COUNTY

State Development
Guide PLAN And
Coastal ZONE

GROWTH AREA
LIMITED GROWTH AREA
AGRICULTURE AREA
CONSERVATION AREA
PINELANDS PROTECTION AREA
PINELANDS PRESERVATION AREA

C. Z. REGIONAL TYPES

HIGH GROWTH

MODERATE GROWTH

LOW GROWTH

BARRIER ISLAND

**PASSAIC - COUNTY**

State Development Guide Plan

GROWTH AREA
LIMITED GROWTH AREA
AGRICULTURE AREA
CONSERVATION AREA
URBAN AID MUNICIPALITY

SCALE IN MILES

STATE OF NEW JERSEY
DEPARTMENT OF COMMUNITY AFFAIRS
DIVISION OF STATE & REGIONAL PLANNING

SALEM COUNTY
State Development Guide Plan
And Coastal Zone

.GROWTH AREA
LIMITED GROWTH AREA
AGRICULTURE AREA
CONSERVATION AREA

C. Z. REGIONAL TYPES

HIGH GROWTH

MODERATE GROWTH

LOW GROWTH

BARRIER ISLAND

STATE OF NEW JERSEY
DEPARTMENT OF COMMUNITY AFFAIRS
DIVISION OF STATE & REGIONAL PLANNING

SCALE IN MILES

# SOMERSET ~ COUNTY
## State Development Guide Plan

Legend:
- GROWTH AREA
- LIMITED GROWTH AREA
- AGRICULTURE AREA
- CONSERVATION AREA

SCALE IN MILES

STATE OF NEW JERSEY
DEPARTMENT OF COMMUNITY AFFAIRS
DIVISION OF STATE & REGIONAL PLANNING

SUSSEX ~ COUNTY

.State Development
Guide Plan

GROWTH AREA
LIMITED GROWTH AREA
AGRICULTURE AREA
CONSERVATION AREA

UNION COUNTY
State Development Guide Plan

WARREN ~ COUNTY

State Development Guide Plan

GROWTH AREA
LIMITED GROWTH AREA
AGRICULTURE AREA
CONSERVATION AREA
URBAN AID MUNICIPALITY